# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____
                                                              :
SECURITIES AND EXCHANGE COMMISSION,        :
                                                              :
                                                              :        Case 14 Civ. 0645
                                                              :
                          Plaintiff,                      :
                                                              :
              v.                                           :
                                                              :
REVELATION CAPITAL MANAGEMENT LTD.       :
and CHRISTOPHER P.C. KUCHANNY,            :
                          Defendants.                 :
                                                              :
_____



**EXPERT REPORT OF GUY ERB**

# TABLE OF CONTENTS

I.    Introduction and Assignment .................................................................................................... 3

II.   Qualifications of the Witness..................................................................................................... 4

III.  Basis of Opinions....................................................................................................................... 6

IV.   Opinions .................................................................................................................................... 6

V.    Background ............................................................................................................................... 7

   A. Gold and Silver Markets.......................................................................................................... 9

   B. The Market for Central Fund Shares....................................................................................... 9

VI.   A Comparison of "Best Efforts" and "Firm Commitment" Underwritings.......................... 12

   A. Deal Characteristics ............................................................................................................... 12

   B. The Underwriting Process..................................................................................................... 13

   C. Shelf Offerings...................................................................................................................... 15

   D. The Base Shelf Prospectus .................................................................................................... 15

   E. The Prospectus Supplement ................................................................................................... 15

   F. The Underwriting Agreement ................................................................................................. 15

   G. Order Confirmations .............................................................................................................. 16

   H. Underwriter Risks .................................................................................................................. 16

VII.  The Offering ............................................................................................................................ 17

   A. Base Shelf Prospectus .......................................................................................................... 18

   B. Prospectus Supplement .......................................................................................................... 19

   C. Book Building and Pricing ..................................................................................................... 20

   D. The Engagement Letter.......................................................................................................... 22

   E. The Underwriting Agreement ................................................................................................. 22

   F. Order Confirmation ................................................................................................................ 23

   G. Closing and Settlement .......................................................................................................... 23

   H. Underwriter Risks .................................................................................................................. 24

VIII. Assessment of the Defendants' Answer .................................................................................. 24

   A. The Offering:  A "best efforts" or a "firm commitment" underwriting? ............................. 24

   B. The Pricing of the Shares ...................................................................................................... 27

IX.   Opinions .................................................................................................................................. 27

X.    Signature and Right to Modify ................................................................................................ 28

Appendix 1 – Curriculum Vitae of Guy Erb ................................................................................. A-1

Appendix 2 – Testimony and Depositions of Guy Erb (2012 – 2015) .......................................... A-7

Appendix 3 – List of Materials Relied Upon ................................................................................ A-9

Appendix 4 ..................................................................................................................................... A-17

   A. Rule 105: §242.105 – Short selling in connection with a public offering. ........................ A-18

   B. §240.10b-9: Prohibited representations in connection with certain offerings. ................... A-20

   C. §229.501: Forepart of Registration Statement and Outside Front Cover Page of Prospectus. ..... A-21

   D. §230.415: Delayed or continuous offering and sale of securities. ..................................... A-24

E.  FINRA Rule 2232: Customer Confirmations ................................................................................. A-27

F.  NASD Rule 2230: Confirmations .................................................................................................. A-28

G. NYSE Rule 409 ................................................................................................................................ A-29

## I.      Introduction and Assignment

1.   This report is submitted in connection with the above captioned dispute, in which the Securities
     and Exchange Commission ("SEC") alleges that Revelation Capital Management Ltd. ("Revelation
     Capital") and Christopher P.C. Kuchanny ("Kuchanny"), the firm's Chairman, Chief Executive
     Officer, Chief Investment Advisor and sole shareholder, violated Rule 105 of Regulation M [17
     C.F.R. § 242.105] in connection with a follow-on offering of shares of the Central Fund of Canada
     Limited ("Central Fund").[1]

2.   At issue in this matter are purchases made by Revelation Capital in a follow-on offering of
     Central Fund shares on November 10, 2009 (the "Offering").  The Offering was "made by a
     foreign issuer that [was] permitted, under a multijurisdictional disclosure system adopted by the
     United States … in accordance with the disclosure requirements of Canada."[2]  Central Fund
     shares were offered in the United States and in all the Canadian provinces and territories (other
     than Quebec) through CIBC World Markets Inc. ("CIBC") and Credit Suisse Securities (Canada),
     Inc. ("Credit Suisse") (collectively, "the Underwriters").[3]

3.   The SEC alleges that Revelation Capital sold Central Fund shares during the five business days
     prior to the pricing of the Offering shares.[4]  The SEC also alleges that Revelation Capital realized
     a profit of $1,368,243 as a result of the transactions.[5]

4.   Rule 105 states that a person may not purchase shares issued in certain registered offerings if
     they have previously sold short the same securities in the defined restricted period prior to that
     offering; in this matter, the restricted period was five business days prior to the pricing of the
     offering shares (the "restricted period").[6]  Defendants have asserted that Rule 105 does not

---

[1] SEC v. Revelation Capital Management Ltd. et al., Complaint, pp. 1-2.
[2] Central Fund of Canada Limited, Prospectus Supplement, dated November 10, 2009, Cover Page.  (Herein the "Prospectus Supplement, dated November 10, 2009" or the "Prospectus Supplement".)
[3] Prospectus Supplement, Cover Page and p. S-7.
[4] A short sale is the sale of a security not yet owned by the seller in order to make a profit by purchasing the security later at a lower price.  An investor borrows stock certificates for delivery at the time of short sale.  If the seller can buy that stock later at a lower price, a profit results; if the price rises, however, a loss results.  See Barron's, *Dictionary of Finance and Investment Terms*, Seventh Edition, dated June 2006, pp. 635-6.
[5] SEC v. Revelation Capital Management Ltd. et al., Complaint, p. 5.
[6] Rule 105 states, in part, that "In connection with an offering of equity securities for cash pursuant to a registration statement or a notification on Form 1-A (§239.90 of this chapter) or Form 1-E (§239.200 of this chapter) filed under the Securities Act of 1933 ("offered securities"), it shall be unlawful for any person to sell short (as defined in §242.200(a)) the security that is the subject of the offering and purchase the offered securities from an underwriter or broker or dealer participating in the offering if such short sale was effected during the period

apply to the Offering, because, in their view, the Offering was underwritten on a "best efforts" basis, and the Rule does not apply to "best efforts" offerings.[7]

5. The SEC has retained me as an expert in investment banking matters, particularly as regards securities underwriting. Counsel for the SEC has asked me to opine on the assertion by Revelation Capital and Kuchanny ("Defendants") that the underwriting of Central Fund shares in the Offering was on a "best efforts" basis, not as a "firm commitment" underwriting.

## II. Qualifications of the Witness

6. I am a Managing Director at Berkeley Research Group, LLC ("BRG"). Appendix 1 to this report contains my curriculum vitae. I have more than 25 years of experience in international finance, including more than 12 years at an NASD-registered broker-dealer and a major investment bank. During my career, I have worked on the underwriting and subsequent trading of numerous equity and debt securities, mergers and acquisitions, and private equity transactions. With regard to securities underwriting, my experience includes the due diligence performed by investment banks prior to debt and equity offerings, presentations of information on the issuing entity to investors, and the pricing of the securities to be included in underwritten offerings.

7. At BRG, and previously at other expert services firms, I have worked on a number of matters related to securities underwriting, including due diligence performed prior to debt and equity offerings, valuation of issuers, and standards and practices of investment banks and other financial institutions. In my expert services practice, I have also analyzed a variety of financial services issues, including markets for private equity financing, exit financing for companies emerging from bankruptcy, mergers and acquisitions, fairness opinions, international payments systems, valuations and damages, and the international arbitration of investment banking and real estate disputes. As an expert in financial services, I follow closely commentary on and analysis of securities underwriting issues.

8. In 1987, I co-founded Lafayette Capital Corporation, a broker-dealer registered by the National Association of Securities Dealers ("NASD"). I worked there as a Managing Director until late 1990. Lafayette Capital provided financial advisory services to investment banks, corporations

---

("Rule 105 restricted period") that is the shorter of the period: (1) Beginning five business days before the pricing of the offered securities and ending with such pricing; or (2) Beginning with the initial filing of such registration statement or notification on Form 1-A or Form 1-E and ending with the pricing. See Appendix 4.A. for the complete text of the rule.

[7] Defendants' Answer to the Complaint, August 8, 2014, p. 4.

and governments, including advisory services and due diligence related to mergers and acquisitions.

9. Beginning in December 1990, while employed by Goldman Sachs in New York, I participated in the underwriting of securities for debt and equity issuance by companies in telecommunications, media, entertainment, bottling, retail, distribution, and real estate.  In addition, I participated in the due diligence for debt issuances by state entities and private companies, including shelf offerings.  In 1994, I began serving as Chief Operating Officer of Goldman Sachs Mexico, becoming Vice-Chairman of that broker-dealer in 1997.  During that time, I worked on a number of investment banking matters, including equity and debt issues, project financing, mergers and acquisitions, public and private debt and direct equity investments in Mexican companies.  As Chief Operating Officer, I was also responsible for operations, regulations, assessment of market developments, and reporting to the Mexican Banking Commission.

10. From 1987 through 1999, I was qualified by the National Association of Securities Dealers ("NASD") and, while at Goldman Sachs, by the New York Stock Exchange ("NYSE") as a General Securities Representative (Series 7) and General Securities Principal (Series 24).  While working in Mexico, I held a comparable certification from the Mexican Banking Commission.

11. From 2000 to 2005, I was the Chief Executive Officer of RapidMoney Corporation, a money service business.  In 2005, I joined LECG, an expert services firm.  I continued my career as an expert in financial services at FTI Consulting, and joined BRG in 2012.

12. As a member of the faculty of the Levin Graduate Institute, State University of New York, from 2007 to 2009, I analyzed and lectured on securities underwriting and other international financial issues.

13. During my career, I have served as a member of the board of directors for private companies and public institutions.  I was appointed by the President of the United States and confirmed by the United States Senate to the board of the Inter-American Development Foundation, a U. S. government-backed, nonprofit organization that provides development assistance and educational programs in Latin America.  From 1996 to 1997, I served on the board of the Mexican Stock Exchange, which is responsible for the oversight of the policies and operations of the Mexican Stock Exchange and of registered Mexican broker-dealers.  The board's discussions often included comparing the practices of the United States securities industry to those of Mexico, including for Mexican companies that undertook initial public offerings ("IPOs") on the

NYSE.  I was a member of the board of *Goldman Sachs México Casa de Bolsa, SA de CV*, from 1994 to 1997, a board member of RapidMoney Corporation, the Advisory Board of Pliana Holdings, and served as an alternate member of the board of Pepsi-Gemex, Mexico City (NYSE listed).

14. In 1963, I earned a Master of Sciences degree in Economics from the London School of Economics and Political Science.  In 1961, I earned a Bachelor of Arts degree from the University of California, Berkeley, with honors in Economics.  I also hold a Diploma from the *Universidad Complutense de Madrid*, Spain, which I received after completing an academic year as an undergraduate in Spain under the auspices of New York University.

15. A list of matters in connection with which I have testified or been deposed over the last four years is attached hereto as Appendix 2.

16. Employees of BRG have assisted me in this assignment, working under my direction and supervision.  My billing rate for time spent on this matter is $500 per hour.  My compensation is not contingent on the outcome of this case.


## III.    Basis of Opinions

17. My opinions are based on my professional training and experience, my review and analysis of independent research and other public material, and the information produced in the course of this matter.  Appendix 3 contains the list of documents upon which I relied in the production of this report.


## IV.    Opinions

18. On the basis of my investment banking experience with securities underwriting, my training in and knowledge of the standards and practices of the industry, my understanding of the regulatory framework for the Offering, the plain language of the Offering documents, and my review of the material produced in this matter, it is my opinion that the underwriting of the Offering was in all respects a firm commitment underwriting.

19. The Underwriters and the Central Fund set the price of the shares in the Offering with reference to the net asset value per share ("NAV") calculated from the prices at which the Central Fund purchased gold and silver bullion on November 10, 2009.   That fact had no bearing on my opinion that the Offering was underwritten on a firm commitment basis.

20. My consideration of the issues in this matter is ongoing, and I may review reports, testimony and exhibits arising from depositions or at trial.  Accordingly, my opinions are subject to revision based on the work I may conduct or supervise in the future, especially in response to arguments made or evidence produced by the Defendants and/or Defendants' experts.  I respectfully reserve the right to supplement my opinions based on any such additional work and to provide additional materials that summarize, support or explain my opinions.

## V.    Background

21. The Central Fund is a closed-end fund.[8]  For open-end funds, new shares are issued by the fund to investors upon purchase.  These purchases are permitted to occur only once per day, at market close, and are determined by a fund's NAV.[9]  For closed-end funds however, the number of shares is fixed, and the trading of shares occurs among investors.[10]  That is, no new shares are issued as a result of a purchase of shares by one investor from another.  Closed-end funds may conduct follow-on public offerings of new shares.

22. Shares of a closed-end fund may trade at a premium or a discount to NAV:  "The closed-end fund puzzle is the empirical finding that closed-end fund shares typically sell at prices not equal to the per share market value of assets the fund holds."[11]  As a result, investors in closed-end funds are exposed to risks arising from fluctuations in the discount or premium to NAV.

---

[8] http://www.bloomberg.com/quote/CEF:US.  Accessed June 22, 2015.  See also *Wall Street Journal,* "Market Data: Closed-End Funds: Specialized Equity Funds," dated June 26, 2015, *available at* http://www.wsj.com/mdc/public/page/2_3040-CEF35.html.  Accessed June 29, 2015.  It is my understanding that the Central Fund is a Canadian investment holding company and is not registered under the Investment Company Act of 1940.

[9] *Wall Street Journal,* "How to Invest in a Closed-End Fund," *available at* http://guides.wsj.com/personal-finance/investing/how-to-invest-in-a-closed-end-fund/.  Accessed July 9, 2015.  The NAV of an investment company is its total assets minus its total liabilities.  See http://www.sec.gov/answers/nav.htm.  Accessed June 15, 2015.

[10] Charles M. C. Lee, Andrei Shleifer, and Richard H. Thaler, "Investor Sentiment and the Closed-End Fund Puzzle," *The Journal of Finance*, Vol. XLVI, No. 1, March 1991, p. 75.  (Herein "LST".)  "Unlike an open-end fund, however, a closed-end fund issues a fixed number of shares that are traded on the stock market."

[11] LST, p. 75.



Figure 1

Gold Price (Q1 2005 – Q4 2009)
London Morning Fix (USD / Troy Ounce)

*Dates indicate Central Fund filings with the SEC of Short Form Prospectuses in April and July of 2006 and Prospectus Supplements for shelf take downs thereafter.

Source: Deutsche Bundesbank Data Repository (data pulled as of May 20, 2015 via Quandl).

23.  Central Fund shares are traded on the NYSE MKT and the Toronto Stock Exchange.[12]  The Central Fund holds gold and silver bullion, and its share price varies according to market supply and demand and assessments by investors regarding the outlook for gold and silver prices.[13]  In this section of my report, I discuss precious metals prices and an important aspect of closed-end funds and of Central Fund shares in particular, the discount or premium of its share price relative to the NAV of the Central Fund.

## A.     Gold and Silver Markets

24.  The prices of gold and silver vary, as do all prices, according to supply and demand.  Physical supplies of gold and silver come from the extraction of these precious metals from new and existing mines worldwide.  Typically, demand for these precious metals—over and above use by industry or for jewelry—is driven by investors looking for a so-called "store of value," an asset that will hold its value despite market volatility or inflation.

25.  At the beginning of 2005, after a period of accommodative monetary policy in the United States, gold stood at just over $400 per troy ounce.  (See Figure 1.)  By the end of 2007, after the first signs of what would become the global financial crisis had appeared, gold prices had nearly doubled to $800 per troy ounce.  Gold prices fluctuated in 2008, but generally remained above $800 per troy ounce.  Throughout 2009, the year of the transaction in question, gold prices were trending upward, from about $870 per troy ounce to nearly $1,100 per troy ounce on November 10, 2009, a 26.4% increase.

## B.     The Market for Central Fund Shares

26.  Gold prices had risen for nearly four years prior to the Central Fund's follow-on offering on November 10, 2009.  Consequently, at the time of the Offering, market expectations were that the price of gold would continue to rise.[14]  (See Figure 2 for a comparison of the daily spread

---

[12] The NYSE MKT was formerly known as the NYSE AMEX.  See *NYSE*, "NYSE Amex LLC to be renamed NYSE MKT LLC," dated May 10, 2012, *available at* http://www1.nyse.com/press/1336646911531.html.  Accessed July 1, 2015.
[13] http://www.bloomberg.com/quote/CEF:US.  Accessed June 22, 2015.
[14] The market's expectations of a rising gold price continued through Q2 2011.  See *Mergent Industry Reports*, "Precious Metals - North America," Mergent, Inc., dated January 1, 2011.  See also *The United States Geological Survey,* "2010 Minerals Yearbook: Gold [Advanced Release]," dated May 2012, pp. 31.1-31.2, 31.12, *available at* http://minerals.usgs.gov/minerals/pubs/commodity/gold/myb1-2010-gold.pdf.  Accessed June 19, 2015; *The United States Geological Survey,* "2011 Minerals Yearbook: Gold [Advanced Release]," dated May 2013, pp. 31.6, 31.11, *available at* http://minerals.usgs.gov/minerals/pubs/commodity/gold/myb1-2011-gold.pdf.  Accessed June 19, 2015; *CPM Group,* "CPM Group Releases Gold Yearbook 2012," Press Release, dated March 30, 2012, p. 1-2, *available at* http://www.cpmgroup.com/sites/default/files/field_press_case_pdf_download/Gold_Yearbook_Press_Release_M Marc_2012.pdf.  Accessed June 22, 2015.  The Central Fund's stock price (ticker "CEF") generally traded at a premium to its NAV from Q1 2006 through the date of the Offering, November 10, 2009.  As of September 4, 2009,

between the NAV of the Central Fund and the Central Fund share price from Q1 2005 to Q4 2009.)  Given the favorable market outlook for gold and silver, beginning in Q2 2006, the Central Fund had issued shares in ten follow-on offerings prior to the date of the Offering, November 10, 2009.[15]  The Central Fund, therefore, was a seasoned issuer of securities.

27. It is generally the case that in follow-on offerings by closed-end funds, the shares are priced at a discount to the market price.[16]  In the Central Fund's Offering, the price of a share was at a 4.17% discount to the closing price on November 9th and at a premium of 4.87% to the NAV on November 9th, which was $12.93.[17]  At the time of the Offering, as I have shown above, gold prices were rising and the Central Fund shares were trading at a premium to its NAV.  This trading pattern held during the restricted period and, indeed, for the ten days prior to the Offering.  (See Figure 2.)

28. The rising gold and silver prices during Q2 2006—2009 and investor expectations that gold and silver prices would continue to rise created an opportunity for traders to engage in virtually risk free trades by short selling Central Fund shares prior to the Offering and closing out those short sales by purchasing new shares at a discount to the market price.

---

the assets of the Central Fund were invested in gold bullion (53.8%), silver bullion (43.4%) and cash and other working capital (2.8%).  See Prospectus Supplement, dated November 10, 2009, p. 20.  Silver prices also rose in the run-up to the Offering, rising from about $11 per ounce in January 2009 to over $17 per ounce in November 2009. See silverprice.org.

[15] The Central Fund filed two short form prospectuses with the SEC, dated April 19, 2006 and July 28, 2006. Beginning in Q3 2006, the Central Fund filed Base Shelf Prospectuses with the SEC dated September 29, 2006, March 31, 2008, and September 8, 2009, and Prospectus Supplements dated December 1, 2006, September 12, 2007, February 27, 2008, July 15, 2008, September 23, 2008, January 27, 2009, April 8, 2009, and August 6, 2009. See also Deposition of Scott Smith, dated June 23, 2015, p. 21.  Base Shelf Prospectuses and Prospectus Supplements are discussed below in Section VII.

[16] Shane A. Corwin, "The Determinants of Underpricing for Seasoned Equity Offers," *The Journal of Finance*, Vol. LVIII, No. 5, October 2003, p. 2254.

[17] Calculations of the premiums and discounts related to the Offering use the unadjusted Central Fund closing price and unadjusted Central Fund NAV, as is consistent with the calculation of the premium on the NAV in RCM 0002 – RCM 0003.  The Central Fund closing price on November 9, 2009 was $14.15.  (See Bloomberg Central Fund price data).  The price of a Central Fund share in the follow-on offering was $13.56.  (See the Prospectus Supplement, dated November 10, 2009.)  Calculation:  13.56 / 14.15 = 0.9583038869.  (1 – 0.9583038869) * 100 = 4.16961131%.  The Central Fund NAV on November 9, 2009 was $12.93 (See Bloomberg Central Fund price data). Calculation: 13.56 / 12.93 = 1.048723898.  (1.048723898 – 1 ) * 100 = 4.8723898%.



**Figure 2**

**Central Fund of Canada (CEF)**
**Adjusted* CEF Price v. NAV (Q1 2005 - Q4 2009)**

— Closing Price
— NAV

*The adjusted CEF closing price includes dividends, offerings, stock splits and other corporate factors.
** Dates indicate Central Fund filings with the SEC of Short Form Prospectuses in April and July of 2006 and Prospectus Supplements for shelf take downs thereafter.

Source: Bloomberg. CEF data pulled as of May 20, 2015.

## VI.    A Comparison of "Best Efforts" and "Firm Commitment" Underwritings

## A.    Deal Characteristics

29.  At issue in this matter is whether the underwriting of Central Fund shares was undertaken on a "best efforts" basis, or as a "firm commitment" underwriting.

30.  A best efforts offering is essentially a placement agreement between an issuer and a broker-dealer that acts as an agent:

> There are two types of fixed-price offerings: (a) firm commitment (or underwritten) and (b) best efforts (non-underwritten).  In the first case (the most common case) the investment bank underwrites the offer, thus guaranteeing the full proceeds to the issuer, regardless of the actual demand.  In the second case, the bank just puts its best effort to sell the shares, with no underwriting.  Often a minimum offer size is set and if at closing there is no sufficient demand, the offer is pulled.  It is evident that the 'firm commitment' is much riskier for the investment bank in terms of underwriting risk.[18]

Types of best efforts offerings include "any-or-all," "all-or-none," and "minimum-maximum." An "any-or-all" transaction will close regardless of how many securities are sold or the amount of proceeds.  In an "all-or-none" best-efforts offering, all of the securities offered must be sold in order for the transaction to close.  In a "minimum-maximum" transaction, the issuer will specify a minimum dollar amount that must be raised in order for the transaction to close as well as the maximum offering size.  Thus, the terms of the offering require that a minimum number of shares are to be sold on an all-or-none basis, with the maximum defined as a greater number of shares at the specified price per share.[19]  During the selling period, the selling agent commits to deposit investor funds in an escrow account.  The minimum-maximum agreement may specify that the escrow will not be broken until the minimum number of shares is sold and a specified amount of investor funds deposited in the account.  If the minimum number of shares cannot be sold during the selling period, the offering is cancelled and the purchasers' money refunded.[20]  None of these features are present in a firm commitment underwriting, in which the underwriter has agreed to purchase the entire offering from the issuer.  Selling agents in a best efforts offering bear no responsibility for unsold shares.

---

[18] Giuliano Iannotta, *Investment Banking: A Guide to Underwriting and Advisory Services*, Springer-Verlag, 2010, p. 52.
[19] Robert B. Robbins, "Structuring Best Efforts Offerings and Closings Under Rule 10b-9," *The American Law Institute Continuing Legal Education: Regulations D Offerings and Private Placements,* March 14-16, 2013, p. 3.
[20] SEC Administrative Proceeding, File No. 3-6346, December 21, 1984, p. 3, *available at* https://www.sec.gov/litigation/aljdec/1984/id19841220rht.pdf.  Accessed June 12, 2015.

31. The following excerpt from the prospectus of a best efforts agreement between an issuer and the underwriters of an offering containing both firm commitment and best efforts components confirms that selling agents (described as underwriters in the citation below) bear no responsibility for unsold shares in a best efforts deal:

> Pursuant to the Agency Agreement, we have agreed to sell and the Underwriters have agreed to use their best efforts to arrange for the purchase of up to 2,281,844 Subordinate Voting Shares on September 11, 2009, or on such other date as may be agreed upon, subject to the terms and conditions contained in the Agency Agreement. The obligations of the Underwriters under the Agency Agreement may be terminated upon the occurrence of certain stated events. While the Underwriters **have agreed to use their best efforts to sell the Subordinate Voting Shares being offered on a "best efforts" basis, the Underwriters will not be obligated to purchase any of such Subordinate Voting Shares which are not sold.** The Agency Agreement provides that the Underwriters will be paid a fee per share sold on a "best efforts" basis for services rendered in connection with the "best efforts" offering, which fee will be paid out of the proceeds of the offering.[21] (Emphasis added.)

## B. The Underwriting Process

32. In a firm commitment securities underwriting, the underwriters purchase the entire stock issue outright from the issuing company and the underwriters, not the issuer, bear the principal risk of selling the shares at the offering price.[22] An underwriter is a principal in a firm commitment offering, not an agent, since the Underwriting Agreement includes a purchase commitment by the underwriters. Both the issuer of the shares and investors have reasons to focus on the nature of an underwriting:

> The terms of the underwriting are material to potential investors for a number of reasons, including the fact that…the terms of [a firm commitment] underwriting assure that all shares being offered by the issuer will be purchased and therefore the issuer will raise all of the capital set forth in the prospectus to fund its future operations.[23]

33. The regulations and rules that provide the framework for the underwriting of securities offerings establish the guidelines for the distinction of firm commitment from best efforts underwritings.[24]

    a. SEC Rule 10b-9, which regulates the representations that may be made to potential investors in connection with best efforts offerings, draws a clear distinction between

---

[21] Fairfax Financial Holdings Limited, Prospectus Supplement, dated September 8, 2009, p. S-15.
[22] Barron's, *Dictionary of Finance and Investment Terms*, Seventh Edition, dated June 2006, p. 255.
[23] See *SEC v. Prousalis et al.*, US District Court for the Southern District of New York, 04-CV-00081, January 2004, paragraph 21, *available at* http://www.sec.gov/litigation/complaints/comp18533.htm. Accessed June 12, 2015.
[24] See Appendix 4 for the regulations cited in this and other sections.

contingent best efforts underwritings and firm commitment underwritings.[25]  The rule specifically does not apply to sales of securities in which "the seller has a firm commitment from underwriters … for the purchase of all the securities being offered."[26]

b.  SEC Regulation § 229.501, which governs the forepart of registration statements and prospectuses' outside front cover pages, stipulates that "if the offering is ***not*** made on a firm commitment basis," a "brief description of the underwriting arrangements" must be included.[27]  (Emphasis added.)  This regulation's examples of other "underwriting arrangements" include a "best efforts offering" and a "best efforts, minimum-maximum offering."[28]

34.  Although the preparations for an IPO may involve a lengthy, detailed investigation of an issuer, the process is necessarily compressed for certain types of follow-on offerings.  Market developments and regulatory changes have facilitated expedited offerings that allow issuers and underwriters to employ procedures that permit the rapid offering of securities where the issuer has previously filed a registration statement.[29]

35.  In the early 1970s, the SEC began permitting reporting companies to incorporate by reference the company's quarterly and annual reports and other information filed with the SEC into new registration forms and statements for public offerings.[30]  Within a few years of that initiative, the SEC began softening former limitations on "shelf" securities registrations.[31]  Expedited or "shelf" offerings allow issuers and underwriters to undertake rapid offerings of securities where the issuer has previously filed a registration statement.

---

[25] 17 CFR 240.10b-9, "Prohibited Representations in Connection with Certain Underwritings," *available at* http://www.gpo.gov/fdsys/pkg/CFR-2011-title17-vol3/pdf/CFR-2011-title17-vol3-sec240-10b-9.pdf.  Accessed June 19, 2015 ("17 CFR 240.10b-9").  See Appendix 4.B.

[26] 17 CFR 240.10b-9.

[27] 17 CFR 229.501, SEC, "Forepart of Registration Statement and Outside Front Cover Page of Prospectus," para. (b)(8), *available at* http://www.gpo.gov/fdsys/pkg/CFR-2011-title17-vol2/pdf/CFR-2011-title17-vol2-sec229-501.pdf.  Accessed June 19, 2015.

[28] See Appendix 4.C.

[29] "The key to the process is to provide for maximum flexibility and the ability to accomplish a takedown in a matter of hours." Charles J. Johnson Jr. and Joseph McLaughlin. *Corporate Finance and the Securities Laws* ("Johnson and McLaughlin"), Fourth Edition, Aspen Publishers, dated September 2006, p. 8:50.

[30] Robert J. Haft and Arthur F. Haft ("Haft and Haft"), *Due Diligence - Periodic Reports and Securities Offerings*, 2005-2006 Edition, § 5:2, "Task force report on sellers' due diligence and similar defenses under the federal securities laws - A.B.A. Committee on federal regulation of securities," Thomson/West, dated 2005.

[31] Haft and Haft, § 5:2.

## C.      Shelf Offerings

36.  In expedited offerings, underwriters typically rely on their continuous due diligence to ensure that they have adhered to due diligence standards.  The knowledge of the issuer gained from frequent offerings enables underwriters to execute shelf takedowns expeditiously.

## D.      The Base Shelf Prospectus

37.  The starting point for a company that wishes to issue shelf offerings when market conditions are propitious is the preparation of a base shelf prospectus.  This initial registration statement, filed with the SEC, announces the company's intentions to issue shares from time to time, that is, to "take down" multiple share offerings from the total amount of funding specified as available for the placement of shares in the market.  The base shelf prospectus describes the company and incorporates by reference filings by the company with the SEC, for example, its quarterly and annual reports.  A base shelf prospectus is valid for up to three years.[32]

## E.      The Prospectus Supplement

38.  The Prospectus Supplement provides information on a specific take down from the shelf, including the underwriter(s) of the transaction, number of shares to be issued, and the price of each share.  The issuer's recent filings with the SEC are incorporated by reference in the prospectus supplement.  The base shelf prospectus and the prospectus supplement constitute an effective registration statement for the issuance of shares.[33]

## F.      The Underwriting Agreement

39.  The underwriters of the transaction defined in a prospectus supplement sign an agreement with the issuer that defines the nature of the transaction, for example, the share price, whether shares will be underwritten on a firm commitment basis, and whether an unspecified number of shares will be issued "at the market," in response to prevailing demand.  If the underwriting is on a firm commitment basis, the underwriters offer to purchase the shares from the company, which, in turn, agrees to sell the shares to the underwriters.[34]  The company also agrees to pay a fee to the underwriters at the closing of the transaction when the underwriters deliver the proceeds of the offering to the issuer.

---

[32] 17 CFR 230.415, "Delayed or Continuous Offering and Sale of Securities," para. (a)(5), *available at* http://www.gpo.gov/fdsys/pkg/CFR-2010-title17-vol2/pdf/CFR-2010-title17-vol2-sec230-415.pdf.  Accessed June 19, 2015.  See Appendix 4.D.

[33] Securities Exchange Act of 1934, as amended, Section 12.  See also Deposition of Scott Smith, dated June 23, 2015, p. 27.

[34] "The underwriting agreement provides that the underwriters are obligated to purchase all the Equity Units in the offering if any are purchased…"  See RCM 0153 – RCM 0196 at RCM 0163.

## G.    Order Confirmations

40.  Underwriters are obligated to confirm transactions with investors, including the share price and

the number of shares purchased by each investor.[35]  Moreover, the Financial Industry

Regulatory Authority ("FINRA") stipulates in FINRA Rule 2232, "Customer Confirmations," that:

> A member [broker-dealer] shall, at or before the completion of any transaction in any
> security effected for or with an account of a customer, give or send to such customer
> written notification ("confirmation") ...[36]

The FINRA rule replaced NASD Rule 2230, which was in force at the time of the Offering.  The

NASD rule stated that:

> A member at or before the completion of each transaction with a customer shall give or
> send to such customer written notification disclosing ... the date and time when such
> transaction took place or the fact that such information will be furnished upon the
> request of such customer ...[37]

## H.    Underwriter Risks

41.  In a firm commitment underwriting, the underwriters, having agreed to purchase the shares,

face the risk of loss if they cannot place the shares in the market at the specified price.  This risk

was well illustrated by the failure in 1987 of an underwriting for British Petroleum ("BP").

Weeks before the date of the offering, the underwriters had agreed to guarantee a specific price

for BP shares and had marketed the shares at that price.  On Monday, October 19, 1987, a day

that became known as "Black Monday," the US and UK stock markets crashed, causing the

market price of BP to fall sharply.

---

[35] See SEA Rule 10b-10, issued pursuant to the Securities Exchange Act of 1934:  SEC, "Final Rule, Confirmation
Requirements for Transactions of Security Futures Products Effected in Futures Accounts," Section II, Background,
*available at* https://www.sec.gov/rules/final/34-46471.htm#VA.  Accessed June 20, 2015.

[36] *FINRA Manual*, 2232.  This rule replaces a similar rule of the National Association of Securities Dealers (NASD
Rule 2230), which was in place in 2009.  On October 21, 2010, the SEC approved FINRA Rule 2232 ("Customer
Confirmations") and the deletion of NASD Rule 2230 and NYSE Rule 409(f) ("Statements of Accounts to
Customers").  The effective date of the consolidated rule was June 17, 2011.  See FINRA Regulatory Notice 10-62,
"SEC Approves New Consolidated FINRA Rule," dated December 2010, *available at*
https://www.finra.org/sites/default/files/NoticeDocument/p122639.pdf.  Accessed June 24, 2015.  In December
2007, FINRA had amended NYSE Rule 409(f).  FINRA Regulatory Notice 07-65, "Amendments to NYSE Rule 409(f),"
dated December 2007, *available at* https://www.finra.org/sites/default/files/NoticeDocument/p037670.pdf.
Accessed June 20, 2015.  See Appendix 4.E-4.G for the text of all three rules.

[37] *NASD Manual*, Rule 2230, "Confirmations," dated March 2006, pp. 4149-4150.  See Appendix 4.F.

42. Nonetheless, the sale of BP shares went forward, which led to substantial losses by the underwriters, who had fulfilled their commitment to purchase the shares at the previously agreed price.[38]

43. The experience gained from the BP offering gave impetus to the practice of building a book of orders for offered shares by soliciting investor indications of their interest in purchasing the shares within an indicative price range.  Such book building became a standard feature of firm commitment underwritings.  Generally, the underwriters aim for an oversubscription of interests in purchasing shares and then allocate the shares among the investors.  Once a deal is priced, the underwriter executes the trades.  However, until the closing of a transaction, the underwriters bear the risk that some of the trades may not be honored by investors.

44. To summarize, there are two types of firm commitment underwriting:  one in which the price is set before the underwriters go to market with the transaction and the other where the deal is "pre-marketed" before the underwriters purchase the shares.  Both have been described as "bought deals," since the distinguishing feature of the two types of firm commitment underwriting is the moment at which the shares are purchased, not whether the underwriters will purchase the shares.[39]  As shown above, selling agents in a best efforts offering make "no commitment to purchase all or any part of the shares."[40]

## VII.   The Offering

45. After an exchange of emails between J. Stefan Spicer of the Central Fund ("Spicer") and Scott Smith of CIBC ("Smith"), in early November, 2009, the Central Fund informed CIBC, the lead underwriter of the shelf take down, of its intention to issue additional shares.[41]  Thereafter, the

---

[38] *International Financing Review*, Special Report, "1987: £7.2bn BP privatisation, the deal that defied Black Monday," Thomson Reuters, dated September 2013, p. 14, *available at* http://edition.pagesuite-professional.co.uk/Launch.aspx?EID=b2eb69c3-7774-4d35-a0ff-c70b03f7288f.  Accessed June 19, 2015; *Reuters*, "Goldman, Sachs Could Lose $112 Million:  US Underwriters Worse Off Than British in BP Flop," November 2, 1987, *available at* http://articles.latimes.com/1987-11-02/business/fi-12078_1_bp-shares.  Accessed May 20, 2015; Ray Mosely, "BP Sale To Proceed, With A Cushion," *Chicago Tribune*, October 30, 1987, *available at* http://articles.chicagotribune.com/1987-10-30/business/8703210845_1_underwriters-buyback-plan-bp.  Accessed June 12, 2015.

[39] The *Dictionary of Financial Terms* has two entries with comparable language, "Bought Deal" and "Firm Commitment" for "Securities Underwriting."  Barron's, *Dictionary of Finance and Investment Terms*, Seventh Edition, dated June 2006, pp. 78 and 255.

[40] See paragraph 31 above and Deposition of Scott Smith, dated June 23, 2015, pp. 31 and 111 for the distinction between "underwritten" and "agency" deals.

[41] The gold market was favorable for a follow-on offering.  See Deposition of Scott Smith, dated June 23, 2015, p. 106.  See also Exhibit D6 in the exhibits prepared for the depositions of J. Stefan Spicer, Scott Smith, David Arthur

preparations for the Offering conformed to the standards and practices of the industry with regard to firm commitment shelf offerings, that is, the filing of a Registration Statement, due diligence, book building, signature of an Underwriting Agreement, pricing, the execution of trades, and closing.

## A.    Base Shelf Prospectus

46.  The Company undertook the Offering under the authority of the Base Shelf Prospectus dated September 8, 2009 (the "Base Shelf Prospectus") and filed with the SEC, which announced the Central Fund plan to issue up to U.S. $1,000,000,000 of Class A non-voting, fully participating shares.  The Central Fund's base shelf prospectuses were valid for three years.[42]  The 2009 Base Shelf Prospectus was the third that the Central Fund had issued since 2006, which indicates that the Central Fund was a frequent, seasoned issuer of its shares.  All Base Shelf Prospectuses described herein designated CIBC as Central Fund's underwriter and CIBC Mellon Trust and Mellon Investor Services LLC ("CIBC Mellon") as registrars and transfer agents.[43]  In connection with the Offering, the Central Fund issued a press release announcing its plan to offer Class A shares under the base shelf prospectus.[44]

47.  As was the case in the previous base shelf prospectuses, the Base Shelf Prospectus authorized the issuance of shares on a firm commitment basis.  To illustrate, the document states that:

> The Company may sell the Class A Shares to or through underwriters or dealers purchasing as ***principals*** to one or more purchasers directly pursuant to applicable statutory exemptions, or through agents designated from time to time by the Company. (Emphasis added.)[45]

48.  Furthermore, the Base Shelf Prospectus states that, if an underwriting is to be on a firm commitment basis, the Central Fund's "Class A shares will be ***acquired*** by the underwriters for their own account…"  And, further on, that "… the underwriters will be obligated to ***purchase*** all

---

Scott, Fran Daly, Christopher Voutsinas, and Christopher Kuchanny (Common Deposition Exhibits); Deposition of David Arthur Scott, dated June 24, 2015, pp. 17, 32, 54; Deposition of J. Stefan Spicer, dated June 22, 2015, pp. 23, 32, 38-39.

[42] 17 CFR 230.415, "Delayed or Continuous Offering and Sale of Securities," para.  (a)(5), *available at* http://www.gpo.gov/fdsys/pkg/CFR-2010-title17-vol2/pdf/CFR-2010-title17-vol2-sec230-415.pdf.  Accessed June 19, 2015.  See Appendix 4.D.

[43] Base Shelf Prospectus, pp. 6 and 23. See earlier Base Shelf Prospectuses in Footnote 15.  See also Deposition of Scott Smith, dated June 23, 2015, p. 21-22, 100; Deposition of J. Stefan Spicer, dated June 22, 2015, p. 34; Deposition of Fran Daly, dated June 25, 2015, p. 15; and Deposition of Christopher Voutsinas, dated June 25, 2015, pp. 9-10.

[44] RCM 0001 (Central Fund, Press Release, November 9, 2009).  See also Deposition of Scott Smith, dated June 23, 2015, p. 44.  "The moment that press release was issued, the sales desk at CIBC would commence soliciting orders for that transaction."

[45] Base Shelf Prospectus, p. 1.

of the Class A shares offered by the Prospectus Supplement if **any** of such Class A Shares are purchased." (Emphasis added.)[46]

49. The statements above clearly show that the subsequent shelf take downs were to be on a firm commitment basis.  Moreover, the Base Shelf Prospectus, in conformity with SEC Regulation 229.501, did not include any description of other "underwriting arrangements."[47]

50. The Base Shelf Prospectus does make allowance for sales of Central Fund shares "through agents…from time to time." The terms of such sales are to "be set forth in a Prospectus Supplement" and, "Unless otherwise indicated in the Prospectus Supplement, any agent would be acting on a best efforts basis for the period of its appointment."[48]  Notwithstanding this general provision in the Base Shelf Prospectus, the Prospectus Supplement for the Offering did not include the designation of any such sales agents by the Central Fund.

## B.     Prospectus Supplement

51. The Prospectus Supplement, dated November 10, 2009, announced that the Central Fund would issue 16,975,000 Class A shares at a price of U.S. $13.56 per share and that the transaction would take down shares from the Base Shelf Prospectus dated September 8, 2009.

The Prospectus Supplement was the ninth prepared by the Central Fund and CIBC since 2006. As had all the earlier Prospectus Supplements described herein, the Prospectus Supplement for the Offering established that CIBC was to be the lead underwriter, joined, in this instance, by Credit Suisse, and incorporated by reference information available about the company in recent SEC filings.  Since Q1 2005, all the offerings of Central Fund shares had been firm commitment underwritings.[49]

52. The Prospectus Supplement confirmed that the underwriting would be on a firm commitment basis, stating that:

> The Underwriters as **principals**, conditionally offer the Class A Shares, subject to prior sale, if, as and when issued by the Company and accepted by the Underwriters in accordance with the conditions contained in the Underwriting Agreement … and subject to the approval of certain legal matters on behalf of the Company by Fraser Milner

---

[46] Base Shelf Prospectus, p. 9.
[47] Regulation CFR 229.501, SEC, "Forepart of Registration Statement and Outside Front Cover Page of Prospectus," para. (b)(8), *available at* http://www.gpo.gov/fdsys/pkg/CFR-2011-title17-vol2/pdf/CFR-2011-title17-vol2-sec229-501.pdf.  Accessed June 19, 2015.  See Appendix 4.C.
[48] Base Shelf Prospectus, p. 9.
[49] Prospectuses and Prospectus Supplements described herein. See also Deposition of Scott Smith, dated June 23, 2015, p. 100.

Casgram LLP and Dorsey & Whitney LLP and on behalf of the Underwriters by Cassels Brock and Blackwell LLP and Shearman and Sterling LLP.  (Emphasis added.)[50]

53. The Prospectus Supplement also states that:

Pursuant to the Underwriting Agreement, the Company has agreed **to issue and sell**, and the Underwriters have severally agreed **to purchase** … 16,975,000 Class A shares at a price of U.S. $13.56 per Class A Share for an aggregate price of U.S. $230,181,000, payable in cash to the Company against delivery of a certificate or certificates representing such Class A shares.[51]  (Emphasis added.)

And that, "The Underwriters … are obligated to take up and pay for all of the securities if **any** of the securities are purchased under the Underwriting Agreement."[52]  (Emphasis added.)  Due diligence for this expedited offering had been completed and the necessary legal and accounting documentation prepared before the issuance of the Prospectus Supplement.[53]

54. The Central Fund announced the price in a press release dated November 10, 2009.[54]  The Central Fund announced in the same press release that the Underwriters were "granted the right to increase the size of the offering … by up to an additional 1,475,000 Class A Shares … at any point prior to 4:00 pm (EST) on November 10, 2009."[55]

## C.   Book Building and Pricing

55. Book building by the sales desk involves solicitation of indications of interest in the deal from:

… existing shareholders, past participants, and potential new investors [in the] offering, by letting them know that the transaction is out there and by reiterating when they need to put their orders in the book.[56]

56. The exchange of emails between Kuchanny and Smith on November 9, 2009 and the morning of November 10th illustrates the negotiations over pricing that built the book.[57]  At 5:18 pm on November 9th, Smith sent the preliminary term sheet to Kuchanny.[58]  At 4:09 pm on November

---

[50] See the Prospectus Supplement, dated November 10, 2009, p. S-1.

[51] Prospectus Supplement, dated November 10, 2009, p. S-7.

[52] Prospectus Supplement, dated November 10, 2009, p. S-7.  See also Deposition of Scott Smith, dated June 23, 2015, p. 79.

[53] Deal Book.  See also, RCM 0060 – RCM 0099 at RCM 0068 ("Underwriting Agreement", p. 7); Deposition of Scott Smith, dated June 23, 2015, p. 93-94.

[54] RCM 0004 (Central Fund, "Pricing Press Release", November 10, 2009).

[55] RCM 0004 (Central Fund, "Pricing Press Release", November 10, 2009).

[56] Deposition of Scott Smith, dated June 23, 2015, p. 67.

[57] RCM 0688 – RCM 0696.  See also Deposition of Scott Smith, dated June 23, 2015, pp. 45-46, 74, 88-89, 120, 122-123; Deposition of David Arthur Scott, dated June 24, 2015, pp. 25-27, 33-37, 47-50, 73-75.

[58] RCM 0688 – RCM 0696 at RCM 0693 – RCM 0694; See also Common Deposition Exhibit D39.  I have assumed that, despite some discrepancies in the time stamps, that RCM 0688 – RCM 0696 run from the most recent email to the earliest email in the thread.

9th, Smith also sent Kuchanny a CIBC memorandum to "All IIROC Members" and the Central Fund Press Release of November 9, 2009, which announced the Offering.[59]  In his email, Smith informed the addressees that the "books would close at 8 am" on November 10, 2009.[60]  The CIBC memorandum included the preliminary term sheet, which stated:

> Selling group books are now open.  You can reflect your firm interest to elton.fernandes@cibc.ca or minerva.isovsk@cibc.ca.  All orders are subject to acceptance and or rejection.

and that: "The offering price will be determined on the morning of November 10, 2009."[61]  Neither the issue size nor the price of the shares was specified in the memorandum.

57. After Smith sent the preliminary term sheet, an exchange of views between Smith and Kuchanny ensued about the appropriate premium to NAV before Kuchanny communicated to Smith the indication of his firm interest in purchasing Central Fund shares on November 10th.[62]

58. On November 10th, following CIBC's receipt of investor indications of their firm interest in the deal, the Central Fund purchased gold and silver bullion in amounts that corresponded to the funds that would become available at the closing of the Offering.  The NAV of those bullion purchases was calculated and the price of a Central Fund share was set on the basis of that NAV, plus a premium of 5.03%.[63]

59. The demand for Central Fund shares in the Offering was such that CIBC was able to exercise to increase the size of the offering (the overallotment).[64]

---

[59] SEC-RC-000000036 – SEC-RC-000000039.  The Investment Industry Regulatory Organization of Canada ("IIROC") "is the national self-regulatory organization which oversees all investment dealers and trading activity on debt and equity marketplaces in Canada."  See "About IIROC" at http://www.iiroc.ca/about/Pages/default.aspx.  Accessed June 24, 2015.  See also Deposition of Scott Smith, dated June 23, 2015, p. 47.

[60] SEC-RC-000000036 – SEC-RC-000000039.  During the evening of March 29, 2011, Kuchanny received a comparable notification regarding the date and time that the books for the March 30, 2011 offering would close ("March 30th, [2011] at 8am EST").  See SEC-RC-000000016 – SEC-RC-000000027 at SEC-RC-000000017.

[61] SEC-RC-000000013 – SEC-RC-000000015.

[62] Kuchanny indicated his firm interest in purchasing the Central Fund shares via telephone.  See Deposition of Christopher Kuchanny, dated June 29, 2015, pp. 118.

[63] Premium calculated by BRG.  The "landed NAV" was $12.91.  See Email from Joe Kostandoff, CIBC, to Julie Harbey and Scott Smith, November 10, 2009, Common Deposition Exhibit D43. (The landed NAV includes the costs related to purchase, shipment, and storage of the bullion.)  See Deposition of Stefan J. Spicer, dated June 22, 2015, p. 49; Deposition of Scott Smith, dated June 23, 2015, pp. 52-53; and Common Deposition Exhibit D43.  13.56 / 12.91 = 1.050348567.  (1.050348567 – 1) * 100 = 5.0348567%.  See also Common Deposition Exhibits D12 and D13.

[64] Common Deposition Exhibit D16.  See also Notice of Exercise of Right from CIBC World Markets, Inc. to the Central Fund of Canada Limited, dated November 10, 2009; RCM 0005.

## D.     The Engagement Letter

60. As is customary in securities underwritings, the Central Fund and CIBC signed an Engagement Letter on November 9, 2009 ("Engagement Letter").[65]  The Engagement Letter set out the obligations of each party and their responsibilities and tasks related to a public offering of Central Fund shares, which the letter defined as the "Proposed Offering."  Among CIBC's responsibilities in the Engagement Letter was advising the Central Fund on the "suitable pricing, timing and deal size for the Proposed Offering …," leaving the determination of those matters to a subsequent stage of the Offering.[66]

## E.     The Underwriting Agreement

61. The Central Fund, CIBC, and Credit Suisse signed the Underwriting Agreement on November 10, 2009.  In addition to spelling out the details of the transaction, including the price of a Central Fund share, the Underwriting Agreement confirmed that the Offering was a firm commitment.[67] In the Agreement, the Underwriters:

> … severally, and not jointly or jointly and severally, offer to **purchase** from the Corporation … , and by its acceptance hereof, the Corporation accepts such offer and agrees to **sell** to the Underwriters, the Underwritten Shares on the Closing Date … at a price of U.S. $13.56 per share…[68]  (Emphasis added.)

62. The Central Fund agreed:

> In consideration of the Underwriters' agreement to **purchase** the Underwritten Shares and in consideration of the services to be rendered by the Underwriters in connection with the distribution of the Underwritten Shares …, the Corporation will pay to the Underwriters a fee of approximately U.S. $0.5424 per Underwritten Share for an aggregate of U.S. $9,207,240 (the "Underwriting Fee.")[69]  (Emphasis added.)

63. The Underwriting Agreement does contain two references to "best efforts," but the use of that term refers to: (1) a commitment by the Underwriters that they "use their best efforts to complete the distribution of the Underwritten shares as promptly as possible;" and (2) a

---

[65] Engagement Letter of CIBC World Markets Inc. by the Central Fund of Canada Limited, dated November 9, 2009. See also Deposition of Scott Smith, dated June 23, 2015, p. 110; and Deposition of David Arthur Scott, dated June 24, 2015, pp. 33-36.

[66] Engagement Letter of CIBC World Markets Inc. by the Central Fund of Canada Limited, dated November 9, 2009, paragraph 1,(d), p.1.

[67] Deposition of Scott Smith, dated June 23, 2015, p. 113.  See also Deposition of David Arthur Scott, dated June 24, 2015, pp. 27-28, 51-53.

[68] RCM 0060 – RCM 0099 at RCM 0062 (The Underwriting Agreement, p. 1).

[69] RCM 0060 – RCM 0099 at RCM 0062 – RCM 0063 (The Underwriting Agreement, pp. 1-2).

commitment by the Central Fund to "use its best efforts to arrange for the listing and posting for trading of the Underwritten Shares on the Stock Exchanges on or before the Time of Closing."[70]

64. The Underwriting Agreement also granted the Underwriters the right "to increase the size of the offering by up to an additional 1,475,000 Class A Shares … at any time prior to 4:00 p.m. (Toronto time) [November 10, 2009]."[71]

## F.    Order Confirmation

65. Sales of Central Fund shares only occurred after CIBC had received expressions of "firm interest" from potential investors, and after the deal was priced and CIBC had allocated the shares to the investors.[72]  No sales or purchases of Central Fund shares were made before the pricing and allocation of shares.[73]  CIBC sent the final term sheet to investors after the execution of the trades.[74]

## G.    Closing and Settlement

66. The Closing Date was November 17, 2009.[75]  "The closing date is the date where money actually changes hands."[76]  Further, the Closing Date is when the underwriters "owe the issuer" the determined value of the shares in the Offering.[77]  At the closing, the Underwriters delivered the proceeds of the Offering to the Central Fund, net of the underwriting fee, in exchange for the Central Fund's delivery of the corresponding shares to CIBC Mellon.[78]  As stated by David Arthur Scott in his deposition:

> At the closing we deliver the company obviously the money.  The shares are then given to us at the same time, and we distribute those shares to investors who bought the transaction.  And to the extent that – which would always be the case, that bullion was purchased, the amount of money for the bullion purchases would go to settle those trades, and if there was any money left over after expenses, et cetera, et cetera, then the company would keep that.[79]

---

[70] RCM 0060 – RCM 0099 at RCM 0070, RCM 0080 (The Underwriting Agreement, pp. 9, 19).

[71] RCM 0060 – RCM 0099 at RCM 0062, (The Underwriting Agreement, p. 1).

[72] Deposition of Scott Smith, dated June 23, 2015, p. 58.  A "reflection of interest is not a sale of securities."

[73] Deposition of Scott Smith, dated June 23, 2015, pp. 58-59, 95-96, 145-146.  See also Deposition of David Arthur Scott, dated June 24, 2015, pp. 60-61, 91.

[74] SEC-RC-000000031 – SEC-RC-000000033 at SEC-RC-000000031.

[75] RCM 0002 – RCM 0003 at RCM 0003.

[76] Deposition of Scott Smith, dated June 23, 2015, p. 55.

[77] Deposition of Scott Smith, dated June 23, 2015, p. 56.

[78] Deposition of Fran Daly, dated June 25, 2015, p. 15.  See also Deposition of Christopher Voutsinas, dated June 25, 2015, pp. 9-10; Central Fund of Canada Limited Direction to CIBC Mellon Trust Company, dated November 17, 2009; Deposition of Scott Smith, dated June 23, 2015, p. 55-56; Deposition of David Arthur Scott, dated June 24, 2015, p. 56; and Deposition of J. Stefan Spicer, dated June 22, 2015, p. 102.

[79] Deposition of David Arthur Scott, dated June 24, 2015, p. 56.

## H.      Underwriter Risks

67. In a firm commitment underwriting, the underwriters, having agreed to purchase the shares, face the risk of loss if they cannot place the shares in the market at the specified price.[80]  The Underwriters of the Offering assumed that risk when the share price was determined and the shares were allocated to individual investors.[81]  Signature of the Underwriting Agreement confirmed the Underwriters' obligation to purchase the Central Fund shares.  The Underwriters relied on their longstanding customer relationships and industry traditions to mitigate the risk that a customer might have opted "not to proceed" with its purchase of Central Fund shares.[82]

## VIII.  Assessment of the Defendants' Answer

68. The Defendants assert that Rule 105 does not apply to the Offering since the rule:

> … does not apply to offerings that are not conducted on a firm commitment basis [17 C.F.R. § 242.1 05(c)].  Moreover, the intent of Rule 105 is to ensure that short selling does not drive down the price of such public offerings to the detriment of the issuing company.[83]

## A.      The Offering:  A "best efforts" or a "firm commitment" underwriting?

69. The Defendants' assertion that the Offering was underwritten on a best efforts basis and not as a firm commitment underwriting runs counter to:

   a.  My understanding of and experience with industry underwriting practices and the regulations and rules that govern securities offerings; and

   b.  The plain language of the documents filed with the SEC in connection with the Offering.

### 1.      Industry practices

70. The Defendants have conflated "best efforts" underwritings with the common investment bank practice of building a book of potential investors' indications of interest in purchasing shares.  Book building does not entail the purchase of shares.  Purchase only occurs after the underwriter:

   a.  Receives indications of firm interest from investors;

   b.  Prices the deal and allocates the shares among the investors; and

---

[80] See Section VII.F. above.
[81] Deposition of David Arthur Scott, pp. 48-49; and Deposition of Scott Smith, pp. 31-32.
[82] Deposition of Scott Smith, pp. 80-81; and Deposition of David Arthur Scott, pp. 49-50, 91.
[83] Defendants' Answer to the Complaint, p. 1.

      c.   Executes the trades.[84]

71. In contrast, the Defendants assert that:

> It was only after Revelation's binding order had been executed that the broker signed an underwriting agreement to purchase from Central Fund the exact number of shares that it had placed with buyers.[85]

72. In his deposition, Mr. Kuchanny, stated that an example of a "firm commitment" deal is provided by a company that needs to raise $50 million.  Such a company:

> … need[s] to get someone to say in advance, we will get you $50 million and this is the floor price.  So, [the company] will go in and [they] will get some sort of firm commitment in advance from the underwriter who is involved in that case.[86]

In effect, in that statement Mr. Kuchanny equated a firm commitment underwriting with the type of transaction represented by the BP deal, discussed above.

73. In Mr. Kuchanny's view, "a best efforts offering:"

> … would be an offering whereby, in substance, an underwriter would say, right, okay, we know the amount of shares roughly that we can sell, and that would always in the U.S. be limited by the shelf, and they might even discuss where they roughly might be able to place those shares, but there won't be a commitment in advance of those shares being placed as to the size and the price.[87]

74. The deposition of David Scott, CIBC, illustrates an underwriter's perspective on the two ways of executing a firm commitment underwriting, a "bought" offering and a "pre-marketed" offering:

> A bought offering is right from the beginning, when we have a discussion with the client we agree to buy it at a specific price, a specific time with a specific closing date.  So the company has no risk at that point, we're on the hook, and we have to do that before we actually sell it … So prior to going out to institutions to sell it, we will have already bought the transaction.[88]

75. Mr. Scott goes on to say that, in a pre-marketed transaction, "the manner in which we [did] the Central Fund deals,"

> … we make an announcement, in most cases right after the market closes … and a press release is issued.  That allows us to go out and market to investors on an overnight basis.  That's why it's called an overnight marketed transaction. And then the size of the offering, the price of the offering, and … ultimately the deal itself is determined the next

---

[84] Deposition of Scott Smith, dated June 23, 2015, pp. 58-59, 95-96, 145-146.  See also Deposition of David Arthur Scott, dated June 24, 2015, pp. 60-61.
[85] "Letter from Schulte Roth & Zabel LLP to the U.S. Securities and Exchange Commission, dated May 20, 2013", in "Revelation 5 20- 13 ltr attachments," p. 2.
[86] Deposition of Christopher Kuchanny, dated June 29, 2015, pp. 124-125.
[87] Deposition of Christopher Kuchanny, dated June 29, 2015, p. 125.
[88] Deposition of David Arthur Scott, dated June 24, 2015, p. 24.

day, the next morning.  And at that stage it's underwritten and becomes a liability of the bank.[89]

76. Thus, the Defendants appear to have equated a "binding order" with Revelation's communication of its firm interest in purchasing Central Fund shares in the Offering, which took place before the pricing of Central Fund shares.  Defendants also appear to have equated the allocation of shares by CIBC with the execution of the sale.  As demonstrated in Sections VII.E. and VIII.F., above, an order cannot be executed until the price of a share and the number of shares purchased is known.  The CIBC memorandum requesting that investors communicate their firm interest in purchasing Central Fund shares in the Offering did not include the price of a Central Fund share.  Furthermore, the CIBC memorandum stated that all indications of firm interest by investors were "subject to acceptance and or rejection."  The indications of "firm interest" were conditional until the allocation of shares among the investors and the execution of the trades.[90]

### 2.    SEC Filings

77. The Central Fund's SEC filings in connection with the Offering met the criteria for firm commitment underwritings, as set forth in securities regulations and rules.[91]  The Base Shelf Prospectus, the Prospectus Supplement, and the Underwriting Agreement are replete with references that could only be applied to a firm commitment offering.

78. The salient references in the Base Shelf Prospectus are:

   a.  Definition of the Underwriters as principals, not agents;

   b.  An agreement between the Central Fund and the Underwriters that the Central Fund would sell and that the Underwriters would purchase the shares in the Offering;

   c.  Agreement that the Underwriters would "acquire" the shares for "their own account;" and

   d.   Acceptance by the Underwriters of the obligation "… to purchase all the Class A shares offered by the Prospectus Supplement if any of such Class A Shares [are] purchased."

---

[89] Deposition of David Arthur Scott, dated June 24, 2015, pp. 25-26.

[90] RCM 0002 – RCM 0003 at RCM 0003.

[91] SEC Rules 105 and 10-b9, and SEC Regulation §229.501 provide clear criteria for distinguishing between contingent best efforts underwritings and firm commitment underwritings.  SEC Regulation §229.501 requires that if an offering is not on a firm commitment basis SEC filings for the offering must contain a brief description of the nature of the underwriting arrangements, for example, a best efforts offering.  NASD Rule 2230 and NYSE Rule 409, contemporaneous with the Offering (and the current FINRA Rule 2232), show that building a book of indicative investor interest in a deal is not the equivalent of pricing the shares in an offering and executing the trades.

79. The Prospectus Supplement also confirmed that the underwriting was on a firm commitment basis, stating that:

    a. The Underwriters as "principals," would "conditionally offer the Class A Shares, subject to prior sale, if, as and when issued by the Company;"

    b. The Company "agreed to issue and sell," and the Underwriters "severally agreed to purchase" the Central Fund's Class A Shares; and

    c. The Underwriters were "obligated to take up and pay for all of the securities if any of the securities" were purchased.

80. The Underwriting Agreement also confirmed that the Offering involved the sale of shares by the Central Fund and purchase of the shares by the Underwriters.

## B.    The Pricing of the Shares

81. As the Defendants have noted, the Underwriters and the Central Fund set the price of the shares in the Offering with reference to the NAV calculated from the price at which the Central Fund purchased gold and silver bullion on November 10th in relation to the Offering, to which a premium of 5.03% was added.  However, that aspect of the transaction is not relevant to my assessment that the Offering was underwritten on a firm commitment basis.

## IX.    Opinions

82. On the basis of my investment banking experience with securities underwriting, my training in and knowledge of the standards and practices of the industry, my understanding of the regulatory framework for the Offering, the plain language of the Offering documents, and my review of the material produced in this matter, it is my opinion that the underwriting of the Offering was in all respects a firm commitment underwriting.

83. The Underwriters and the Central Fund set the price of the shares in the Offering with reference to the NAV calculated from the prices at which the Central Fund purchased gold and silver bullion on November 10, 2009.  That fact had no bearing on my opinion that the Offering was underwritten on a firm commitment basis.

## X.    Signature and Right to Modify

My opinions are based upon information available to me as of the date of this report.  I reserve the right to modify or supplement my analysis and opinions if additional material or information comes to my attention.

By:

Guy F. Erb

July 13, 2015

[This page intentionally left blank.]

**Appendix 1 – Curriculum Vitae of Guy Erb**

**BRG**
Berkeley Research Group

**GUY F. ERB**
BERKELEY RESEARCH GROUP, LLC
810 Seventh Avenue, Suite 600 | New York, NY 10019

Direct: 646.862.0953
Cell: 646.416.2763
GErb@thinkBRG.com

Guy Erb is a Managing Director in BRG's New York office, providing expert reports and testimony in litigation and arbitration related to financial services, investment banking, securities, mergers and acquisitions and damages.  Mr. Erb bases his consulting services on his experience in investment banking, international business, money services businesses, corporate governance, senior government positions, and graduate level teaching.

Mr. Erb has advised clients and provided expert services in the following areas:

- Underwriter due diligence prior to offerings of equity, debt and RMBS
- Mergers and acquisitions
- Post-acquisition disputes
- Valuation
- Damages
- Strategic options for corporate clients in US and international markets
- Access to capital, including financing available for companies emerging from bankruptcy
- International payments
- Cross border real estate disputes.

His experience as an expert witness includes:

- Qualification as an Expert in the Southern District of New York. Testified at trial on damages in a matter in which breaches of representations and warranties were alleged, 2014
- Deposition on securities underwriter due diligence in an RMBS matter, 2014
- Deposition on damages in a post-acquisition dispute, Southern District, NY, 2013
- Deposition on access to debt and equity capital markets by an early stage pharmaceutical company, Delaware Chancery Court, 2012
- Expert testimony before an Arbitrator on capital raising services, ICC, New York 2012
- Expert testimony before an Arbitral Tribunal on a European project finance matter, ICC, Paris, 2012
- Deposition on the preparation of a Fairness Opinion and the performance of other financial advisory services by an investment bank, 2007
- Deposition on an assessment of the actions of an asset manager, 2007
- Deposition on underwriter due diligence, 2006.

The subjects of expert reports prepared by Mr. Erb include:

- Analysis of damages in a post-liquidation dispute, 2015
- An assessment of underwriter due diligence prior to an RMBS offering, 2014
- Analysis of damages in a post-acquisition dispute, 2013
- Assessment of underwriter due diligence prior to a shelf take down, 2013
- Analysis of an investment bank's valuation of minority interests in subsidiaries of a large privately held company, prepared for the Counsel for the Trustees of a family trust, 2012
- Analysis of a project financing for an ICC Arbitral Panel, 2011
- Assessments of the due diligence performed by underwriters of mortgage backed securities and of debt offerings by issuers of mortgage backed securities, 2010
- Assessments of the valuation methodologies applied to diverse corporate assets valued in the billions of dollars.  These reports, prepared for Counsel for the Trustees, assisted counsel in obtaining Court approval for the disposition of the trust assets, 2010
- Securities underwriter due diligence, 2009
- International payments matters, 2008 and 2009
- A foreign subsidiary's access to the leveraged loan market, 2008
- Fairness opinions and other investment banking services related to mergers and acquisitions, 2007
- Banking standards and practices, 2006
- Transaction banking issues, 2006
- Securities underwriter due diligence, 2006.

Mr. Erb's advisory services for clients have included:

- Assessment of bank standards and practices regarding trade credit, 2015
- Evaluation of case material in a matter relating to the alleged destruction of a business in Mexico and Brazil, 2015
- Evaluation of case material in a matter relating to the alleged failure to observe prudent commercial banking practices, 2014
- Banking credit and compliance standards, 2014
- Bank acquisition, 2012
- International financial transactions, 2011
- Enhancement of the value and the splitting of assets held in family trusts, taking fiduciary considerations into account, 2010
- The 2007-2008 market for the financing of private equity transactions, 2008
- Evaluation of efforts to secure debt financing for a foreign subsidiary economy, 2008
- Investment advisory issues, 2007
- An international real estate dispute, 2006
- Matter relating to due diligence by underwriters, 2006
- A commercial banking matter involving the assessment of loan covenants, 2006
- Fair disclosure standards and practices, 2006
- The international arbitration of a real estate dispute, 2006.

**BRG**
Berkeley Research Group

**Testimony before US Congressional Committees and Independent Agencies**

Testimony during the 1980s on trade, investment and aid policy before committees and sub-committees of the U.S. House and Senate and the U.S. International Trade Commission.

**Investment Banking**

At Goldman, Sachs & Co. from 1990 to 1994, Mr. Erb worked across the firm to develop its investment banking business in Mexico, Latin America and Europe.  Prior to joining Goldman Sachs Mr. Erb had helped Goldman Sachs obtain the mandate for the sale of strategic control of Telmex, the Mexican national telephone company, and for the subsequent public offerings of government-owned Telmex shares.

Other deals included the valuation of one of Mexico's largest banks prior to its privatization, international IPOs for Televisa, the largest media company in Mexico, and for other major Mexican companies that also listed their shares on the New York Stock Exchange.  His experience includes private equity investments in joint ventures and project financings. Mr. Erb was the chief operating officer and member of the board of Goldman Sachs México, Casa de Bolsa, Mexico City, from 1994 to 1997 and Vice Chairman of Goldman Sachs México from 1997 through 1999.  He worked on investment banking and private equity transactions, equity sales and trading and reported to and negotiated with Mexican financial authorities.

Mr. Erb was a founding managing director of Lafayette Capital Corporation, an NASD regulated broker-dealer in Washington, DC, from 1987 to 1990.  Lafayette Capital provided M&A and other financial advisory services to corporations and governments.  Clients included a major U.S. pharmaceutical company, investment banks and governments. From 1987 through 1999, Mr. Erb was qualified as General Securities Principal (Series 24) and General Securities Representative (Series 7).  While in Mexico, he held a comparable certification from the Mexican Banking Commission.

**International Business**

In addition to his work as a consultant for US, European, Asian and Latin American companies, Mr. Erb founded RapidMoney Corporation (RMC) in 2000 and led the company until 2005.  RMC provided an advanced point-of-sale system for migrant remittances.  Mr. Erb was responsible for raising capital, including M&A transactions, and the oversight of RMC's reporting to state and federal authorities.  As managing director of Erb & Madian, Inc. Washington, DC, during the 1980s, Mr. Erb provided business advisory services to major public and private corporations.

**Corporate Governance**

- Chairman of Board and CEO, RapidMoney Corporation, San Antonio, TX, 2000-2005
- Vice Chairman, Goldman Sachs México, Casa de Bolsa, SA de CV, 1997-1999.
- Board Member, Goldman Sachs México, Casa de Bolsa, SA de CV, 1994-1997

- Board Member, Mexican Stock Exchange, Mexico City, 1996-1997
- Alternate Board Member, Pepsi-Gemex (NYSE listed company), 1994-1996
- Board Member, American Chamber of Commerce of Mexico, 1996-1997
- Advisory Board Member, Pliana Holdings, Mexico City, 1996-98
- Board Member, *Asociación de Instituciones Financieras Internacionales,* México City, 1996-1998
- Co-founded and managed Lafayette Capital Corporation and NASD registered broker-dealer, 1987 and Erb & Madian, Inc., a corporate consulting firm, 1982.

## U.S. Government and International Organizations

- Deputy Director, U.S. International Development Cooperation Agency (IDCA), 1980-81 (confirmed by the U.S. Senate)
- Board Member, Inter-American Development Foundation, Washington, DC, 1980 (confirmed by the U.S. Senate)
- Member National Security Council Staff (NSC), 1977-1980
- Financial Advisor to the Secretariat of the Central American Common Market, 1971-72
- Financial Advisor to the Association of Southeast Asian Nations, 1970
- U.N. officer, United Nations Conference on Trade and Development, 1965-70
- Foreign Service Officer, U.S. State Department, Washington, D.C., 1963-1965.

## Non-profit Organizations

- Chairman, Advisory Committee on Foreign Direct Investment and National Security, Council on Foreign Relations, 2006
- Executive Director of U.S. Council of the Mexico-U.S. Business Committee, 1982-1990:
- Co-Chairman, Committee on U.S.- Mexico Relations, 1981-1982
- Senior Fellow, Overseas Development Council (ODC), Washington, DC. 1972-1977.

## Publications

- Articles in Law360, Journal of Political Economy, Journal of World Trade Law, Foreign Policy and contributor to and editor of books on economic policy and commentary in The New York Times, Los Angeles Times, Journal of Commerce and other periodicals.

## Testimony before US Congressional Committees and Independent Agencies

- Testimony during the 1980s on trade, investment and aid policy before committees and sub-committees of the U.S. House and Senate and the U.S. International Trade Commission.

## Teaching Experience

- Faculty Director and Senior Fellow - Global Finance, Levin Graduate Institute, SUNY, 2006-2009
- Adjunct Professor at Georgetown University, Washington, DC, 1981-82.

**Education**

- M.Sc., Economics, London School of Economics and Political Science
- B.A. Economics, University of California at Berkeley
- Diploma, University of Madrid, Spain, under the auspices of New York University.

**Languages**

- Fluent in Spanish.

**Professional Affiliations**

- Council on Foreign Relations, New York
- The Economic Club of New York.

**Appendix 2 – Testimony and Depositions of Guy Erb (2012 – 2015)**



**Guy F. Erb, Managing Director, Berkeley Research Group**
**Deposition and Testimony: 2010 - 2014**

| DEPOSITION / TESTIMONY | LAW FIRM | ATTORNEY | CITY | SUBJECT | MATTER NAME | VENUE | YEAR | TESTIFIED FOR |
|---|---|---|---|---|---|---|---|---|
| Deposition | Simpson Thacher & Bartlett | David Woll | New York, NY | Securities Litigation (RMBS) | Massachusetts Mutual Life Insurance Company v. Countrywide Financial Corporation, et.al. | US District Court, Central District of California, Western Division | 2014 | Defendants |
| Testimony at Trial | Morrison & Foerster | Karen L. Hagberg | New York, NY | Damages | Sekisui American Corp and Sekisui Medical Co. Ltd., v. Richard Hart and Marie Louise Trudell Hart | US District Court, Southern District of New York | 2014 | Plaintiffs |
| Deposition | Morrison & Foerster | Karen L. Hagberg | New York, NY | Damages | Sekisui American Corp and Sekisui Medical Co. Ltd., v. Richard Hart and Marie Louise Trudell Hart | US District Court, Southern District of New York | 2013 | Plaintiffs |
| Testimony | Castaldi Mourre | Alexis Mourre | Paris, France | Project financing issues | Deutsche Bank AG v. BEG S.P.A., ICC Case 17496/JHN | ICC Arbitration Centre, Paris | 2012 | Defendant |
| Testimony | Boies, Schiller & Flexner LLP | Bruce Weil | New York, NY | Investment banking issues | Ornstein, et al., against ZGN, Management LLC | AAA International Centre for Dispute Resolution | 2012 | Respondent |
| Deposition | Gibson, Dunn & Crutcher LLP | Thad A. Davis | New York, NY | Securities market issues | Tang Capital Partners, LP et. al., v. David Y. Norton, et al., and Savient Pharmaceuticals, Inc. | Court of the Chancery of the State of Delaware | 2012 | Plaintiff |

**Appendix 3 – List of Materials Relied Upon**

**Appendix 3**

*List of Documents Relied Upon*

*as of July 13, 2015*

<u>Court Filings</u>

*Securities and Exchange Commission v. Revelation Capital Management Ltd. et al.*, U.S. District Court for the Southern District of New York, 14-CV-0645, Complaint, dated January 29, 2014.

*Securities and Exchange Commission v. Revelation Capital Management Ltd. et al.,* U.S. District Court for the Southern District of New York, 14-CV-0645, Defendants' Answer to the Complaint, dated August 8, 2014.

<u>Depositions</u>

Deposition of Fran Daly, dated June 25, 2015.

Deposition of Christopher Kuchanny, dated June 29, 2015.

Deposition of David Arthur Scott, dated June 24, 2015.

Deposition of Scott Smith, dated June 23, 2015.

Deposition of J. Stefan Spicer, dated June 22, 2015.

Deposition of Christopher Voutsinas, dated June 25, 2015.

<u>Common Deposition Exhibits</u>

Exhibits D1 - D35

Exhibits D37 - D43

Exhibits 44 - 45

Exhibits D-46 - D-55

<u>Deal Book</u>

011: Response Letter from Fraser Milner Casgrain LLP to the Albert Securities Commission, dated September 4, 2009.

012: Comment Email from the Albert Securities Comission to Fraser Milner Casgrain LLP, dated September 4, 2009.

013: Response Letter from Fraser Milner Casgrain LLP to the Alberta Securities Commission, dated September 8, 2009.

014: Central Fund of Canada Limited Short Form Base Shelf Prospectus, dated September 8, 2009 ("Executed Copy").

015: Central Fund of Canada Limited Short Form Base Shelf Prospectus, dated September 8, 2009 ("Blacklined Copy").

016: Central Fund of Canada Limited Prospectus Supplement, dated November 10, 2009 ("Commercial Copy").

017: Letter from Fraser Milner Casgrain LLP to the British Columbia Securities Commission, et al., dated September 8, 2009.

018: Letter from the Central Fund of Canada Limited to the British Columbia Securities Commission, et al., dated September 8, 2009.

019: Central Fund of Canada Limited Officer's Certificate to Fraser Milner Casgrain LLP, dated September 8, 2009.

020: Consent Letter from Ernst & Young to the British Columbia Securities Commission, et al., dated September 8, 2009.

021: Consent Letter from Fraser Milner Casgrain LLP, to the British Columbia Securities Commission, et al., dated September 8, 2009.

022: Consent Letter from Dorsey & Whitney, LLP, to the British Columbia Securities Commission, et al., dated September 8, 2009.

023: Alberta Securities Commission and Ontario Securities Commission Receipt of the Central Fund of Canada Limited MJDS Shelf Prospectus, dated September 8, 2009.

024: Engagement Letter of CIBC World Markets Inc. by the Central Fund of Canada Limited, dated November 9, 2009.

025: Central Fund of Canada Limited Press Release: "Central Fund Announces Proposed Offering," Marketwire and U.S. Disclosure Circuit, dated November 9, 2009.

026: Central Fund of Canada Limited November 2009 Form 6-K, dated November 10, 2009, and Exhibit 99.1 Press Release dated November 10, 2009.

027: Underwriting Agreement of CIBC World Markets Inc. and Credit Suisse Securities (Canada), Inc. by the Central Fund of Canada Limited, dated November 10, 2009 ("Execution Copy").

028: Central Fund of Canada Limited November 2009 Form 6-K, dated November 10, 2009, and Exhibit 99.1 Underwriting Agreement dated November 10, 2009.

029: Central Fund of Canada Limited Press Release: "Central Fund of Canada Limited Enters into Underwriting Agreement," Marketwire and U.S. Disclosure Circuit, dated November 10, 2009.

030: Central Fund of Canada Limited November 2009 Form 6-K, dated November 10, 2009, and Exhibit 99.1 Press Release dated November 10, 2009.

031: Notice of Exercise of Right from CIBC World Markets, Inc. to the Central Fund of Canada Limited, dated November 10, 2009.

032: Central Fund of Canada Limited Press Release: "Central Fund of Canda Limited Increases Equity Offering to U.S. $230 million as Underwriters Exercise Their Right to Purchase Additional Class A Shares," Marketwire and U.S. Disclosure Circuit, dated November 10, 2009.

033: Central Fund of Canada Limited November 2009 Form 6-K, dated November 9, 2009, and Exhibit 99.1 Press Release dated November 9, 2009.

034: Letter from Fraser Milner Casgrain LLP to the Toronto Stock Exchange, dated November 9, 2009.

035: Letter from the Toronto Stock Exchange to Fraser Milner Casgrain, dated November 10, 2009.

036: Central Fund of Canada Limited Officer's Certificate to Fraser Milner Casgrain LLP, dated November 10, 2009.

037: Central Fund of Canada Limited Prospectus Supplement, dated November 10, 2009 ("Executed Copy").

038: Central Fund of Canada Limited Prospectus Supplement, dated November 10, 2009 ("Commercial Copy").

039: Letter from Fraser Milner Casgrain LLP to the British Columbia Securities Commission, et al., dated November 10, 2009.

040: Central Fund of Canada Limited Undertaking to the British Columbia Securities Commission, dated November 10, 2009.

041: Consent Letter from Ernst & Young to the British Columbia Securities Commission, et al., dated November 10, 2009.

042: Consent Letter from Fraser Milner Casgrain LLP, to the British Columbia Securities Commission, et al., dated November 10, 2009.

043: Consent Letter from Dorsey & Whitney, LLP, to the British Columbia Securities Commission, et al., dated November 10, 2009.

044: Consent letter from Cassels Brock & Blackwell, LLP, to the British Columbia Securities Commission, et al., dated November 10, 2009.

045: SEDAR Form 6 Certification of Authentication filed by the Central Fund of Canada Limited, dated November 10, 2009.

046: Response Letter from Fraser Milner Casgrain LLP to the Toronto Stock Exchange, dated November 11, 2009.

047: Central Fund of Canada Limited Prospectus Supplement, dated November 10, 2009 ("U.S. Filing").

048: Central Fund of Canada Limited Prospectus Supplement, dated November 10, 2009 ("U.S. Filing Commercial Copy").

049: Securities and Exchange Commission Filing Confirmation of the Central Fund of Canada Limited Prospectus Supplement, dated November 10, 2009.

050: Central Fund of Canada Limited Additional Listing Application to the American Stock Exchange, dated November 10, 2009.

051: Approval of NYSE Amex LLC, dated November 13, 2009.

052: Central Fund of Canada Limited Certificate to CIBC World Markets Inc., Credit Suisse Securities (Canada), Inc., and Cassels Brock & Blackwell LLP, dated November 17, 2009, and Attached Schedules.

053: Copy of Specimen of Central Fund of Canada Limited Class A Share.

054: CIBC Mellon Trust Company Article Two: Section 2.02: Execution of Instruments, dated November 17, 2009.

055: CIBC Mellon Trust Company Transfer Agent and Registrar Certificate, dated November 17, 2009.

056: Central Fund of Canada Limited Officer's Certificate to CIBC World Markets Inc. and Credit Suisse Securities (Canada), Inc, dated November 17, 2009.

057: Central Fund of Canada Certificate of Status (Form 32) in the Province of Alberta, dated November 16, 2009.

058: List of Reporting Issuers and Issuers in Default by the British Columbia Securities Commission, et al., dated November, 2009.

059: Central Fund of Canada Limited Officer's Certificate to Fraser Milner Casgrain LLP, dated November 17, 2009.

060: CIBC World Markets Inc. Direction to the Central Fund of Canada Limited, dated November 17, 2009.

061: Central Fund of Canada Limited Direction to CIBC Mellon Trust Company, dated November 17, 2009.

062: Copy of Certificate of the Central Fund of Canada Limited 16,975,000 Class A Non-Voting Shares, dated November 17, 2009.

063: CIBC World Markets Inc. Receipt to Central Fund Canada Limited and CIBC Mellon Trust Company, dated November 17, 2009.

064: CIBC World market Inc. Wire Transfer Memorandum for the Closing of the Central Fund of Canada Limited Class A Share Public Offering, dated November 16, 2009.

065: Central Fund of Canada Limited Direction to CIBC World Markets, Inc. and Credit Suisse Securities (Canada) Inc., dated November 17, 2009.

066: Emails between Central Fund of Canada Limited, CIBC World Markets Inc., and Fraser Milner Casgrain LLP Providing Evidence of Receipt of Wire Transfer, dated December 16, 2009.

067: CIBC World Markets Inc. Receipt of Underwriting Fee to Central Fund of Canada Limited, dated November 17, 2009.

068: Central Fund of Canada Limited Receipt of Wire Transfer to CIBC World Markets Inc. and Credit Suisse Securities (Canada) Inc., dated November 17, 2009.

069: Letter from Ernst & Young LLP to CIBC World Markets Inc., Credit Suisse Securities (Canada), Inc., and the Central fund of Canada Limited Inc., dated November 17, 2009 and Attached Audited Statements.

070: Opinions of MacDonald & Company, et al. to Central Fund of Canada Limited, CIBC World Markets Inc., Credit Suisse Securities (Canada), Inc., Fraser Milner Casgrain LLP, and Cassels Brock & Blackwell LLP, dated November 17, 2009.

071: Opinion of Parlee McLaws LLP to CIBC World Markets Inc., Credit Suisse Securities (Canada), Inc., Cassels Brock & Blackwell LLP, Central Fund of Canada Limited, and Fraser Milner Casgrain LLP, dated November 17, 2009.

072: Opinion of Fraser Milner Casgrain LLP to CIBC World Markets Inc., Credit Suisse Securities (Canada), Inc., and Cassels Brock & Blackwell LLP, dated November 17, 2009.

073: Opinion of Dorsey & Whitney LLP to CIBC World Markets Inc. and Credit Suisse Securities (Canada), Inc., dated November 17, 2009.

074: Opinion of Cassels Brock & Blackwell LLP to CIBC World Markets Inc. and Credit Suisse Securities (Canada), Inc., dated November 17, 2009.

075: Central Fund of Canada Limited Press Release: "Central Fund of Canada Limited Closes U.S. $230,181,000 Class A Share Issue," Marketwire and U.S. Disclosure Circuit, dated November 17, 2009.

076: Central Fund of Canada Limited November 2009 Form 6-K, dated November 17, 2009, and Exhibit 99.1 Press Release dated November 17, 2009.

077: Central Fund of Canada Limited Material Change Report under National Instrument 51-102 (Form 51-102F3), dated November 17, 2009.

078: Central Fund of Canada Limited November 2009 Form 6-K, dated November 17, 2009, and Exhibit 99.1 Material Change Report dated November 17, 2009.

079: Opinion of Fraser Milner Casgrain LLP to the Toronto Stock Exchange, dated November 17, 2009.

080: CIBC World Markets Inc. Breakdown of Sales of Central Fund of Canada Shares for closing date November 17, 2009.

081: Notices of Completion of Distribution from Fraser Milner Casgrain LLP to the British Columbia Securities Commission and to the Alberta Securities Commission, dated November 17, 2009 and December 21, 2009, respectively.

**Other Documents Received from Counsel**

Letter from Schulte Roth & Zabel LLP to the U.S. Securities and Exchange Commission, dated May 20, 2013, and Attached Exhibits.

Letter from Schulte Roth & Zabel LLP to the U.S. Securities and Exchange Commission, dated September 3, 2013, and Attached Exhibits.

Letter from Schulte Roth & Zabel LLP to the U.S. Securities and Exchange Commission, dated September 10, 2013, and Attached Exhibit.

Letter from Schulte Roth & Zabel LLP to the U.S. Securities and Exchange Commission, dated September 30, 2013.

Letter from Hughes Hubbard & Reed LLP to the U.S. Securities and Exchange Commission, dated November 13, 2014.

**Bates Stamped Documents**

HHR_MFGI_SEC_CFCL_000002

RCM 0001 - RCM 0741

SEC-RC-000000001 - SEC-RC-000001597

**Regulations and Rules**

17 CFR 229.501, "Forepart of Registration Statement and Outside Front Cover Page of Prospectus," *available at* http://www.gpo.gov/fdsys/pkg/CFR-2011-title17-vol2/pdf/CFR-2011-title17-vol2-sec229-501.pdf. Accessed June 19, 2015.

17 CFR 230.415, "Delayed or Continuous Offering and Sale of Securities," *available at* http://www.gpo.gov/fdsys/pkg/CFR-2010-title17-vol2/pdf/CFR-2010-title17-vol2-sec230-415.pdf. Accessed June 19, 2015.

17 CFR 240.10b-9, "Prohibited Representations in Connection with Certain Offerings," *available at* http://www.gpo.gov/fdsys/pkg/CFR-2011-title17-vol3/pdf/CFR-2011-title17-vol3-sec240-10b-9.pdf. Accessed June 19, 2015.

17 CFR 242.105, "Short selling in Connection with a Public Offering," *available at* http://www.gpo.gov/fdsys/pkg/CFR-2012-title17-vol3/pdf/CFR-2012-title17-vol3-sec242-105.pdf. Accessed June 19, 2015.

*Finra Manual* , Rules 2230, 2232, "Customer Confirmations," *available at* http://finra.complinet.com/en/display/display_viewall.html?rbid=2403&element_id=9787&record_id=13290&filtered_tag=&print=1. Accessed June 12, 2015.

FINRA Regulatory Notice 07-65, "Amendments to NYSE Rule 409 (f)," dated December 2007, *available at* https://www.finra.org/sites/default/files/NoticeDocument/p037670.pdf.  Accessed June 20, 2015.

FINRA Regulatory Notice 10-62, "SEC Approves New Consolidated FINRA Rule," dated December 2010, *available at* https://www.finra.org/sites/default/files/NoticeDocument/p122639.pdf.  Accessed June 24, 2015.

*NASD Manual* , Rule 2230, "Confirmations," dated March 2006, pp. 4149-4150.

SEC Administrative Proceeding, File No. 3-6346, dated December 21, 1984, *available at* https://www.sec.gov/litigation/aljdec/1984/id19841220rht.pdf. Accessed June 12, 2015.

SEC, "Final Rule, Confirmation Requirements for Transactions of Security Futures Products Effected in Futures Accounts," Section II, Background," *available at*  https://www.sec.gov/rules/final/34-46471.htm#VA.  Accessed June 20, 2015.

Securities Exchange Act of 1934, as amended, Section 12.


**SEC Filings**

Central Fund of Canada Limited, Base Shelf Prospectus, dated September 29, 2006, *available at* http://www.sec.gov/Archives/edgar/data/784959/000104746906012260/a2173431zf-10a.htm. Accessed June 15, 2015.

Central Fund of Canada Limited, Base Shelf Prospectus, dated March 31, 2008, *available at* http://www.sec.gov/Archives/edgar/data/784959/000104746908003865/a2184385zf-10a.htm. Accessed May 27, 2015.

Central Fund of Canada Limited, Base Shelf Prospectus, dated September 8, 2009, *available at* http://www.sec.gov/Archives/edgar/data/784959/000104746909008205/a2194462zf-10a.htm. Accessed June 15, 2015.

Central Fund of Canada Limited, Prospectus Supplement, dated December 1, 2006 *available at* http://www.sec.gov/Archives/edgar/data/784959/000104746906014685/a2174972zsuppl.htm. Accessed June 18, 2015.

Central Fund of Canada Limited, Prospectus Supplement, dated September 12, 2007, *available at* http://www.sec.gov/Archives/edgar/data/784959/000104746907006983/a2179727zsuppl.htm. Accessed June 18, 2015.

Central Fund of Canada Limited, Prospectus Supplement, dated February 27, 2008, *available at* http://www.sec.gov/Archives/edgar/data/784959/000104746908001866/a2183161zsuppl.htm. Accessed June 18, 2015.

Central Fund of Canada Limited, Prospectus Supplement, dated July 15, 2008, *available at* http://www.sec.gov/Archives/edgar/data/784959/000104746908008172/a2186843zsuppl.htm. Accessed May 27, 2015.

Central Fund of Canada Limited, Prospectus Supplement, dated September 23, 2008, *available at* http://www.sec.gov/Archives/edgar/data/784959/000104746908010226/a2188050zsuppl.htm. Accessed May 27, 2015.

Central Fund of Canada Limited, Prospectus Supplement, dated January 27, 2009 *available at* http://www.sec.gov/Archives/edgar/data/784959/000104746909000422/a2190181zsuppl.htm. Accessed September 5, 2014.

Central Fund of Canada Limited, Prospectus Supplement, dated April 8, 2009, *available at* http://www.sec.gov/Archives/edgar/data/784959/000104746909003964/a2192238zsuppl.htm. Accessed September 5, 2014.

Central Fund of Canada Limited, Prospectus Supplement, dated August 6, 2009 *available at* http://www.sec.gov/Archives/edgar/data/784959/000104746909007307/a2194016zsuppl.htm. Accessed September 5, 2014.

Central Fund of Canada Limited, Prospectus Supplement, dated November 10, 2009 *available at* http://www.sec.gov/Archives/edgar/data/784959/000104746909009904/a2195410zsuppl.htm. Accessed May 28, 2015.

Central Fund of Canada Limited, Short Form Prospectus, dated April 19, 2006 *available at* http://www.sec.gov/Archives/edgar/data/784959/000104746906005321/a2169333zf-10a.htm. Accessed June 18, 2015.

Central Fund of Canada Limited, Short Form Prospectus, dated July 28, 2006 *available at* http://www.sec.gov/Archives/edgar/data/784959/000104746906010074/a2172039zf-10a.htm. Accessed June 18, 2015.

Fairfax Financial Holdings Limited, Prospectus Supplement, dated September 8, 2009, *available at* http://www.sec.gov/Archives/edgar/data/915191/000095012309041606/x56941suppl.htm.  Accessed July 10, 2015.


**Public Information**

Barron's, *Dictionary of Finance and Investment Terms*, Seventh Edition, dated June 2006.

Charles J. Johnson Jr. and Joseph McLaughlin, *Corporate Finance and the Securities Laws*, Fourth Edition, Aspen Publishers, dated September 2006.

Charles M. C. Lee, Andrei Shleifer, and Richard H. Thaler, "Investor Sentiment and the Closed-End Fund Puzzle," *The Journal of Finance*, Vol. XLVI, No. 1, dated March 1991.

*CPM Group,* "CPM Group Releases Gold Yearbook 2012," Press Release, dated March 30, 2012, http://www.cpmgroup.com/sites/default/files/field_press_case_pdf_download/Gold_Yearbook_Press_Release_MMarc_2012.pdf.  Accessed June 22, 2015.

Giuliano Iannotta, *Investment Banking: A Guide to Underwriting and Advisory Services*, Springer-Verlag, dated 2010.

*International Financing Review*, Special Report, "1987: £7.2bn BP privatisation, the deal that defied Black Monday," Thomson Reuters, dated September 2013, *available at* http://edition.pagesuite-professional.co.uk/Launch.aspx?EID=b2eb69c3-7774-4d35-a0ff-c70b03f7288f. Accessed June 19, 2015.

*Mergent Industry Reports*, "Precious Metals - North America," Mergent, Inc., dated January 1, 2011.

*NYSE*, "NYSE Amex LLC to be renamed NYSE MKT LLC," dated May 10, 2012, *available at* http://www1.nyse.com/press/1336646911531.html.  Accessed July 1, 2015.

Ray Mosely, "BP Sale To Proceed, With A Cushion," *Chicago Tribune*, dated October 30, 1987, *available at* http://articles.chicagotribune.com/1987-10-30/business/8703210845_1_underwriters-buyback-plan-bp. Accessed June 12, 2015.

*Reuters*, "Goldman, Sachs Could Lose $112 Million:  US Underwriters Worse Off Than British in BP Flop, dated November 2, 1987, *available at* http://articles.latimes.com/1987-11-02/business/fi-12078_1_bp-shares. Accessed May 20, 2015.

Robert B. Robbins, "Structuring Best Efforts Offerings and Closings Under Rule 10b-9," *The American Law Institute Continuing Legal Education: Regulations D Offerings and Private Placements*, dated March 14-16, dated 2013.

Robert J. Haft and Arthur F. Haft, *Due Diligence - Periodic Reports and Securities Offerings*, 2005-2006 Edition, § 5:2, "Task force report on sellers' due diligence and similar defenses under the federal securities laws - A.B.A. Committee on federal regulation of securities," Thomson/West, dated 2005.

*SEC v. Prousalis et al.*, US District Court for the Southern District of New York, 04-CV-00081, Complaint, dated January 2004, *available at* http://www.sec.gov/litigation/complaints/comp18533.htm. Accessed June 12, 2015.

Shane A. Corwin, "The Determinants of Underpricing for Seasoned Equity Offers," *The Journal of Finance*, Vol. LVIII, No. 5, dated October 2003.

*The United States Geological Survey*, "2010 Minerals Yearbook: Gold [Advanced Release]," dated May 2012, *available at* http://minerals.usgs.gov/minerals/pubs/commodity/gold/myb1-2010-gold.pdf. Accessed June 19, 2015.

*The United States Geological Survey*, "2011 Minerals Yearbook: Gold [Advanced Release]," dated May 2013, *available at* http://minerals.usgs.gov/minerals/pubs/commodity/gold/myb1-2011-gold.pdf. Accessed June 19, 2015.

*Wall Street Journal,* "How to Invest in a Closed-End Fund," *available at* http://guides.wsj.com/personal-finance/investing/how-to-invest-in-a-closed-end-fund/. Accessed July 9, 2015.

*Wall Street Journal*, "Market Data Center: Closed-End Funds: Specialized Equity Funds," dated June 26, 2015, *available at* http://www.wsj.com/mdc/public/page/2_3040-CEF35.html. Accessed June 29, 2015.


**Websites**

Central Fund of Canada Limited Stock Data for CEF, CEF.A, and CEF.U, http://www.bloomberg.com. Accessed May 20, 2015.

*Deutsche Bundesbank Data Repository*, London Gold Price (Morning Fixing Per Troy Ounce), Quandl, https://www.quandl.com/data/BUNDESBANK/BBK01_WT5511-Gold-Price-USD. Accessed May 20, 2015.

http://www.bloomberg.com/quote/CEF:US. Accessed June 22, 2015.

http://www.iiroc.ca/about/Pages/default.aspx. Accessed June 24, 2015.

http://www.sec.gov/answers/nav.htm. Accessed June 15, 2015.

http://www.silverprice.org. Accessed June 18, 2015.

**Appendix 4**

**A.** Rule 105: §242.105 – Short selling in connection with a public offering.

**B.** §240.10b-9: Prohibited representations in connection with certain offerings.

**C.** §229.501: Forepart of Registration Statement and Outside Front Cover Page of Prospectus.

**D.** §230.415: Delayed or continuous offering and sale of securities.

**E.** FINRA Rule 2232: Customer Confirmations.

**F.** NASD Rule 2230: Confirmations

**G.** NYSE Rule 409

## A.        Rule 105: §242.105 – Short selling in connection with a public offering.

(a) *Unlawful activity.*  In connection with an offering of equity securities for cash pursuant to a registration statement or a notification on Form 1-A (§239.90 of this chapter) or Form 1-E (§239.200 of this chapter) filed under the Securities Act of 1933 ("offered securities"), it shall be unlawful for any person to sell short (as defined in §242.200(a)) the security that is the subject of the offering and purchase the offered securities from an underwriter or broker or dealer participating in the offering if such short sale was effected during the period ("Rule 105 restricted period") that is the shorter of the period:

(1) Beginning five business days before the pricing of the offered securities and ending with such pricing; or

(2) Beginning with the initial filing of such registration statement or notification on Form 1-A or Form 1-E and ending with the pricing.

(b) *Excepted activity*—(1) *Bona fide purchase.*  It shall not be prohibited for such person to purchase the offered securities as provided in paragraph (a) of this section if:

(i) Such person makes a bona fide purchase(s) of the security that is the subject of the offering that is:

(A) At least equivalent in quantity to the entire amount of the Rule 105 restricted period short sale(s);

(B) Effected during regular trading hours;

(C) Reported to an "effective transaction reporting plan" (as defined in §242.600(b)(22)); and

(D) Effected after the last Rule 105 restricted period short sale, and no later than the business day prior to the day of pricing; and

(ii) Such person did not effect a short sale, that is reported to an effective transaction reporting plan, within the 30 minutes prior to the close of regular trading hours (as defined in §242.600(b)(64)) on the business day prior to the day of pricing.

(2) *Separate accounts.*  Paragraph (a) of this section shall not prohibit the purchase of the offered security in an account of a person where such person sold short during the Rule 105 restricted period in a separate account, if decisions regarding securities transactions for each account are made separately and without coordination of trading or cooperation among or between the accounts.

(3) *Investment companies.*  Paragraph (a) of this section shall not prohibit an investment company (as defined by Section 3 of the Investment Company Act) that is registered under Section 8 of the Investment Company Act, or a series of such company (investment company) from purchasing an offered security where any of the following sold the offered security short during the Rule 105 restricted period:

(i) An affiliated investment company, or any series of such a company; or

(ii) A separate series of the investment company.

(c) *Excepted offerings.*  This section shall not apply to offerings that are not conducted on a firm commitment basis.

(d) *Exemptive authority.*  Upon written application or upon its own motion, the Commission may grant an exemption from the provisions of this section, either unconditionally or on specified terms and conditions, to any transaction or class of transactions, or to any security or class of securities.

[62 FR 544, Jan. 3, 1997, as amended at 69 FR 48029, Aug. 6, 2004; 72 FR 45107, Aug. 10, 2007]

Source: 17 CFR 229.501, "Forepart of Registration Statement and Outside Front Cover Page of Prospectus," *available at* http://www.gpo.gov/fdsys/pkg/CFR-2012-title17-vol3/pdf/CFR-2012-title17-vol3-sec242-105.pdf.

**B.      §240.10b-9: Prohibited representations in connection with certain offerings.**


(a) It shall constitute a *manipulative or deception device or contrivance,* as used in section 10(b) of the Act, for any person, directly or indirectly, in connection with the offer or sale of any security, to make any representation:

(1) To the effect that the security is being offered or sold on an "all-or-none" basis, unless the security is part of an offering or distribution being made on the condition that all or a specified amount of the consideration paid for such security will be promptly refunded to the purchaser unless (i) all of the securities being offered are sold at a specified price within a specified time, and (ii) the total amount due to the seller is received by him by a specified date; or

(2) To the effect that the security is being offered or sold on any other basis whereby all or part of the consideration paid for any such security will be refunded to the purchaser if all or some of the securities are not sold, unless the security is part of an offering or distribution being made on the condition that all or a specified part of the consideration paid for such security will be promptly refunded to the purchaser unless (i) a specified number of units of the security are sold at a specified price within a specified time, and (ii) the total amount due to the seller is received by him by a specified date.

(b) This rule shall not apply to any offer or sale of securities as to which the seller has a firm commitment from underwriters or others (subject only to customary conditions precedent, including "market outs") for the purchase of all the securities being offered.

Source:  17 CFR 240.10b-9, "Prohibited Representations in Connection with Certain Offerings," *available at* http://www.gpo.gov/fdsys/pkg/CFR-2011-title17-vol3/pdf/CFR-2011-title17-vol3-sec240-10b-9.pdf. Accessed June 19, 2015.

**C.     §229.501: Forepart of Registration Statement and Outside Front Cover Page of Prospectus.**

The registrant must furnish the following information in plain English.  See §230.421(d) of Regulation C of this chapter.

        (a) *Front cover page of the registration statement.*  Where appropriate, include the delaying amendment legend from §230.473 of Regulation C of this chapter.

        (b) *Outside front cover page of the prospectus.*  Limit the outside cover page to one page.  If the following information applies to your offering, disclose it on the outside cover page of the prospectus.

        (1) *Name.*  The registrant's name.  A foreign registrant must give the English translation of its name.

        *Instruction to paragraph 501(b)(1):* If your name is the same as that of a company that is well known, include information to eliminate any possible confusion with the other company.  If your name indicates a line of business in which you are not engaged or you are engaged only to a limited extent, include information to eliminate any misleading inference as to your business.  In some circumstances, disclosure may not be sufficient and you may be required to change your name.  You will not be required to change your name if you are an established company, the character of your business has changed, and the investing public is generally aware of the change and the character of your current business.

        (2) *Title and amount of securities.*  The title and amount of securities offered.  Separately state the amount of securities offered by selling security holders, if any.  If the underwriter has any arrangement with the issuer, such as an over-allotment option, under which the underwriter may purchase additional shares in connection with the offering, indicate that this arrangement exists and state the amount of additional shares that the underwriter may purchase under the arrangement.  Give a brief description of the securities except where the information is clear from the title of the security.  For example, you are not required to describe common stock that has full voting, dividend and liquidation rights usually associated with common stock.

        (3) *Offering price of the securities.*  Where you offer securities for cash, the price to the public of the securities, the underwriter's discounts and commissions, the net proceeds you receive, and any selling shareholder's net proceeds.  Show this information on both a per share or unit basis and for the total amount of the offering.  If you make the offering on a minimum/maximum basis, show this information based on the total minimum and total maximum amount of the offering.  You may present the information in a table, term sheet format, or other clear presentation.  You may present the information in any format that fits the design of the cover page so long as the information can be easily read and is not misleading:

*Instructions to paragraph 501(b)(3):* 1. If a preliminary prospectus is circulated and you are not subject to the reporting requirements of Section 13(a) or 15(d) of the Exchange Act, provide, as applicable: (A) A bona fide estimate of the range of the maximum offering price and the maximum number of securities offered; or (B) A bona fide estimate of the principal amount of the debt securities offered.  2. If it is impracticable to state the price to the public, explain the method by which the price is to be determined.  If the securities are to be offered at the market price, or if the offering price is to be determined by a formula related to the market price, indicate the market and market price of the securities as of the latest practicable date.  3. If you file a registration statement on Form S–8, you are not required to comply with this paragraph (b)(3).

(4) *Market for the securities.*  Whether any national securities exchange or the Nasdaq Stock Market lists the securities offered, naming the particular market(s), and identifying the trading symbol(s) for those securities;

(5) *Risk factors.*  A cross-reference to the risk factors section, including the page number where it appears in the prospectus.  Highlight this cross-reference by prominent type or in another manner;

(6) *State legend.*  Any legend or statement required by the law of any state in which the securities are to be offered.  You may combine this with any legend required by the SEC, if appropriate;

(7) *Commission legend.*  A legend that indicates that neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the securities or passed upon the accuracy or adequacy of the disclosures in the prospectus and that any contrary representation is a criminal offense.  You may use one of the following or other clear, plain language:

*Example A:* Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy or accuracy of this prospectus.  Any representation to the contrary is a criminal offense.

*Example B:* Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete.  Any representation to the contrary is a criminal offense.

(8) *Underwriting.*  (i) Name(s) of the lead or managing underwriter(s) and an identification of the nature of the underwriting arrangements;

(ii) If the offering is not made on a firm commitment basis, a brief description of the underwriting arrangements.  You may use any clear, concise, and accurate description of the underwriting arrangements.  You may use the following descriptions of underwriting arrangements where appropriate:

*Example A: Best efforts offering.*  The underwriters are not required to sell any specific number or dollar amount of securities but will use their best efforts to sell the securities offered.

*Example B: Best efforts, minimum-maximum offering.*  The underwriters must sell the minimum number of securities offered (*insert number*) if any are sold.  The underwriters are required to use only their best efforts to sell the maximum number of securities offered (*insert number*).

(iii) If you offer the securities on a best efforts or best efforts minimum/ maximum basis, the date the offering will end, any minimum purchase requirements, and any arrangements to place the funds in an escrow, trust, or similar account.  If you have not made any of these arrangements, state this fact and describe the effect on investors;

(9) *Date of prospectus.*  The date of the prospectus;

(10) *Prospectus ''Subject to Completion'' legend.*  If you use the prospectus before the effective date of the registration statement, a prominent statement that:

(i) The information in the prospectus will be amended or completed;

(ii) A registration statement relating to these securities has been filed with the Securities and Exchange Commission;

(iii) The securities may not be sold until the registration statement becomes effective; and

(iv) The prospectus is not an offer to sell the securities and it is not soliciting an offer to buy the securities in any state where offers or sales are not permitted.  The legend may be in the following or other clear, plain language:

The information in this prospectus is not complete and may be changed.  We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective.  This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.

(11) If you use §230.430A of this chapter to omit pricing information and the prospectus is used before you determine the public offering price, the information and legend in paragraph (b)(10) of this section.  *Instruction to Item 501:* For asset-backed securities, see also Item 1102 of Regulation AB (§229.1102).

[63 FR 6381, Feb. 6, 1998, as amended at 70 FR 1594, Jan. 7, 2005]

Source: 17 CFR 229.501, "Forepart of Registration Statement and Outside Front Cover Page of Prospectus," *available at* http://www.gpo.gov/fdsys/pkg/CFR-2011-title17-vol2/pdf/CFR-2011-title17-vol2-sec229-501.pdf.  Accessed June 19, 2015.

**D.     §230.415: Delayed or continuous offering and sale of securities.**

(a) Securities may be registered for an offering to be made on a continuous or delayed basis in the future, *Provided*, That:

(1) The registration statement pertains only to:

(i) Securities which are to be offered or sold solely by or on behalf of a person or persons other than the registrant, a subsidiary of the registrant or a person of which the registrant is a subsidiary;

(ii) Securities which are to be offered and sold pursuant to a dividend or interest reinvestment plan or an employee benefit plan of the registrant;

(iii) Securities which are to be issued upon the exercise of outstanding options, warrants or rights;

(iv) Securities which are to be issued upon conversion of other outstanding securities;

(v) Securities which are pledged as collateral;

(vi) Securities which are registered on Form F–6 (§239.36 of this chapter);

(vii) Mortgage related securities, including such securities as mortgage backed debt and mortgage participation or pass through certificates;

(viii) Securities which are to be issued in connection with business combination transactions;

(ix) Securities the offering of which will be commenced promptly, will be made on a continuous basis and may continue for a period in excess of 30 days from the date of initial effectiveness;

(x) Securities registered (or qualified to be registered) on Form S–3 or Form F–3 (§239.13 or §239.33 of this chapter) which are to be offered and sold on an immediate, continuous or delayed basis by or on behalf of the registrant, a majority-owned subsidiary of the registrant or a person of which the registrant is a majority-owned subsidiary; or

(xi) Shares of common stock which are to be offered and sold on a delayed or continuous basis by or on behalf of a registered closed-end management investment company or business development company that makes periodic repurchase offers pursuant to §270.23c–3 of this chapter.

(2) Securities in paragraph (a)(1)(viii) of this section and securities in paragraph (a)(1)(ix) of this section that are not registered on Form S–3 or Form F– 3 (§239.13 or §239.33 of this chapter) may only be registered in an amount which, at the time the registration statement becomes effective, is reasonably expected to be offered and sold within two years from the initial effective date of the registration.

(3) The registrant furnishes the undertakings required by Item 512(a) of Regulation S–K (§229.512(a) of this chapter), except that a registrant that is an investment company filing on Form N–2 must furnish the undertakings required by Item 34.4 of Form N–2 (§239.14 and §274.11a–1 of this chapter).

(4) In the case of a registration statement pertaining to an at the market offering of equity securities by or on behalf of the registrant, the offering must come within paragraph (a)(1)(x) of this section.  As used in this paragraph, the term ''at the market offering'' means an offering of equity securities into an existing trading market for outstanding shares of the same class at other than a fixed price.

(5) Securities registered on an automatic shelf registration statement and securities described in paragraphs (a)(1)(vii), (ix), and (x) of this section may be offered and sold only if not more than three years have elapsed since the initial effective date of the registration statement under which they are being offered and sold, *provided, however*, that if a new registration statement has been filed pursuant to paragraph (a)(6) of this section:

(i) If the new registration statement is an automatic shelf registration statement, it shall be immediately effective pursuant to Rule 462(e) (§230.462(e)); or

(ii) If the new registration statement is not an automatic shelf registration statement:

(A) Securities covered by the prior registration statement may continue to be offered and sold until the earlier of the effective date of the new registration statement or 180 days after the third anniversary of the initial effective date of the prior registration statement; and

(B) A continuous offering of securities covered by the prior registration statement that commenced within three years of the initial effective date may continue until the effective date of the new registration statement if such offering is permitted under the new registration statement.

(6) Prior to the end of the three-year period described in paragraph (a)(5) of this section, an issuer may file a new registration statement covering securities described in such paragraph (a)(5) of this section, which may, if permitted, be an automatic shelf registration statement.  The new registration statement and prospectus included therein must include all the information that would be required at that time in a prospectus relating to all offering(s) that it covers.  Prior to the effective date of the new registration statement (including at the time of filing in the case of an automatic shelf registration statement), the issuer may include on such new registration statement any unsold securities covered by the earlier registration statement by identifying on the bottom of the facing page of the new registration statement or latest amendment thereto the amount of such unsold securities being included and any filing fee paid in connection with such unsold securities, which will continue to be applied to such unsold securities.  The offering of securities on the earlier registration statement will be deemed terminated as of the date of effectiveness of the new registration statement.

(b) This section shall not apply to any registration statement pertaining to securities issued by a face-amount certificate company or redeemable securities issued by an open-end management company or unit investment trust under the Investment Company Act of 1940 or any registration statement filed by any foreign government or political subdivision thereof.

[48 FR 52896, Nov. 23, 1983, as amended at 59 FR 43470, Aug. 24, 1994; 70 FR 44812, Aug. 3, 2005; 73 FR 968, Jan. 4, 2008]

Source: 17 CFR 230.415, "Delayed or Continuous Offering and Sale of Securities," *available at* http://www.gpo.gov/fdsys/pkg/CFR-2010-title17-vol2/pdf/CFR-2010-title17-vol2-sec230-415.pdf. Accessed June 19, 2015.

**E.      FINRA Rule 2232: Customer Confirmations**


(a) A member shall, at or before the completion of any transaction in any security effected for or with an account of a customer, give or send to such customer written notification ("confirmation") in conformity with the requirements of SEA Rule 10b-10.

(b) A confirmation given or sent pursuant to this Rule shall further disclose:

(1) with respect to any transaction in any NMS stock, as defined in Rule 600 of SEC Regulation NMS, or any security subject to the reporting requirements of the FINRA Rule 6600 Series, other than direct participation programs as defined in FINRA Rule 6420, the settlement date of the transaction; and

(2) with respect to any transaction in a callable equity security, that:

(A) the security is a callable equity security; and

(B) a customer may contact the member for more information concerning the security.

Adopted by SR-FINRA-2009-058 eff. June 17, 2011; amended by SR-FINRA-2010-066 eff. June 17, 2011.

**Selected Notice:** 10-62.


Source: *Finra Manual*, Rule 2232, "Customer Confirmations," *available at* http://finra.complinet.com/en/display/display_viewall.html?rbid=2403&element_id=9787&record_id=1 1329&filtered_tag=&print=1.  Accessed June 12, 2015.

**F.**      **NASD Rule 2230: Confirmations**

A member at or before the completion of each transaction with a customer shall give or send to such customer written notification disclosing (a) whether such member is acting as a broker for such customer, as a dealer for his own account, as a broker for some other person, or as a broker for both such customer and some other person; and (b) in any case in which such member is acting as a broker for such customer or for both such customer and some other person, either the name of the person from whom the security was purchased or to whom it was sold for such customer and the date and time when such transaction took place or the fact that such information will be furnished upon the request of such customer, and the source and amount of any commission or other remuneration received or to be received by such member in connection with the transaction.

Selected Notices to Members: 89-77, 90-11, 90-63.

Source: *NASD Manual*, Rule 2230, "Confirmations," dated March 2006, pp. 4149-4150.

## G.      NYSE Rule 409

(As amended, effective date: January 1, 2008)

(New language is underlined; deletions are in brackets)

Rule 409.  Statements of Accounts to Customers

(a) through (e) No change.

(f) Confirmation of all transactions (including those made "over-the-counter" and on other exchanges) in securities admitted to dealings on the Exchange, sent by members or member organizations to their customers, shall [indicate] clearly set forth with a suitable legend the settlement date of each transaction [and bear the name of the securities market on which the transaction was made].  This requirement also applies to confirmations or reports from an organization to a correspondent, but does not apply to reports made by floor brokers to the member organization from whom the orders were received.

[All confirmations shall contain a suitable legend clearly setting forth all required information.]

Source:  FINRA Regulatory Notice 07-65, "Amendments to NYSE Rule 409(f)," dated December 2007, *available at* https://www.finra.org/sites/default/files/NoticeDocument/p037670.pdf.  Accessed June 20, 2015.