# EXHIBIT 2

**In The Matter Of:**

*Securities and Exchange Commission v.*
*Revelation Capital Management, Ltd., et al.*

---

*Guy F. Erb*
*July 23, 2015*

---

*Behmke Reporting and Video Services, Inc.*
*160 Spear Street, Suite 300*
*San Francisco, California 94103*
*(415) 597-5600*

Original File 27231Erb.txt
Min-U-Script® with Word Index

Securities and Exchange Commission v.
Revelation Capital Management, Ltd., et al.

Guy F. Erb
July 23, 2015

---

**Page 1**

```
 1            UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF NEW YORK
 3   - - - - - - - - - - - - - - - - -
 4   SECURITIES AND EXCHANGE COMMISSION, )
 5                    Plaintiff,       )
 6        v.                   )  Civil Action No.
 7   REVELATION CAPITAL MANAGEMENT,      )  14-cv-0645
 8   LTD. and CHRISTOPHER P.C. KUCHANNY, )
 9                    Defendants.       )
10   - - - - - - - - - - - - - - - - -
11
12
13
14       VIDEOTAPED DEPOSITION OF GUY F. ERB
15            THURSDAY, JULY 23, 2015
16
17
18
19
20
21            BEHMKE REPORTING AND VIDEO SERVICES, INC.
22                    BY:  MICHELE MOSKOWITZ
23                160 SPEAR STREET, SUITE 300
24            SAN FRANCISCO, CALIFORNIA 94105
25                          (415) 596-5600
```

---

**Page 2**

```
 1
 2
 3
 4
 5
 6
 7
 8       Videotaped deposition of GUY F. ERB, taken on
 9   behalf of Plaintiff, at Securities and Exchange
10   Commission, 200 Vesey Street, New York, New York,
11   commencing at 9:33 A.M., THURSDAY, JULY 23, 2015,
12   before Michele Moskowitz, a Notary Public within
13   and for the State of New York, pursuant to Notice
14   of Videotaped Deposition.
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 3**

```
 1   APPEARANCES OF COUNSEL:
 2   FOR PLAINTIFF SECURITIES AND EXCHANGE COMMISSION
 3       UNITED STATES SECURITIES AND EXCHANGE COMMISSION
 4       BY:  CHARLES D. STODGHILL, ATTORNEY AT LAW
 5       100 F Street N.E.
 6       Washington, DC  20549-4030
 7       Telephone:  (202) 551-4413
 8       Email:  stodghillc@sec.gov
 9
10   FOR DEFENDANTS
11       SEWARD & KISSEL LLP
12       BY:  JACK YOSKOWITZ, ATTORNEY AT LAW
13            THOMAS ROSS HOOPER, ATTORNEY AT LAW
14            JULIA TEBOR, ATTORNEY AT LAW
15       One Battery Park Plaza
16       New York, New York  10004
17       Telephone:  (212) 574-1507
18       Email:  yoskowitz@sewkis.com
19
20   ALSO PRESENT:
21       David Jiminez, Legal Video Operator
22
23
24
25
```

---

**Page 4**

```
 1                    INDEX
 2   THURSDAY, JULY 23, 2015
 3   GUY F. ERB                          Page
 4       Examination by MR. YOSKOWITZ        7
 5
 6                    -oOo-
 7
 8       QUESTION WITNESS INSTRUCTED NOT TO ANSWER:
 9            PAGE      LINE
10                 None.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Securities and Exchange Commission v.
Revelation Capital Management, Ltd., et al.

Guy F. Erb
July 23, 2015

Page 5

```
 1                    EXHIBITS
 2                  GUY F. ERB
 3   Number          Description          Page
 4   Exhibit 67   Expert report - 59 pages    6
 5   Exhibit 68    Citation from Dictionary
 6                  of Financial Terms - 4 pages   81
 7
 8
 9            EXHIBITS PREVIOUSLY MARKED
10   Number          Description          Page
11   Exhibit 9      Press release           62
12   Exhibit 10     Selling memorandum      63
13   Exhibit 19     Underwriting agreement  79
14   Exhibit 38     Engagement letter       59
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1     THURSDAY, JULY 23, 2015; 9:33 A.M.
2     (Expert report of Guy Erb was marked Exhibit
3 67 for identification, as of this date.)
4     **VIDEOTAPE OPERATOR:** Here begins DVD No. 1 in
5 the deposition of Mr. Guy F. Erb in the matter of
6 United States Securities and Exchange Commission
7 vs. Revelation Capital Management, Ltd, et al.
8 It's in the United States District Court, Southern
9 District of New York, Case No. 14 CV0645.
10    The date today is July 23, 2015, and the time
11 on the video monitor is 9:33 a.m.
12    The video operator today is David Jiminez with
13 Behmke Reporting and Video Services, Inc., 160
14 Spear Street, Suite 300, San Francisco, California.
15 The video deposition is taking place at 200 Vesey
16 Street in New York, New York, and is noticed by
17 Mr. Jack Yoskowitz of Seward & Kissel.
18    Would counsel please voice identify yourselves
19 and state whom you represent.
20    **MR. YOSKOWITZ:** Jack Yoskowitz, Julia Tebor,
21 and Ross Hooper from Seward & Kissel representing
22 the defendants.
23    **MR. STODGHILL:** And Charles Stodgill from the
24 Securities and Exchange Commission representing the
25 plaintiff.

Page 7

1     **VIDEOTAPE OPERATOR:** The court reporter today
2 is Michele Moskowitz, certified shorthand reporter
3 with Behmke Reporting and Video Services, Inc.
4 Would the reporter please swear in the witness and
5 we can proceed.
6     **THE COURT REPORTER:** Can you raise your
7     right hand, please? Do you solemnly swear
8     that the testimony you're about to give will
9     be the truth, the whole truth, and nothing but
10    the truth so help you God?
11    **THE WITNESS:** I do.
12    **THE COURT REPORTER:** Please state your
13    name for the record.
14    **THE WITNESS:** Guy F. Erb.
15    **THE COURT REPORTER:** Thank you.
16
17        **EXAMINATION**
18 BY MR. STODGHILL:
19    Q.   Good morning, Mr. Erb.
20    A.   Good morning.
21    Q.   As you heard, I'm Jack Yoskowitz, I
22 represent the defendants.
23        Have you ever been deposed before?
24    A.   Yes, I have.
25    Q.   How many times?

Page 8

1     A.   I think this will be the fifth time.
2     Q.   Okay. Great. Just so we have the
3 rules, some of them anyway, I'll let you finish
4 your answer and hopefully you'll let me finish my
5 question. If you don't understand my question,
6 please let me know and I'll try to rephrase it. If
7 you need a break pretty much for any reason, let me
8 know. If you need to consult with Mr. Stodghill,
9 let me know.
10        With that being said, can you just
11 briefly describe your educational background after
12 high school?
13    A.   After high school I attended the
14 University of California at Berkeley and then
15 during my junior year I spent the year under the
16 auspices of New York University at the -- at the
17 University of Madrid, receiving a diploma under
18 that, and then I came back to Berkeley and received
19 my undergraduate degree a year later. I then went
20 to the London School of Economics and took a
21 master's degree in economics from the London
22 School.
23    Q.   What -- what was your degree in from
24 Berkeley?
25    A.   Economics.

Securities and Exchange Commission v.
Revelation Capital Management, Ltd., et al.

Guy F. Erb
July 23, 2015

1  Q.    And what kind of diploma did you get
2  from the University of Madrid?
3  A.    It's just a certification that I had
4  spent the year there.  It was a full university
5  year.
6  Q.    Okay.  When did you graduate from
7  London School of Economics?
8  A.    '65.
9  Q.    Okay.  Have you done any postgraduate
10 work since then?
11 A.    No.
12 Q.    Okay.  Do you have any other degrees or
13 certifications?
14 A.    No.
15 Q.    All right.  Are you licensed by FINRA?
16 A.    Not anymore.
17 Q.    Okay.  You were though at some point?
18 A.    Not by FINRA because it hadn't come
19 into being yet, but I was licensed by the NASD and
20 then the New York Stock Exchange.
21 Q.    What licenses did you have?
22 A.    Series 7 and Series 24.
23 Q.    And approximately when did you get
24 them?
25 A.    The 7 was in the late '80s, I think

1  '87, the 24 was probably 88.
2  Q.    And how long did you hold them for?
3  A.    Until roughly 2000 -- after I left
4  Goldman I associated briefly with a broker-dealer
5  and that probably ran into 2001.
6  Q.    Okay.  And I guess since you graduated
7  from the London School, can you take me through
8  your -- your job history in the finance services?
9  A.    Yes.  After the London School I joined
10 the U.S. Foreign Service, spent roughly two years
11 with the State Department in Washington, and then I
12 left the Foreign Service and went to the United
13 Nations in New York, first of all working in the
14 United Nations Secretariat as an economics officer.
15       After four years there I went to
16 Geneva, still with the United Nations Conference on
17 Trade and Development, spent two years in Geneva
18 and then one year as a financial advisor in Central
19 America, following which I went back to Washington,
20 spent five years at the think tank known as the
21 Overseas Development Council, and from there I
22 joined the Whitehouse staff of President Carter
23 under the supervision of Dr. Brzezinksi.
24 Q.    How long were you working at the
25 Whitehouse?

1  A.    A little over two years.  For the last
2  year of the Carter Administration I was named the
3  deputy director of an independent agency known as
4  the U.S. International Development Cooperation
5  Agency.
6  Q.    What did you do after that?
7  A.    Then I founded a consulting firm when I
8  left the Government in 1981 and worked as a
9  corporate consultant on my own for a couple of
10 years, then formed a business known as Erb & Madian
11 with a partner Alan Madian and with him I then
12 formed Lafayette Capital Corporation, which was the
13 vehicle that was supervised by the NASD, and then
14 after that I joined Goldman Sachs.
15 Q.    So what did you -- what -- what was the
16 business of Erb & Madian?
17 A.    A corporate consulting, advisory work
18 related to for the most part foreign investments
19 and strategic decisions regarding those
20 investments.
21 Q.    Did you do any underwriting work when
22 you were at Erb & Madian?
23 A.    No, it was not a licensed
24 broker-dealer.
25 Q.    Okay.  And what about Lafayette

1  Capital?  What did you do at Lafayette Capital?
2  A.    That as an M&A advisory firm and it was
3  registered by the NASD, but we were limiting our
4  activities to merger and acquisition development
5  and fostering transactions.
6  Q.    So who were the clients of Lafayette
7  Capital?
8  A.    Oh, well, we had, among other things,
9  Goldman Sachs, some Mexican companies, a couple --
10 I think, I can't recall them all now, but they
11 would have been American or Mexican companies.
12 Q.    Okay.  And did you do any underwriting
13 while you were there?
14 A.    Not there, no.
15 Q.    Okay.  And what did you do after
16 Lafayette Capital?
17 A.    Then I joined Goldman Sachs.  I had
18 been retained by Goldman during late 1989 and for
19 the bulk of 1990 I worked with Goldman teams on the
20 liberalization that was taking place in Mexico at
21 that time.
22 Q.    Okay.  And -- and what were your duties
23 and responsibilities at Goldman Sachs?
24 A.    At Goldman I was the vice president in
25 the investment banking services.  My

Securities and Exchange Commission v.
Revelation Capital Management, Ltd., et al.

Guy F. Erb
July 23, 2015

1 responsibilities largely related to the development
2 of investment banking business in Mexico.
3 **Q.    What did you do to develop investment**
4 **banking business in Mexico?**
5     A.    Well, this is a process of calling on
6 potential clients, working with a team from Goldman
7 to present the firm and its credentials, obtaining
8 the mandate if we were successful, and then joining
9 the team as they work through whatever transaction
10 we had been assigned to do, whether that was
11 underwriting a merger assignment, a valuation
12 assignment, whatever it happened to be.
13     **Q.    How long were you in that role at**
14 **Goldman?**
15     A.    Well, you could say that I was in that
16 role for the entire ten years that I worked at
17 Goldman, although my title changed halfway through
18 when I moved to Mexico and became the director of
19 the office but my -- in addition to managing the
20 office and reporting to Mexican authorities, my
21 responsibilities remained largely the same.
22     **Q.    Okay.  Is it -- is it fair to say that**
23 **while you were at Goldman your clients were Mexican**
24 **companies?**
25     A.    Largely, but we also responded to

1 requests from U.S. or European clients of Goldman
2 for information or advice regarding Mexico.  I was
3 frequently calling on American companies as well,
4 but for the most part the underwriting we did was
5 in my case mainly Mexican companies, in other cases
6 they were Latin American companies from Brazil or
7 other -- other nations.  But in the case of Mexico,
8 all the companies that we worked with were in --
9 underwritten in the United States for placement of
10 securities through the New York Stock Exchange.
11     **Q.    So these were Mexican companies that --**
12 **that had shares listed on the American stock**
13 **exchanges?**
14     A.    Yes.  Well, New York Stock Exchange for
15 the most part.
16     **Q.    New York Stock Exchange?**
17     A.    Yes.
18     **Q.    Okay.  And you said you worked on**
19 **different types of transactions for these clients,**
20 **valuation I think you said, underwriting?**
21     A.    Yes.
22     **Q.    So approximately how many underwritings**
23 **did you work on while you were at Goldman?**
24     A.    I would say counting those we worked on
25 but did not realize for one reason or another

1 probably ten.
2     **Q.    Okay.  And how many were realized?**
3     A.    Five or six of those.
4     **Q.    Okay.  And as I understand your career**
5 **prior to Goldman, you didn't work on underwritings**
6 **prior to joining Goldman, right?**
7     A.    That's correct.  I would add one thing,
8 I was thinking of equity offerings when I responded
9 to that question, but we also did debt offerings
10 and the number of underwritings would go over ten
11 in that case.
12     **Q.    Okay.  So you worked -- you worked**
13 **on -- in terms of realized equity underwritings,**
14 **you worked on about five?**
15     A.    Five to seven.  I think it's hard to
16 recall them all right now.
17     **Q.    Okay.  And to the best of your**
18 **recollection, all of those underwritings were for**
19 **Mexican companies that were listed on the New York**
20 **Stock Exchange?**
21     A.    Yes.
22     **Q.    And what was your role in the actual**
23 **underwriting process?**
24     A.    I joined the teams -- usually these
25 teams comprised corporate finance for the

1 management of due diligence, debt capital markets
2 if it was a debt offering, and the equity desk and
3 often involved the interest or involvement of the
4 senior management of the company as well.
5         And I would join the teams from the
6 outset first in what we call the coverage of the
7 company, calling on the company, making the
8 presentation.  In several cases the company
9 communicated its decision to work with Goldman
10 Sachs through me and then I would help form the
11 team that responded to that mandate.
12         The process begins with due diligence.
13 I would frequently join the due diligence teams
14 which were exploring issues about the issuer,
15 meeting with officials of the company or in the
16 case of privatizations, meeting with officials of
17 the government who were selling the shares or the
18 government's representative, which happened to be a
19 bank, and one of the largest transactions, which
20 was the Telmex transaction.
21         Once the due diligence was completed, I
22 would work with the team on the preparation of the
23 prospectus, work with the equity desk as they
24 contacted investors about the offering and would be
25 present in the communications with the company if

Securities and Exchange Commission v.
Revelation Capital Management, Ltd., et al.

Guy F. Erb
July 23, 2015

Page 17

1  any issues had arose or what the pricing might be
2  for the deal, what -- what the market was like for
3  the deal, that sort of thing.
4      Q.    So when you say you worked with the
5  equity desk, did you actually contact customers and
6  talk with customers, potential purchasers?
7      A.    Sometimes, yes.  In the context of the
8  road shows, which would be used to present these
9  companies to the market.  I would meet with -- with
10  the investors either in New York or wherever they
11  happened to be, and that would include United
12  States and Europe, to introduce the company to the
13  investors.
14      Q.    Were you considered a salesperson at
15  Goldman?
16      A.    No.
17      Q.    Okay.  So did you ever solicit orders
18  directly and take orders from customers?
19      A.    I did for a brief time when I was in
20  Mexico.  I oversaw the trading desk we had in
21  Mexico and --
22      Q.    When was that?  Sorry.
23      A.    That was -- well, we formed the Mexican
24  company in December of 1994, we began trading on
25  the Mexican stock exchange -- would have been in

Page 18

1  1996.  I think we began trading in 1996, so it
2  would have been in the period between '96 and '98.
3      Q.    Okay.  And when you were on -- when you
4  were overseeing the trading desk, was that in
5  connection with underwritings or was that in
6  connection with something else?
7      A.    Normally it was in connection with
8  transactions, buy/sell transactions on the
9  exchange.  Any ticket had to be signed by a
10  supervisor of the bank.  The office of Mexico, I
11  mean Goldman Sachs.
12      Q.    Did -- were you considered part of the
13  Goldman securitization department or desk?
14      A.    I worked with them, but I was not part
15  of that desk.
16      Q.    What did you do after you left Goldman?
17      A.    I formed with some others a company
18  known as Rapid Money Corporation, which was a money
19  transfer company offering services to migrant
20  workers who wished to transmit money back to Mexico
21  and other Latin American companies.
22      Q.    That didn't involve -- that did not
23  involve underwriting, I assume, correct?
24      A.    No, it did not.
25      Q.    Okay.  And.  What did you do after --

Page 19

1  if anything, after Rapid Money?
2      A.    Then I joined LECG, which is a expert
3  services firm.  That was in 2005.  And after that I
4  joined FTI in 2009 and BRG in 2012.
5      Q.    And both FTI and Berkeley -- BRG are
6  expert search firms?
7      A.    Not search, expert services.
8      Q.    Services.  So in terms of your
9  underwriting experience, to the extent there is
10  any, I don't mean that pejoratively, it's the time
11  that you spent at Goldman, correct?
12      A.    Yes.
13      Q.    And that -- that's it, right?
14      A.    Well, there was a brief time after
15  Goldman when I was soliciting business together
16  with other broker-dealers for a much smaller firm,
17  but I don't recall that ever led to an actual
18  underwriting.
19      Q.    Okay.  And do you have any experience
20  with working with Canadian issuers?
21      A.    We did work with Wood Gundy in a couple
22  of transactions.  They were part of the selling
23  syndicate for the Telmex transaction, for example.
24      Q.    So they were part of the syndicate.
25  Did you ever work with a Canadian company, an

Page 20

1  issuer?
2      A.    Not that I recall.
3      Q.    Okay.  And did you ever work on an
4  underwriting that was a Canadian underwriting?
5      A.    I'm not sure what you mean.  Solely a
6  Canadian underwriting?
7      Q.    Let's start with that, sure.
8      A.    No.
9      Q.    Did you ever work on a company that was
10  partly an underwriting in Canada?
11      A.    I don't recall.  Well, yes, partly an
12  underwriting in Canada, of course.  We worked
13  with -- as I said, on the Telmex transaction
14  Goldman was the book runner for all the books.
15  That's the U.S., Europe and Asia, and North America
16  included Canada.  So as I said, we worked with Wood
17  Gundy.  Wood Gundy participated in the road show
18  and the transactions.  But I didn't travel to
19  Canada, I worked with Wood Gundy.
20      Q.    What kind of work did you do at Wood
21  Gundy?
22      A.    I didn't work at Wood Gundy.  I'm just
23  saying they were in the selling syndicate.
24      Q.    So you had no role sort of in
25  connection with what was going on in Canada, is

Securities and Exchange Commission v.
Revelation Capital Management, Ltd., et al.

Guy F. Erb
July 23, 2015

Page 21

1  that fair to say, in that transaction?
2  A.   Only insofar as I helped prepare the
3  prospectus and get the documents ready for the
4  transaction.
5  Q.   Did you prepare any documents that you
6  know were filed in Canada?
7  A.   I presume that something was filed
8  related to the prospectus that we did, but I was
9  not involved in the filing.
10  Q.   Now, I -- I believe you said you've
11  given deposition testimony before?
12  A.   Yes.
13  Q.   Is that all in connection with expert
14  services?
15  A.   Yes.
16  Q.   Okay.  How many times have you -- well,
17  let's start generally.
18        How many -- how many expert engagements
19  do you think you've worked on?
20  A.   Oh, 20, 25, I guess.
21  Q.   Okay.  And how many of those resulted
22  in you offering an expert report?
23  A.   10 to 15, I guess.
24  Q.   Okay.  And how many resulted in
25  depositions?  I guess five?

Page 22

1  A.   Five or six, yeah.
2  Q.   And have you ever testified in a court?
3  A.   Yes.
4  Q.   How many times?
5  A.   Once in a court, twice in arbitration.
6  Q.   In each of those were you actually
7  qualified by the court as an expert?
8  A.   Well, the -- formally I was qualified
9  in the Southern District of New York.  The process
10  in the arbitrations was less formal, but I'm -- I
11  was not -- I was admitted to the testimony.  I
12  don't recall it using the word qualified in the
13  arbitrations however.
14  Q.   That's fine.  In the Southern District
15  action, what area were you giving expert testimony
16  in?
17  A.   That was a transaction -- a suit
18  involving a transaction, a mergers and acquisitions
19  transaction, I was testifying as to the damages
20  that had been sustained.
21  Q.   And what about the arbitrations?
22  What -- what expert opinions in general were you
23  offering in those arbitrations?
24  A.   One was related to a project financing
25  and the other was related to a compensation for

Page 23

1  capital raising services.
2  Q.   Have you given -- offered expert
3  opinions in the areas of underwriting before?
4  A.   Yes.
5  Q.   And tell me about -- generally tell me
6  about those.
7  A.   Well, the first case that I worked on
8  was a case involving the underwriter of various
9  transactions for Enron.  There was a second case
10  where I was involved in assessing the due diligence
11  that had been performed for the -- prior to the
12  underwritings for WorldCom.  Similarly I worked on
13  tran -- on a matter involving the various rounds of
14  due diligence and underwriting that had taken place
15  for Refco, that's R-E-F-C-O --
16  Q.   Yup.
17  A.   -- and in other matters relating to
18  mortgage-backed securities.  I opined on the
19  underwriting process and in particular the due
20  diligence prior to the underwriting of the
21  securities, the mortgage-backed securities that
22  were offered in the markets.
23  Q.   Have you ever provided any expert
24  testimony in connection with any Canadian
25  underwriting?

Page 24

1  A.   No.
2  Q.   Have you ever provided expert testimony
3  on the way that an underwriting should be
4  characterized?
5  A.   Not exactly as -- as we're doing here,
6  no.
7  Q.   Have you ever provided expert testimony
8  before on Rule 105, as you understand it?
9  A.   No.
10  Q.   Rule 105 was not in existence while you
11  were at Goldman; is that fair to say?
12  A.   I don't recall.  I don't recall.
13  Q.   Did you -- did you have ever any
14  occasion to -- while you were working to -- to
15  review 105 or its predecessor?
16  A.   Not that I recall.
17  Q.   Have you ever been the subject of a SEC
18  or FINRA inquiry?
19  A.   No.
20  Q.   Okay.  Have you ever been a defendant
21  or plaintiff in a lawsuit?
22  A.   No.  Well, excuse me, there was a -- a
23  lawsuit related to a piece of property I own in San
24  Francisco, but that I was for a while a defendant,
25  but the case never went anywhere.

Securities and Exchange Commission v.
Revelation Capital Management, Ltd., et al.

Guy F. Erb
July 23, 2015

1  Q.  Is that Califass vs. Erb?  Is that
2  the --
3  A.  Yes, Califass.  I've forgotten how to
4  spell Califass.  It's in the record I think.
5  Q.  Was -- was the allegation in there a
6  fraud allegation related to the property?
7  A.  No.  It was an allegation regarding a
8  sale to a third party rather than anything I had
9  formed with regard to Mr. Califass.
10  Q.  Okay.  And that -- what happened with
11  that case?
12  A.  Nothing.
13  Q.  Was it settled or was it --
14  A.  No.  It just --
15  Q.  Faded away?
16  A.  -- faded away.
17  Q.  I think in your -- and I'll just mark
18  this so we have it.
19  MR. YOSKOWITZ: We're going to mark as Exhibit
20  67 the expert report of Guy Erb.
21  A.  Thank you.
22  Q.  There's a -- there -- under teaching
23  experience, Mr. Erb --
24  A.  Yes.
25  Q.  -- it says you're a faculty director

1  and senior fellow in global finances at the Levin
2  Graduate Institute?
3  A.  Yes.
4  Q.  Where is that?
5  A.  It's part of the -- I think it was part
6  of the State University of New York system.  I'm
7  not sure of its status right now.  Their location
8  physically was on East 54th Street.
9  Q.  Okay.  Okay.  You think they were part
10  of the SUNY system when you were there?
11  A.  Yes, definitely.
12  Q.  Did -- did you actually teach a course?
13  A.  Yes.
14  Q.  And what course did you teach?
15  A.  It was called global finance, I
16  believe, or something to that effect.  I taught
17  that for three different semesters.
18  Q.  Okay.  Did that course in any way --
19  did you cover underwritings in that course?
20  A.  Yes.
21  Q.  Okay.  Did you cover Rule 105 in that
22  course?
23  A.  No.
24  Q.  Okay.  It says you also were an adjunct
25  professor at Georgetown?

1  A.  That was in 1981 after I left the
2  Government.
3  Q.  Okay.  Did you teach any courses while
4  you were there?
5  A.  One course, as I recall.
6  Q.  What was that course?
7  A.  It was a course on, again,
8  international relations focused on the political
9  and economic risk that foreign investors raise.
10  Q.  And you have -- you don't have a list,
11  but you have a summary of sort of your
12  publications?
13  A.  Yes.
14  Q.  Are there any publications that cover
15  the way underwriting is conducted?
16  A.  No.
17  Q.  And are there any publications
18  concerning Rule 105 or its predecessor?
19  A.  No.
20  Q.  Have you written articles or
21  underwritings?
22  A.  I believe I would have touched on
23  underwritings or commented on them, but not one
24  that's focused entirely on underwriting, no.
25  Q.  When were you first contacted by

1  someone regarding this engagement?
2  A.  Sometime in 2014 I think.  I'm not sure
3  of an exact date.
4  Q.  And who contacted you?
5  A.  I believe it was Mr. Stodghill.
6  Q.  Okay.  And what did he -- the SEC, what
7  did they ask you to do?
8  A.  I was asked to opine on the
9  underwriting of Central Fund of Canada's shares in
10  November of 2009 and to assess whether it was a
11  firm commitment or best efforts underwriting.
12  Q.  And have you ever been retained as an
13  expert by the SEC?
14  A.  No.
15  Q.  Okay.  Have you ever worked with
16  Mr. Stodghill before?
17  A.  No.
18  Q.  Okay.  I take it -- strike that.
19  Did you ever -- did you have any
20  familiarity with the defendants in this action
21  before you were contacted by Mr. Stodghill?
22  A.  No.
23  Q.  What about Central Fund of Canada?
24  A.  No, I don't think so.
25  Q.  By the way, while you were at -- while

Securities and Exchange Commission v.
Revelation Capital Management, Ltd., et al.

Guy F. Erb
July 23, 2015

Page 29

1  you were at Goldman, did you have any -- did any of
2  your matters concern Goldman and silver markets?
3      A.    I'm trying to recall.  I don't think so
4  directly, not in the sense that we didn't
5  underwrite anything such as the Central Fund.
6  That's hard to say whether or not there wasn't some
7  tangential connection.
8      Q.    Okay.  What about --
9      A.    Well, excuse me one second.
10     Q.    Okay.
11     A.    We did work quite a lot with Grupo
12  Mexico in Mexico, which is a mining company.
13     Q.    A mining company?
14     A.    Yes.
15     Q.    Do they mine gold and silver?
16     A.    Among other things.
17     Q.    What did you do for that company?
18     A.    We talked to them about a number of
19  different possibilities, but while I was there I
20  don't believe we ever did a deal with them.
21     Q.    Did you have any familiarity with
22  closed-end funds while you were at Goldman?
23     A.    Certainly I was aware of closed-end
24  funds.  We had quite a wide array of products to
25  consider at Goldman and they were among those

Page 30

1  products.
2      Q.    Did you actually do any work for
3  closed-end funds while you were there?
4      A.    Not that I recall.
5      Q.    Do you recall if this mining operation
6  was a closed-end fund?
7      A.    No, no.  It was a mining company.
8      Q.    Okay.  When did you first put together,
9  I guess, a draft of your expert opinion in this
10  case?
11     A.    It would have been during May/June, I
12  believe.
13     Q.    Of this year?
14     A.    Of this year.
15     Q.    So -- and I'm not trying to get behind
16  any of your communications, but I'm just wondering
17  if you did any work from the time you were
18  contacted in 2014 to May/June of this year on this
19  matter.
20     A.    Probably, but I don't recall exactly
21  what -- what the timetable was.
22     Q.    So the first time you sort of put pen
23  to paper was in May/June of this year?
24     A.    I don't recall.
25     Q.    Okay.  Did -- did anyone assist you in

Page 31

1  drafting your report?
2      A.    Yes.
3      Q.    And who assisted you?
4      A.    Staff of BRG.
5      Q.    What -- what -- who are they and what
6  do they do?
7      A.    Normally we work with a case manager.
8  In this case it was Dr. Tim Savage, Timothy Savage.
9      Q.    Okay.
10     A.    The junior staff included Collette
11  Porter and -- and we worked with -- for a while
12  with Jocelyn Teece.
13     Q.    What did Dr. Savage do?
14     A.    He assisted me in the preparation of
15  the report.  He also assisted in the preparation of
16  the statistical analysis of the gold and silver
17  markets and the charts and material related to the
18  evolution of the price of the Central Fund.  He
19  also assisted me in commenting on the draft report
20  and generally offering advice from the perspective
21  of a Ph.D. in economics.
22     Q.    Did he give you -- did he give you any
23  advice that informed your opinion in this area?
24     A.    No.  I was able to be do that based on
25  my own experience and -- and education and training

Page 32

1  and different matters I worked on at Goldman.
2      Q.    So -- so turn to your report, and just
3  while we're on this area, just turn to page 9 of
4  your report, and under A on that page it says gold
5  and silver markets and there's a couple of
6  paragraphs?
7      A.    Yes.
8      Q.    Is that the information that you got
9  from Dr. Savage?
10     A.    In part, yes.
11     Q.    Well, did he -- there's a bunch of
12  footnotes to various industry reports.  Is that
13  something that Dr. Savage put together?
14     A.    Together with the team, yes.
15     Q.    Okay.  And I think you testified you --
16  you don't really have any experience in the gold
17  and silver markets right?
18     A.    Well, not directly, no.
19     Q.    Okay.  All right.  So what -- what is
20  your expert area, Dr. Erb that -- or is it Dr. or
21  Mr.?
22     A.    Mr.
23     Q.    Okay.  Sorry.  What is your area,
24  Mr. Erb, that you're being offered for as an
25  expert?

Securities and Exchange Commission v.
Revelation Capital Management, Ltd., et al.

Guy F. Erb
July 23, 2015

Page 33

1    A.    The underwriting of securities
2 transactions.
3    Q.    What did Collette Porter do, if
4 anything?
5    A.    In part the research that you referred
6 to here in footnotes 12, 13, 14 and some of the
7 calculations we see in -- in the report and also
8 the review of case material.
9    Q.    When you say case material, what do you
10 mean?
11    A.    All the material that was produced with
12 regard to this matter.
13    Q.    What -- what did you look at -- and I
14 know there's a list in the back, but generally what
15 did you look at with regard to forming your opinion
16 in this matter?  I guess we'll talk about the
17 citations, but in terms of the case file, what did
18 you look at?
19    A.    Either I or Ms. Porter or Dr. Savage
20 looked at nearly every document that was produced
21 that we had.  We used them to support or comment on
22 my opinion.
23    Q.    Did you actually request any documents
24 from the SEC?
25    A.    Yes, we did.

Page 34

1    Q.    And what documents did you request?
2    A.    Well, I can recall some of the
3 documents relating to press releases from the SEC
4 that were issued in the 1990s, we had difficulty
5 finding those.  They provided those.
6    Q.    Anything else?
7    A.    We made a general request for documents
8 produced and they responded.  I'm sure that we
9 probably asked for individual documents that we
10 couldn't find or were uncertain about.
11    Q.    Was there any document you requested
12 from the case file that you did not get?
13    A.    No.
14    Q.    How are you being compensated for this
15 matter or how is BRG being compensated?
16    A.    My rate for this matter is $500 per
17 hour.
18    Q.    And do you know how much BRG has
19 incurred in -- in fees so far on this matter?
20    A.    Roughly $100,000.
21    Q.    Did you review any Canadian offerings
22 apart from the Central Fund of Canada in connection
23 with this report?
24    A.    No.
25    Q.    Did you review any Canadian sources of

Page 35

1 information with respect to your opinions in this
2 report?
3    A.    Among the materials produced there are
4 some Canadian documents.
5    Q.    Apart from the case files?
6    A.    No.
7    Q.    Okay.
8    A.    Well, let me think for a minute.  I'm
9 not sure as I look at this whether some of the
10 sources were not of Canadian origin, but I'm not
11 sure.
12    Q.    Okay.  If you turn to page 6 of your
13 report, 17 has the basis of opinions; do you see
14 that?
15    A.    Yes.
16    Q.    Okay.  We've talked about, I assume,
17 your professional training and experience, there's
18 nothing that we haven't talked about that you
19 relied on this report; is that correct?
20    A.    Well, there's a lot of experience at
21 Goldman that's relevant to this.  When I referred
22 to the number of underwritings we'd done, I was
23 referring to the successful underwritings, those
24 actually placed in the markets.  There were another
25 five or six that were carried forward to near

Page 36

1 completion or beginning of operations that were not
2 executed, so those went into my opinions as well.
3    Q.    You've -- you've -- you've mentioned
4 that you were looking at in this engagement whether
5 something was a firm commitment or best efforts
6 offering?
7    A.    Yes.
8    Q.    How many of those five offerings were
9 firm commitment offerings?
10    A.    All of them.
11    Q.    Have you ever worked on a best efforts
12 offering?
13    A.    No, I have not.
14    Q.    The ones that were -- never got to
15 realization, were any of those going to be best
16 efforts offerings?
17    A.    No.
18    Q.    All right.  So is it fair to say -- the
19 next sort of clause in that basis of opinion is the
20 review and analysis of independent research and
21 other public material.  Is all the research and
22 public material that you relied on referenced in
23 the report?
24    A.    Yes.
25    Q.    Under the opinion, under 18 there's

Securities and Exchange Commission v.
Revelation Capital Management, Ltd., et al.

Guy F. Erb
July 23, 2015

Page 37

1    a -- there's a reference on the second line to the
2    standards and practice in the industry; do you see
3    that?
4        A.    Yes.
5        Q.    What do you mean by that?
6        A.    Well, I'm drawing on my experience at
7    Goldman Sachs and to a certain extent at Lafayette
8    Capital there where we would work according to the
9    standards set by the framework of regulations, the
10   framework of commitments that underlay transactions
11   in the investment banking business.
12           The practices included due diligence,
13   consultation with legal teams, the method of
14   pricing transactions.  All those different aspects
15   went into my understanding of what the standards
16   and practices are.
17       Q.    Okay.  What experience at Lafayette
18   goes -- went into -- did you rely on?
19       A.    Just the due diligence that goes into
20   different transactions, which when you're working
21   on a merger transaction, much of the due diligence
22   is similar, you're trying to find out as much about
23   the company as you can.
24       Q.    If I remember your testimony, you
25   didn't work on underwritings at Lafayette, right?

1        A.    That's correct.
2        Q.    All right.  So if I ask you did you
3    look at a firm commitment offering at Lafayette,
4    the answer would be no, right?
5        A.    Right.
6        Q.    And the same for best efforts, right?
7        A.    Yes.
8        Q.    Yes, the answer is no, right?  Just so
9    the record is clear.  We'll get to your -- your
10   opinion, which is in 18, that the underwriting in
11   this offering was in all respects a firm
12   commitment, which is your opinion.  I have a
13   question about 19.
14       A.    Yes.
15       Q.    How did 19 come about?  Were you
16   asked -- you said you were asked I think to look at
17   how the underwriting essentially in this offering
18   should be characterized?  What is 19 meant to do
19   there?
20       A.    Respond to a comment or a -- an
21   allegation in the Complaint.
22       Q.    And what -- what allegation is that?
23       A.    Well, I don't have it in front of me
24   right now, but they did refer to this issue of how
25   the price was set.

1        Q.    And did you discuss -- how did that
2    sort of no opinion -- I don't know what to call it
3    because it's not an opinion, but -- but how did 19
4    come about?  Was that in your initial discussions
5    with the SEC?
6        A.    No.  This was in my initial draft.  I
7    just felt that it had been in the Complaint and
8    therefore just -- I was -- I felt that I was
9    obligated to make some sort of comment on it.
10       Q.    Setting aside the --
11       A.    Excuse me.  I misspoke.  It's the
12   defendant's answer, not the Complaint.  Pardon me.
13       Q.    Right.  I heard Answer in the second
14   part.
15           MR. STODGHILL:  I heard Complaint.
16       A.    Sorry about that.
17       Q.    And I guess when you were contacted by
18   the SEC in 2014, had the Complaint in this case
19   already been filed?  Was this already a Southern
20   District action?
21       A.    I don't recall the exact dates, but I
22   believe it must have been, yes.
23       Q.    Okay.  Am I correct that - you know,
24   the first sentence of 19, you're agreeing with the
25   factual statement that's in the Answer, right?

1        A.    Yes.
2        Q.    Okay.  You're not -- okay.  So in your
3    review of the facts, you're -- it's your
4    understanding that Central Fund is a Canadian
5    closed-end fund?
6        A.    Yes.
7        Q.    Okay.  And they're headquartered in
8    Canada?
9        A.    Yes.
10       Q.    And they don't actually have a U.S.
11   presence, correct?
12       A.    I don't know of one.
13       Q.    Okay.  And the underwriters -- at least
14   the lead underwriter was CIBC World Markets, Inc.?
15       A.    Yes.
16       Q.    And they're -- they're located in
17   Canada, correct?
18       A.    In both Canada and the United States,
19   yes.
20       Q.    But the office that was dealing with
21   this Central Fund of Canada was in -- was in
22   Canada?
23       A.    Yes.
24       Q.    Okay.  And the transfer agent was the
25   Canadian Trust Company, is that your understanding?

Securities and Exchange Commission v.
Revelation Capital Management, Ltd., et al.

Guy F. Erb
July 23, 2015

Page 41

1    A.    Well, I think there was shared
2  responsibility for the transfer agent between the
3  U.S. and the Canadian entity.
4    Q.    Did you look at the depositions of the
5  Canadian Trust Company and the depository company?
6    A.    If you mean CIBC Mellon, yes.
7    Q.    Okay. Well, yes, I'll -- at the time
8  they were CIBC Mellon, right?
9    A.    Well, I -- Mr. Daly was -- right.
10  Daly. I think it's D-A -- is it Mr. or Ms. Daly?
11    Q.    It's Mr. Daly.
12    A.    Mr. Daly, yes.
13    Q.    And so you're aware that the share
14  certificate for all the shares was filed with that
15  Canadian depository, correct?
16    A.    I don't know the dates of that
17  particular aspect.
18    Q.    Okay. And you're aware that Revelation
19  Capital is located in Bermuda?
20    A.    Yes.
21    Q.    Did you consider any Canadian law when
22  drafting your report?
23    A.    No, not directly.
24    Q.    And did you consider Canadian custom
25  and practice?

Page 42

1    A.    No. Well, excuse me, I think to the
2  extent that it's described in the depositions and
3  the -- what we call the IROC memo was circulated
4  under the authority of the Canadian regulator, to
5  that extent, yes.
6    Q.    Okay. Do you have any experience with
7  a multijurisdictional system?
8    A.    Well, yes, we did something comparable
9  to that when we underwrote a number of the
10  transactions, particularly the first one, where I
11  mentioned that Wood Gundy was -- represented the
12  syndicate. I don't recall at that time whether the
13  multijurisdictional procedures were exactly the
14  same or in place at the time, but we certainly had
15  deals that involved many different countries and
16  would have observed whatever regulations and rules
17  were extended in Europe or England or Japan or
18  Canada at the time.
19    Q.    It's fair to say in a
20  multijurisdictional offering you have to look at
21  the laws of each country?
22    A.    I don't know the questions of law.
23    Q.    Okay. So can you tell me why it's your
24  opinion that the underwriting in this offering was
25  a -- I guess in all respects a firm commitment

Page 43

1  underwriting?
2    A.    As I outline in the report, the
3  components of my decision include my own experience
4  with firm commitment underwritings, my
5  understanding of what a best efforts underwriting
6  is, the language of the offering documents in my
7  mind makes it clear that this is a firm commitment
8  underwriting and, as I understand, the framework
9  provided by various regulations of the SEC and --
10  conforms to the firm commitment underwriting.
11    Q.    When you say the language of the
12  offering document, what do you mean?
13    A.    The base shelf prospectus is the first
14  of the documents and the prospectus supplement,
15  which was filed on the day of the offering, is the
16  other. They're the two primary offering documents
17  and each one defines the transaction as a firm
18  commitment underwriting.
19    Q.    It doesn't actually use those words,
20  right?
21    A.    It uses the term purchase, which is a
22  characteristic of firm commitment underwritings.
23    Q.    But just so we're clear, it doesn't use
24  the word firm commitment?
25    A.    I'm not sure I focus -- I focused on

Page 44

1  the fact that it says purchase. I don't recall in
2  the entire document whether that phrase is used or
3  not.
4    Q.    You didn't think it was important when
5  you were looking at a document to see if it's
6  characterized at a firm commitment to see if the --
7  if those words are in the document?
8    A.    Well, once you purchase shares, you've
9  made a firm commitment, as the record indicates.
10  In fact, going firm is a term that was used by one
11  of the deponents in the matter.
12    Q.    What does going firm mean?
13    A.    It means you've underwritten the deal.
14    Q.    And what does underwriting the deal
15  mean?
16    A.    It means you have purchased the shares
17  for sale to individual investors.
18    Q.    Is every underwritten deal a firm
19  commitment?
20    A.    Is every --
21    Q.    Underwritten deal a firm commitment?
22    A.    Yes.
23    Q.    So you're saying you cannot have an
24  underwritten deal that's not a firm commitment?
25    A.    Strictly speaking, that's true. There

Securities and Exchange Commission v.
Revelation Capital Management, Ltd., et al.

Guy F. Erb
July 23, 2015

Page 45

1  is a certain flexibility or looseness in the
2  terminology. It's not infrequent for the term
3  underwriter to be used -- as I show in another
4  paragraph of the report to be used in a description
5  of a best efforts underwriting, but as I
6  understand, the term underwriting strictly defined
7  means the purchase of the shares.
8      Q.   Well, where is it strictly defined?
9      A.   This is coming back to the standards
10 and practices of the industry. This has all been
11 consistent with my experience, consistent with the
12 documents where it says the underwriters commit to
13 purchase the shares. That is the indication that
14 it's a firm commitment, it's an underwriting
15 properly defined.
16     Q.   Right. So when you say strictly
17 defined, you're not saying it's written down
18 anywhere that way, you're saying that in your
19 experience in the trading markets an underwriting
20 deal is a firm commitment, but you're also saying
21 that there's some flexibility so that under a
22 deal -- best efforts deals are sometimes referred
23 to as underwritten deals, correct?
24     A.   They are, but incorrectly.
25     Q.   Okay. But they are?

Page 46

1      A.   Yes.
2      Q.   Okay.
3      A.   But there's -- commenting on your
4  phrase you used there written down, it's frequently
5  written down in the literature surrounding equity
6  underwriting. I have a quote to that effect in the
7  report.
8      Q.   Okay. But we're -- now we're talking
9  about the documents themselves.
10     A.   Yes.
11     Q.   And in the documents themselves,
12 prospectuses, and other documents relating to
13 underwritings, a best efforts deal could be
14 referred to as an underwritten deal, correct?
15     A.   Not in the offering documents, no.
16     Q.   Not in the offering documents?
17     A.   No.
18     Q.   How is a best efforts deal referred to
19 in offering documents?
20     A.   Well, it usually refers -- if -- if the
21 term agent is used, it's quite clear they're
22 selling agents. If the term underwriter is used,
23 it usually is accompanied by a phrase or a
24 definition that says these firms are under no
25 obligation to purchase the shares. And that is the

Page 47

1  key to a best efforts underwriting, that the
2  underwriters or the agents are not bound to
3  purchase the shares, they bear no responsibility
4  for purchasing the shares.
5      Q.   Okay. So if I hear what you're saying,
6  in a best efforts deal, the documents could say
7  that this is an underwritten deal or referred to
8  the underwriters, correct?
9      A.   It could refer to the underwriters when
10 they really mean the agents, and we've illustrated
11 that in the report. It could not refer to
12 underwriting in the sense that the agents would
13 purchase the shares.
14     Q.   Okay. But you're talking about senses
15 and what's -- you're not talking about the written
16 words.
17     A.   Yes, I am. I mean, if -- if you're
18 talking about the deal that's described in the --
19 in -- if it is a best efforts offering, they will
20 say words to the effect that there is no obligation
21 to purchase the shares by the firms that are
22 running the underwriting or the agency sales.
23     Q.   But again, you're using the words to
24 the effect, right, so that does -- there's no --
25 there's no specific words, these -- for example,

Page 48

1  just in taking your opinion, you're saying this is
2  a firm commitment offering, but the words firm
3  commitment don't appear in the documents, right?
4      A.   The definition of a firm commitment
5  offering is the purchase of the shares, so it does
6  implicitly infer --
7      Q.   I'm not talking about implicitly,
8  Mr. Erb.
9      MR. STODGHILL: Wait a minute. Let him -- let
10 him finish.
11     Q.   I'm not talking implicitly, Mr. Erb.
12 I'm saying do the words firm commitment just like
13 that appear in the base shelf prospectus?
14     A.   I don't know.
15     Q.   So you have -- if you turn to your
16 report on page 7, you know, you have background on
17 closed-end funds, it's fair to say -- and I think
18 you testified to that, that you don't really have
19 any experience in closed-end funds and presumably
20 some of this research, if all of it, was just done
21 by people at BRG, correct?
22     A.   No. I have in my personal investments
23 purchased closed-end funds so I'm familiar with the
24 concept and certainly we did deal with all aspects
25 of sales activities at Goldman Sachs and frequently

Securities and Exchange Commission v.
Revelation Capital Management, Ltd., et al.

Guy F. Erb
July 23, 2015

1 were talking to private client representatives who
2 were transacting in closed-end funds, so it's not
3 just book knowledge.
4     Q.    But you didn't -- the underwritings
5 that you did were not closed-end funds, is that
6 correct, while you were at Goldman?
7     A.    That's correct.
8     Q.    Okay. And I think we talked about the
9 gold and silver market. Do you follow the gold and
10 silver market in your work?
11     A.    Yes. As I follow many different
12 international markets.
13     Q.    So have you written on the gold and
14 silver markets?
15     A.    I don't recall if we've actually -- not
16 a single article solely dedicated to that, but it's
17 quite likely that I referred to those markets or
18 commodity markets in general.
19     Q.    Does -- does the -- I'm looking at 9
20 and -- and I guess on 9, the 24 and 25 and 26
21 paragraphs.
22     A.    Yes.
23     Q.    Do those at all go into your opinion
24 about whether or not this is a firm commitment
25 offering?

1     A.    No. This is describing the market into
2 which the -- which was relevant to the offering or
3 offerings by the Central Fund.
4     Q.    In 28 you talk about creating an
5 opportunity for traders to engage in virtually
6 risk-free trades; do you see that?
7     A.    28. Yes.
8     Q.    What do you mean by that?
9     A.    Well, if you can sell at a lower -- let
10 me start again here. Short selling puts downward
11 pressure on prices and if you're successful in
12 selling short a product and then covering or
13 closing out that short at a price lower than you've
14 sold at, that's a profitable transaction, and if
15 the prices are aligned in such a way that you can
16 count on that relationship existing, then it's
17 virtually risk free.
18     Q.    So do I hear you by basically saying
19 you would need to know that an offering was coming
20 for that trade to be risk free at the time you put
21 on the shorts?
22     A.    Well, traders make judgments that are
23 independent of offerings, but that is one
24 possibility, yes.
25     Q.    Okay. And there's no indication that

1 anybody knew that this Central Fund offering was
2 happening until after the close of the market on
3 November 9th, right?
4     A.    Well, certainly it had been discussed
5 within the team and with the Central Fund, but in
6 terms of general public knowledge, the announcement
7 of this deal would have marked the time it was
8 officially known. I think that's fair.
9     Q.    And so for my client, Revelation,
10 there's no indication in the record that they knew
11 that this offering was coming before they got word
12 after the close on November 9th, correct?
13     A.    I don't know.
14     Q.    And did you review Mr. Kuchanny's
15 testimony?
16     A.    I did.
17     Q.    And did you see that he put on hedges
18 related to the gold and silver markets?
19     A.    If it's in the deposition, I would have
20 read that. I don't recall it at this moment.
21     Q.    Okay. And so you don't know or haven't
22 analyzed what risks are inherent in sort of hedging
23 in the gold and silver markets at least for
24 purposes of this engagement?
25     A.    Well, I haven't studied that, but

1 certainly over the years I have an understanding of
2 hedging that you do in the markets.
3     Q.    Okay. And there are risks involved as
4 in any transaction, right?
5     A.    Yes. Some are riskier than others.
6     Q.    So going back to this shelf prospectus,
7 you understand that a shelf prospectus for Central
8 Fund was filed on September 8, 2009?
9     A.    I think that's the date, yes.
10     Q.    Okay. And in -- in nonfirm commitment
11 offerings, a shelf prospectus is also filed, right?
12 It's not unique to firm commitment offerings,
13 right?
14     A.    That's correct.
15     Q.    And there's no discussion in -- in the
16 record that you've seen that explicitly states that
17 the November 9th offering would be a firm
18 commitment offering, right?
19     A.    No, I don't think that's correct.
20     Q.    Okay. Why isn't that correct?
21     A.    The testimony of the two bankers from
22 CIBC makes reference to the fact that all the deals
23 they underwrote -- that CIBC underwrote for Central
24 Fund were firm commitment underwritings.
25     Q.    Where does it say that?

Securities and Exchange Commission v.
Revelation Capital Management, Ltd., et al.

Guy F. Erb
July 23, 2015

1    A.    I'd have to look up the deposition.
2    Q.    I would like you to tell me where any
3  CIBC person said exactly that these offerings were
4  firm commitment offerings and that every deal prior
5  to that was a firm commitment offering.
6    A.    They say that every deal we've done for
7  the Central Fund was underwritten.
8    Q.    Okay.  That's not what you say in the
9  report, right?  In the report you say that they say
10  that every prior Central Fund offering was a firm
11  commitment offering, right, and that's not what
12  you're saying?
13    A.    That's what I'm saying.
14    Q.    And that's not what they said, right?
15    A.    They said underwritten.
16    Q.    And you --
17    A.    And they defined the term underwritten
18  very strictly.
19    Q.    They don't define it as a firm
20  commitment offering, do they?
21    A.    They are referring to underwriting in
22  the term -- in the way that I use it, that it means
23  that you have purchased the shares.
24    Q.    Okay.  But they don't refer to the
25  underwriting in this deal as a firm commitment

1  offering, correct?
2    A.    I haven't -- I'd have to review the
3  depositions to see.
4    Q.    Okay.  You don't recall them
5  specifically saying that, right?
6    A.    Not at the moment.  Except I do recall
7  the term underwritten.
8    Q.    And we've discussed that underwriting
9  can be used outside of the firm commitment context,
10  right?
11    A.    Yes.  And that is -- they recognize
12  that in their -- in their testimony as well.
13    Q.    They recognize in their testimony that
14  underwriting can be used outside of the firm
15  commitment context, right?
16    A.    In the context of their statements that
17  they were purchasing the shares, yes.
18    Q.    Just -- just so I understand your -- is
19  it your testimony that what makes something a firm
20  commitment offering is -- strike that.  I'll start
21  again.
22         Is it your testimony that what makes
23  something a firm commitment offering is the -- is
24  the purchase of the shares by the underwriter?
25    A.    Yes.

1    Q.    Okay.  Is it -- is it that they're
2  taking a risk?  Is it the transfer of risk that
3  makes it --
4    A.    Yes.
5    Q.    Okay.  On page 12 of your report you
6  talk about the types of best efforts offerings; do
7  you see that?
8    MR. STODGHILL:  Which paragraph?
9    A.    Oh, yes.
10    MR. YOSKOWITZ:  It's -- well, I'm sorry, the
11  main paragraph 30 any and all, all or none.
12  Q.    Do you see that?
13    A.    Yes.
14    Q.    Did you do any of that while you worked
15  at Goldman?  You said you only worked on firm
16  commitment offerings?
17    A.    We were aware what best efforts
18  offerings were, but as I said, we didn't do any.
19    Q.    And on 31, by the way, you give -- you
20  give an example of a prospectus of a best efforts
21  agreement; do you see that?
22    A.    Yes.
23    Q.    And you note that actually the selling
24  agents are described as underwriters; do you see
25  that?

1    A.    Yes.
2    Q.    You're saying that that's incorrect,
3  right?
4    A.    That's correct.
5    Q.    But that's the way the document reads,
6  right?
7    A.    Yes.
8    Q.    Turn to page 18.  And in paragraph 46
9  you -- you talk about the base shelf prospectus; do
10  you see that?
11    A.    Yes.
12    Q.    And you actually -- you refer to a
13  citation in 42 of the 17 CFR 230.415; do you see
14  that?
15    A.    Yes.
16    Q.    And why do you refer to that citation?
17    A.    That rule, Rule 415, covers shelf
18  offerings or takedowns from base shelf
19  prospectuses.
20    Q.    Are you relying on anything in that
21  rule for your opinion that this was a firm
22  commitment offering?
23    A.    In the sense that I tried to convey
24  here that these shelf takedowns were often on an
25  expedited or rapid basis and so the exercise of the

Securities and Exchange Commission v.
Revelation Capital Management, Ltd., et al.

Guy F. Erb
July 23, 2015

Page 57

1 underwriting often occurs very quickly. That's the
2 context I wished to set for this particular
3 transaction or my description of this transaction.
4 Q. Are you aware that -- or is it -- is it
5 accurate to say that this is a cite under
6 Regulation C?
7 A. Under Regulation C of what -- of what
8 rule? I'm not sure --
9 Q. Under the Securities Act?
10 A. Regulation C?
11 Q. Are you familiar with that?
12 A. Not C standing alone, no.
13 Q. Okay. And are you aware that this
14 prospectus was filed under Form F-10?
15 A. The filing forms are -- are not
16 something I paid particular attention to but --
17 Q. Okay.
18 A. -- whatever --
19 Q. Are you aware -- sorry.
20 A. Whatever the file on Edgar shows.
21 Q. Well, are you aware that Regulation C
22 does not apply to documents filed under Form F-10
23 so that this rule that you're citing doesn't
24 actually apply?
25 A. No.

Page 58

1 Q. Okay. You saw that in -- that the
2 CIBC -- or strike that.
3 You saw that this offering was done as
4 an overnighted marketed offering?
5 A. Yes.
6 Q. Have you ever had any experience with
7 overnighted marketed offerings?
8 A. Yes.
9 Q. What is your experience?
10 A. Only that we had from time to time done
11 such offerings, particularly in the medium-term
12 note markets, for example.
13 Q. And -- but have you ever had any
14 experience with Canadian overnighted market
15 offerings?
16 A. No.
17 Q. Okay. And did you review the
18 engagement letter between CIBC and Central Fund in
19 this case?
20 A. Yes.
21 Q. So this is a binder of the premarked
22 exhibits or the marked exhibits.
23 MR. STODGHILL: Are you going to show him the
24 engagement?
25 MR. YOSKOWITZ: I'm going to show him 38, yes.

Page 59

1 MR. STODGHILL: Okay.
2 Q. I'm going to show you what was already
3 marked as 38. Did you review this document in
4 drafting your opinion?
5 A. I believe this is the engagement letter
6 I reviewed, but I haven't -- I'd have to have both
7 documents in front of me to confirm that. But I
8 believe this is the same documents.
9 Q. Okay. And you understand that this
10 engagement letter was signed in the afternoon of
11 November 9, 2009?
12 A. Yes.
13 Q. And is it your understanding that --
14 that this document -- in this document the parties
15 agree that the agreement does not represent an
16 offer or binding commitment by CIBC to purchase the
17 securities? And I'm looking at paragraph 13.
18 MR. STODGHILL: Can I just have the question
19 back, please?
20 (The record is read back by the reporter.)
21 A. Yes.
22 Q. Okay. And up until the signing of the
23 underwriting agreement, this was the only written
24 document in place between the parties with regard
25 to the November 2009 offering, right?

Page 60

1 A. In terms of formal legal documents,
2 yes, but there certainly were documents exchanged
3 by the parties, including e-mails, but this is the
4 formal document, yes.
5 Q. This is the only legally binding
6 document between the parties until the underwriting
7 agreement was signed, right? Is that fair to say?
8 A. Legally binding document, yes.
9 Q. Okay. And did you review the testimony
10 of Stefan Spicer?
11 A. I did.
12 Q. And did you see his testimony that CIBC
13 was working on the best efforts basis until the
14 order book was closed?
15 A. I did.
16 Q. Did you take that into consideration in
17 your opinion?
18 A. In the context of all the testimony, I
19 did, yes. Including testimony of either Mr. Scott
20 or Mr. Smith concerning Mr. Spicer's remarks.
21 Q. Okay.
22 MR. YOSKOWITZ: All right. We've been going a
23 little over an hour, why don't we take a break.
24 A. Sure.
25 VIDEOTAPE OPERATOR: This marks the end of DVD

Securities and Exchange Commission v.
Revelation Capital Management, Ltd., et al.

Guy F. Erb
July 23, 2015

Page 61

1  No. 1 in the deposition of Mr. Guy F. Erb. We are
2  going off the record and the time is 10:43 a.m.,
3  July 23, 2015.
4      (A brief recess was taken from 10:43 a.m. to
5  10:51 a.m.)
6      **VIDEOTAPE OPERATOR:** Back on the record. This
7  marks the beginning of DVD No. 2 in the deposition
8  of Guy F. Erb. The time is 10:51 a.m., July 23,
9  2015.
10     Q.  Mr. Erb, before the break we were
11 chatting about the engagement letter. I just want
12 to turn your attention to the afternoon of November
13 9th after the market, right. Engagement letter is
14 signed. At this point in time, right, the pricing
15 of the shares has not yet been determined, right?
16     A.  We're on November 9th?
17     Q.  Yes.
18     A.  That's correct.
19     Q.  And the size of the offering has not
20 been determined, right?
21     A.  That's correct.
22     Q.  And there's no commitment by CIBC to
23 purchase either a number of shares or an amount
24 of -- of -- of shares?
25     A.  Correct.

Page 62

1      Q.  And they're certainly not at risk at
2  this point in time, correct? The underwriter?
3      A.  Only reputationally. If the deal
4  doesn't get done, there's a reputational risk, but
5  in terms of the actual risk of the transaction, not
6  yet.
7      Q.  And in fact, if they don't raise a
8  certain amount, they -- they can walk away and the
9  underwriter can walk away, right? There's no
10 commitment to any size -- size, right?
11     A.  They being the Central Fund, you mean?
12     Q.  Yes.
13     A.  That's correct.
14     Q.  So if you turn to Exhibit 9 in that
15 binder.
16     A.  In this binder?
17     Q.  Yeah. Do you recognize Exhibit 9?
18     A.  Yes.
19     Q.  And -- and Exhibit 9 is the press
20 release that went out after the close on November
21 9th announcing the proposed offering; is that fair?
22     A.  I think that's correct. I don't have
23 the time stamp on here, but it certainly was the
24 afternoon of November 9th, yes.
25     Q.  And there's nothing in here that says

Page 63

1  this is going to be a firm commitment offering,
2  correct?
3      A.  Well, it refers to a proposed
4  underwritten offering by CIBC, so to my mind that's
5  an indication that this will be done on a firm
6  commitment basis.
7      Q.  Okay. And not to rehash our argument,
8  but -- but you said that there can be the use of
9  the word underwriting without reference -- without
10 meaning a firm commitment even if in your mind it's
11 incorrect, right?
12     A.  That's correct.
13     Q.  All right. Turn to D-10, the next
14 exhibit. And do you recognize Exhibit 10?
15     A.  Yes.
16     Q.  And what do you recognize Exhibit 10 to
17 be?
18     A.  This is a selling memorandum to members
19 of -- to broker-dealers in Canada.
20     Q.  And the purchase size of the offering
21 was fully dependent on the size of the orders that
22 CIBC was able to gather, right?
23     A.  Yes, mm-hmm.
24     Q.  Okay. And if you turn to the second
25 page of that document.

Page 64

1      A.  Yes.
2      Q.  It says, Selling groups are now open,
3  you can reflect your firm interest; do you see
4  that?
5      A.  Selling group books are now open, yes.
6      Q.  Sorry. You can reflect your firm
7  interest; do you see that?
8      A.  Yes.
9      Q.  Firm interest means a firm bid; is that
10 right?
11     A.  Firm interest is not -- is an
12 indication that the buyer, in this case the clients
13 of these broker-dealers, is willing to buy a
14 certain number of shares, oftentimes they will set
15 a -- an indicative price range at which they would
16 like to see the transaction done.
17     Q.  Okay. But a firm offer in securities
18 language is actually if it's accepted, it is a
19 transaction, right?
20     A.  If it's accepted.
21     Q.  It's different than an indication of
22 interest, right?
23     A.  Both terms are used, but they're still
24 subject to the confirmation of the firm interest,
25 which will go out once the price has been set.

Securities and Exchange Commission v.
Revelation Capital Management, Ltd., et al.

Guy F. Erb
July 23, 2015

1  Q.   But the confirmation of the firm
2  interest in that regard is just -- Revelation, for
3  example, made a -- a firm bid based on a particular
4  premium and a size of 56 million, right?  Is that
5  your understanding here?
6  A.   Roughly, yes.  I -- the actual quantity
7  I think was roughly 56 million, yes.
8  Q.   So when -- and that was done prior to
9  the pricing call, right?
10  A.   Yes.  That was done in the context of a
11  discussion he had with Mr. Smith, yes.  E-mail
12  discussion he had with Mr. Smith.
13  Q.   So when CIBC after the pricing call
14  confirms with Revelation, Revelation is not free to
15  walk away from that, right?
16  A.   Well, technically they are free, but it
17  would have a serious reputational impact on any
18  buyer that walks away from its interest.
19  Q.   But it's different than an indication
20  of interest, right?
21  A.   As of this point he's saying I have the
22  price and I'm willing to purchase a certain number
23  of shares at that price.
24  Q.   But he -- but from Revelation's point
25  of view, they don't -- the number of shares is

1  irrelevant, correct?  They made an offer based on a
2  premium and a size of 56 million, right?
3  A.   They stipulated the premium, that's
4  correct.
5  Q.   And so that was the order and the --
6  the confirmation after the pricing call is just a
7  confirmation of that transaction, correct?
8  A.   In this case.  In cases -- other cases
9  the confirmation will come at a number or an
10  allocation less than the buyer wished to purchase.
11  Q.   Well, when you say in other cases, what
12  do you mean?
13  A.   In my experience when the book was
14  built, a book of orders was built, the equity desk
15  would then allocate shares and several of the
16  underwritings I'm aware of that I participated in,
17  even those that I had not been involved with
18  directly, the allocation differed from the
19  expression of interest.
20  Q.   But here CIBC is purchasing an amount
21  of shares equal to the firm orders it received from
22  clients, right?
23  A.   Not exactly, no.
24  Q.   Why do you say that?
25  A.   Because they then went on to exercise

1  the so-called green shoe, which expanded the
2  offering.  So they were able to fill the orders and
3  then solicit more orders.
4  Q.   Well, they certainly didn't make --
5  they didn't get less shares than the orders that
6  they received, correct?
7  A.   That's correct.  In this case.
8  Q.   Okay.  And so there's no allocation
9  here saying you only get 60 percent of what you
10  ordered, right?
11  A.   I use the term allocation as when you
12  go back to the buyers and say you're in the deal
13  for this many shares, if it happens to be the same
14  number of shares you indicated you're interested
15  in, it's still an allocation in my mind.
16  Q.   Okay.  Is there a difference in your
17  mind between an indication of interest and a firm
18  order?
19  A.   Yes.
20  Q.   Okay.  And is what Revelation gave
21  prior to the pricing call a firm order?
22  A.   No.
23  Q.   And why do you say that?
24  A.   Because it didn't have a price attached
25  to it.

1  Q.   But it had a premium and a size, all it
2  didn't have was a share price, right?
3  A.   Right.  But he didn't know or any
4  bidder doesn't know what the premium will finally
5  be until after they price the deal.
6  Q.   But he said I will take 56 million at 5
7  and a half percent, right?
8  A.   No.
9  Q.   What did he say?
10  A.   He said at 5.
11  Q.   Okay.  But that's in an e-mail.  Did
12  you see the conversation?
13  A.   No.  I have no record of that.
14  Q.   Okay.  So if he -- if he said I will
15  take 56 million at 5 and a half percent and the
16  pricing comes in at 5 and a half percent, is
17  Revelation free to walk away?
18  A.   Technically they are.  As I said, they
19  would have serious sequences.
20  Q.   You don't consider that a firm
21  transaction under the securities law, a binding
22  transaction?
23  A.   It's a commitment.  The transaction
24  occurs a bit later when the tickets are written.
25  Q.   Okay.  You understand that oral

Securities and Exchange Commission v.
Revelation Capital Management, Ltd., et al.

Guy F. Erb
July 23, 2015

Page 69

1  transactions are binding over securities exchanges?
2    A.   I beg your pardon?
3    Q.   That you can have a binding oral
4  transaction in the securities industry?
5    A.   Yes.
6    Q.   Okay.  And it's confirmed later by a
7  trade ticket, but the -- the transaction itself is
8  that oral transaction, would you agree with me on
9  that?
10   A.   An oral transaction?
11   Q.   Yes.
12   A.   The oral transaction that really counts
13  in this case is when the underwriter goes back and
14  says all right, we have a certain premium and the
15  price is such and such, are you confirmed in that
16  number and he says yes, that's -- that is a
17  binding -- in the sense that if the buyer walks
18  away, he would face serious consequences with
19  regard to his reputation in the market.
20   Q.   What about a legal consequence?  Could
21  he be legally sued to confirm that transaction?
22   A.   I can't opine on questions of law.
23   Q.   Okay.  And are you discounting
24  Mr. Kuchanny's testimony that he thought he had
25  reached a transaction prior to the pricing call?

Page 70

1    A.   No.  I think that's common amongst
2  traders.
3    Q.   Okay.  That's the custom and practice
4  that he reached a firm transaction?
5    A.   A trader will make every effort to
6  stand behind his indication, that's correct.
7    Q.   So again, are you saying that what
8  happened in this instance was an indication of
9  interest, not a firm order?
10   A.   The first indication was -- the first
11  exchange was an indication of interest and you can
12  see that in the exchange of e-mails between
13  Mr. Smith and Mr. Kuchanny.  When the order is
14  confirmed, when Mr. Smith goes back and says all
15  right, now we have a price of 13.56 and
16  Mr. Kuchanny then confirms that number, that's --
17  that's the basis of the ticket.  That's the --
18  that's the really both sides are bound at that
19  point.
20   Q.   Would you agree that trades can be
21  priced off of other metrics other than price per
22  share?
23   A.   In the question of this -- in terms of
24  this offering, yes, it was.
25   Q.   And so when -- when did the -- when did

Page 71

1  CIBC take on the risk in this matter?
2    A.   8:58 on the 10th.
3    Q.   And what happened at 8:58?
4    A.   That was the time they set the price.
5    Q.   Was that on the pricing call?
6    A.   That's the result of the pricing call,
7  yes.  The pricing call lasted 15 or 20 minutes.
8    Q.   And was that a -- was that in a written
9  agreement at that time?
10   A.   No.  That was -- that was the basis of
11  the ensuing transactions that became the basis for
12  the communication back to the buyers after the price
13  had been set and the number of shares were now set.
14   Q.   So that was an orally binding
15  transaction, you're saying, between CIBC and
16  Central Fund?
17   A.   That was orally binding, yes.
18   Q.   Okay.  But the ones right before that
19  with the purchasers like Revelation were not orally
20  binding?
21   A.   Until the price is set, you don't have
22  a transaction.
23   Q.   Okay.  And certainly you would agree
24  with me that there was no written underwriting
25  agreement in effect at that point, right?

Page 72

1    A.   No written agreement, but the shares
2  are underwritten at that point.
3    Q.   Okay.  And the underwriting agreement
4  came into effect actually after -- sometime after
5  2:30 p.m. that day?
6    A.   The actual written documents, yes.
7    Q.   So the only binding written agreement
8  between CIBC and Central Fund at 8:58 was the
9  engagement letter, right?
10   A.   To the extent the e-mails communicating
11  the price were written, I would say you have to
12  take those into account, but if you're talking
13  about a formal legal document, that's my
14  understanding, yes.
15   Q.   And so CIBC had essentially engaged in
16  a riskless principal transaction, right?
17   A.   No.
18   Q.   Why do you say that?
19   A.   There are two risks:  One is that
20  despite the negative consequences for the buyer,
21  somebody could walk away from their transaction,
22  the second risk is until the deal is closed and you
23  actually have the funds from the buyers in hand and
24  you've delivered the funds to the issuer, you're at
25  risk of market risk that there might be a sudden

Securities and Exchange Commission v.
Revelation Capital Management, Ltd., et al.

Guy F. Erb
July 23, 2015

Page 73

1  fall in the market that would leave you with a --
2  unsold shares or a reflection of market risk, one
3  of the buyers might go bankrupt.  You have the
4  market risk and buyer risk combined during those
5  seven days.
6     Q.    Market risk is inherent in any
7  securities transaction, correct?
8     A.    That's right.
9     Q.    Okay.  Whether it's best efforts or
10 firm commitment?
11    A.    No.
12    Q.    Why do you say that?
13    A.    Well, once -- if, for example, you're
14 in a best efforts offering and you have made a best
15 efforts commitment to the issuer and you go to him
16 on day one and say I believe we can -- we can
17 arrange buyers of your shares up to a certain
18 amount and the next day if the market has declined
19 significantly and the buyers walk away, nobody's at
20 risk there, but if the market crashed between the
21 pricing and the closing, the underwriters would be
22 forced to accept that risk and cover the
23 transaction.
24    Q.    Now, the first risk you're talking
25 about was whether or not buyers walked away.  In

Page 74

1  your experience buyers don't walk away, right?
2     A.    Rarely.
3     Q.    Okay.  And you testified you're not
4  here to -- and you don't know what the legal
5  ramifications of that would be, right?
6     A.    That's correct.
7     Q.    Okay.  And -- and couldn't CIBC walk
8  away from its -- certainly between 8:50 a.m. and
9  2:30 when the underwriting agreement -- couldn't
10 CIBC walk away from its oral transaction with the
11 underwriter?
12    A.    It could, but there would be extremely
13 serious consequences for CIBC, which any investment
14 bank would take very seriously.
15    Q.    Okay.  But certainly if the market risk
16 was so inherent, CIBC might take that risk, right?
17    A.    In my experience the most graphic
18 example of this was the BP offering, which I
19 referred to in my report.
20    Q.    Sure.
21    A.    When I joined Goldman this was very
22 fresh in people's minds and they would frequently
23 refer to the seriousness of the commitment they
24 undertook in that offering and why they honored
25 their commitment to buy the shares.

Page 75

1     Q.    When -- when -- I'm looking where you
2  discuss the BP offering in your report.  I see a
3  reference in 43.
4     A.    Pardon me?
5     Q.    So the BP offering, British Petroleum,
6  that you're referring to I think starts in
7  paragraph 41 of your report; do you see that?
8     A.    Yes.
9     Q.    Okay.  And in that instance the
10 underwriters had agreed to guarantee a specific
11 price weeks before the date of the offering, right?
12    A.    Yes.
13    Q.    Okay.  And that's different than here
14 where it was an overnight marketed transaction,
15 right?
16    A.    Yes.
17    Q.    You talked about -- you talk about --
18 in your report about book building?
19    A.    Yes.
20    Q.    Is it accurate to say book building is
21 a market practice for almost all types of
22 offerings?
23    A.    No.  I mean, in -- in the context that
24 I use it, it's only in connection with the deals
25 that were firm commitments or were underwritings

Page 76

1  where the shares were purchased.  Having no
2  experience with best efforts deals, I don't know
3  how they'd refer to it.
4     Q.    Okay.  So you don't know if there is --
5  based on your experience or lack of, you don't know
6  what book building is done in best efforts
7  offerings, right?
8     A.    I know that they contact investors
9  seeking to confirm what they're interested in, but
10 since they don't bear any responsibilities for
11 those commitments, it's a different -- different
12 situation.
13    Q.    By the way, I -- just earlier you were
14 talking about your work and the work of other
15 people at BRG on this matter.  Did you actually
16 review all the deposition transcripts or did other
17 people at BRG review the transcripts and tell you
18 what they said?
19    A.    I reviewed many of them myself as well
20 as having other people look at them.  I think -- I
21 did not review every line of the depositions from
22 CIBC Mellon.
23    Q.    You did not?
24    A.    I -- I relied on a highlighted version.
25 Somebody else read the whole document.

Securities and Exchange Commission v.
Revelation Capital Management, Ltd., et al.

Guy F. Erb
July 23, 2015

1  Q.    Did someone else highlight what they
2  thought was relevant and that's what you looked at?
3  A.    Yeah.  And I made spot checks then
4  thereafter.
5  Q.    That was CIBC.  What about Mr. Kuchanny
6  and Mr. Spicer?
7  A.    No, I read all those.
8  Q.    Is it accurate to say that during the
9  pricing call CIBC would not have gone out and
10  purchased all the gold and silver if it didn't have
11  the firm commitment orders from its clients?
12  A.    Well, the decision to purchase the gold
13  and silver was the Central Fund's.  CIBC in that
14  case was the purchasing agent for orders that they
15  would have received from the Central Fund.  So I
16  think they wouldn't have purchased any gold or
17  silver without an order from the Central Fund.
18  Q.    And the two of them together, Central
19  Fund and CIBC, wouldn't have made the amount of
20  purchases they did unless they had that same amount
21  from their firm orders from customers, right?
22  A.    That's correct.  They -- they had a
23  good idea about the deal and what they could
24  purchase at the time they priced the deal.
25  Q.    They had more than a good idea, they

1  purchased exactly what they got from their firm
2  orders, right?
3  A.    I don't recall if it was the exact
4  number.  It was -- there -- I believe there were
5  some -- there was a difference between the actual
6  gold and silver prices, a minor difference between
7  that and the total issue.
8  Q.    On your report in paragraph 40 on 16 --
9  A.    Yes.
10  Q.    -- you cite a FINRA rule regarding
11  customer confirmations; do you see that?
12  A.    Yes.
13  Q.    And the former NASD rule.  That
14  wouldn't apply to a Canadian offering, right?
15  A.    Well, not to shares sold in Canada.  It
16  replies to shares sold in the United States.
17  Q.    In fact, all the materials that you
18  cite in here basically refer to U.S. regulations,
19  right?
20  A.    They do because the -- those are the
21  regulations that govern transactions run through
22  the New York Stock Exchange.
23  Q.    Okay.  And you haven't considered
24  whether or not those rules actually apply to the
25  Canadian offering in this instance, have you?

1  A.    Not to the Canadian offering, but to
2  the sale of shares in the United States, yes.
3  Q.    Sale of shares?
4  A.    Purchase of shares.
5  Q.    Purchase of shares in the United
6  States?
7  A.    Right.
8  Q.    Sir, if you turn to Exhibit 19.
9  A.    In this book?
10  Q.    Yes.  Sorry.  And just a couple of
11  pages in, is that your understanding that's the
12  underwriting agreement as filed?
13  A.    Yes.
14  Q.    Okay.  Is there anything -- does the
15  underwriting agreement specifically use the words
16  firm commitment?
17  A.    I don't recall.
18  Q.    And what in your mind, if anything, in
19  the underwriting agreement is the basis that this
20  was a firm commitment offering?
21  A.    On page 5 the -- of this document,
22  Exhibit 19, there's reference to purchase price,
23  which I believe is a reference to purchases by the
24  underwriters of the shares from the Central Fund.
25  Q.    So on page 5 it just says purchase

1  price has the meaning given to it above, right?
2  A.    Right.  And we can look for other
3  points here.  Well, I'd have to read the whole
4  thing to find where that is actually used, but I
5  think that is sufficient indication that the
6  underwriters were purchasing the shares.
7  Q.    Okay.  So you -- you're just referring
8  to the fact that the underwriters are -- are
9  purchasing the shares as showing that this is a
10  firm commitment offering, right?
11  A.    That's what I'm relying on in answer to
12  this question, yes.  Well, in the second paragraph
13  too, it's referring to the fact that the
14  underwriters hereby severally and not jointly or
15  jointly and severally offer to purchase from the
16  corporation the shares.
17  MR. STODGHILL:  Can I just ask for the record,
18  when you say page 5, are you referring to the Bates
19  numbers or are you referring to the top numbers?
20  I'm trying to find where you are.
21  A.    I was referring to the --
22  MR. YOSKOWITZ:  I think it's referring to the
23  top number, Charles.
24  A.    The top number.  The Bates number is
25  0107.

Securities and Exchange Commission v.
Revelation Capital Management, Ltd., et al.

Guy F. Erb
July 23, 2015

1    MR. STODGHILL: Okay.
2    A.    And the one I just quoted from is on
3    0103.
4    MR. STODGHILL: Okay. Thanks.
5    Q.    Okay. Anything else?
6    A.    Well, not without reading every word of
7    the document, right.
8    Q.    Going back to your expert report,
9    Mr. Erb, in 44, paragraph 44 on page 17.
10   A.    I have it.
11   Q.    Okay. It says, To summarize, there are
12   two types of firm commitment underwritings: One in
13   which the price is set before the underwriters go
14   to market with the transaction and the other where
15   the deal is premarketed before the underwriters
16   purchase the shares; do you see that?
17   A.    Yes.
18   Q.    Both have been described as bought
19   deals. And then you cite the Dictionary of
20   Financial Terms; do you see that?
21   A.    Just as an example, yes -- so let me
22   just mark this as the next exhibit. I think we're
23   on 68.
24        (Citation from the Dictionary of Financial
25   Terms was marked Exhibit 68 for identification, as

1    of this date.)
2    Q.    And I'll represent to you or at least
3    my colleagues will that this -- that this is the
4    portion of the dictionary of financial terms that
5    talk about bought deals and firm commitments, and
6    if you recognize it as that, that's great.
7    A.    I do.
8    Q.    Okay. So you cite this and I -- I'm
9    just curious when it says bought deal in this
10   description it says bought deal in securities
11   underwriting, a firm commitment to purchase an
12   entire issue outright from the issuing company and
13   so it's equating a bought deal to a firm
14   commitment, right?
15   A.    Yes.
16   Q.    Okay. And you talk -- and then on the
17   next page is the definition of firm commitment
18   and -- and it says or as they -- the last line says
19   as they sometimes call it bought deals and so you
20   have a reference in paragraph 44 to premarketed, in
21   quotes. There's no reference in either of those
22   definitions to premarketed deals, is there?
23   A.    I don't think so. Let me look to check
24   here. That is correct.
25   Q.    So I guess I'm wondering what the basis

1    is because it's not in the cite for your statement
2    that a premarketed deal has been described as a
3    bought deal?
4    A.    Well, just my own experience any deal
5    that involves a purchase of the shares would be
6    sometimes referred to as a bought deal. I just
7    recall that terminology from my time in the
8    industry.
9    Q.    Okay. So you're -- that citation is
10   not meant to talk about premarketed deals?
11   A.    Which -- which citation?
12   Q.    To the Dictionary of Financial Terms.
13   A.    Oh, I was referring to the fact that
14   what's operational here or the point I would
15   emphasize is that both these descriptions or
16   definitions use the term outright purchase and
17   that's the common element between a BP type
18   transaction and the Central Fund type transaction
19   that we're talking about here.
20   Q.    Did you see the -- in the CIBC
21   depositions that there is something in Canada
22   called a bought deal?
23   A.    Yes, yes, uh-huh.
24   Q.    And that the Canadian witnesses all
25   said that this November 2009 transaction was not a

1    bought deal?
2    A.    There are some terminology differences
3    between the U.S. and the Canadian industry, but
4    they're -- both are describing purchase deals.
5    Q.    All right. Can you just answer my
6    question? Is it -- is it accurate to say that the
7    Canadian witnesses said that this November 2009
8    transaction was not a bought deal?
9    A.    Yes.
10   Q.    And that they equated a bought deal to
11   a firm commitment transaction?
12   A.    They equated it to a firm commitment as
13   expressed in the BP type transaction in my report,
14   that's correct.
15   Q.    Okay. And they -- they said that the
16   November 2009 transaction was not a capital F,
17   capital C, Firm Commitment transaction, correct?
18   A.    That, I don't recall. They did say it
19   was an underwritten transaction.
20   Q.    Okay. But they said it wasn't a bought
21   deal and that it wasn't like the BP deal that you
22   describe in your report?
23   A.    That's correct.
24   Q.    Could there be something that's neither
25   firm commitment nor best efforts?

Securities and Exchange Commission v.
Revelation Capital Management, Ltd., et al.

Guy F. Erb
July 23, 2015

1   A.   Not that I'm aware of.
2   Q.   Okay.
3   A.   Well, there is a standby commitment,
4   that's true.  There is the standby commitment as
5   defined in this dictionary, but we're not talking
6   about here.
7   Q.   And that's because you're referring to
8   U.S. regulations where there's either a firm
9   commitment or a best efforts, right?  In the U.S.
10  it's one or the other, right?
11  A.   Well, not just in the U.S.  I mean,
12  I've worked on -- nearly all the deals that I
13  worked on involved other countries besides the U.S.
14  and so I would say that it was commonly understood
15  that whether we were marketing overnight or whether
16  we had built a book over a longer period of time,
17  there would be a purchase of shares at the end and
18  therefore a firm commitment.
19  Q.   In Canada the testimony is that there
20  is a bought deal, there's an agency deal, and
21  there's an overnight marketed transaction, right?
22  A.   The overnight marketing transactions
23  were as they said underwritten, all of them were
24  underwritten.
25  Q.   Okay.  But there are three types,

1   right?
2   A.   Well, the -- I would say that the
3   overnight marketing deal is a type of firm
4   commitment offering, yes.
5   Q.   Well, is it a type of firm commitment
6   or is it a type of underwritten deal?
7   A.   They're synonymous.
8   Q.   They're synonymous in your mind?
9   A.   Yes.
10  Q.   But they're not synonymous in the
11  Canadian witness' mind, right?
12  A.   I don't know what's in their minds.
13  Q.   But you saw their testimony that said
14  that was not a firm commitment deal, right?
15  A.   No.
16      MR. STODGHILL: I object to that
17  characterization of the testimony.
18  A.   No, I wouldn't agree with that.
19  Q.   Okay.  You saw their testimony that
20  they said this was not a bought deal, right?
21  A.   Yes.
22  Q.   And that a bought deal in Canada is
23  equal to a Capital F, Capital C, Firm Commitment
24  transaction, right?
25  A.   I don't recall them using that -- I

1   remember -- recall using capital B, capital E, but
2   I don't remember seeing capital F, capital C.
3   Q.   Okay.  So turn to 74, paragraph 74 of
4   your report.
5   A.   Yes.
6   Q.   And -- and not to -- well, maybe I'm
7   beating a dead horse, but -- but when you -- you
8   say the deposition of David Scott, CIBC,
9   illustrates an underwriter's perspective on the two
10  ways of executing a firm commitment underwriting;
11  do you see that?
12  A.   Yes.
13  Q.   He didn't actually say that these were
14  the two ways to execute a firm commitment offering,
15  right?  He may have talked about underwritten
16  deals, right?
17  A.   Well, yes, we have to read that
18  paragraph in conjunction with paragraph 75.
19  Q.   Okay.  But in -- in none of it does he
20  equate the overnight marketed offering to a firm
21  commitment underwriting, right?  He never uses
22  those words?
23      MR. STODGHILL:  Well, those are two questions
24  you want to --
25      MR. YOSKOWITZ:  Okay.  He can answer either

1   one of them.
2   A.   Well --
3   Q.   He never uses the word firm commitment
4   to reference the overnight marketed offering,
5   right?
6   A.   Not the term firm commitment, but if
7   you look --
8   Q.   Okay.  You're -- sorry.  I apologize.
9   A.   If you look at page 26.
10  Q.   Yeah.
11  A.   The top of the page there, he's
12  continuing the quotation I cite in page -- in
13  paragraph 75.
14  Q.   Sure.  He says -- sorry, go ahead.
15  A.   Ultimately the deal itself is
16  determined the next day, the next morning.  At that
17  stage it's underwritten and becomes a liability of
18  the bank, and the important thing there is that --
19  then -- taken in context he says the price of the
20  offering and ultimately the deal itself is not
21  known until the next morning and at that stage it's
22  underwritten and becomes a liability of the bank
23  that to my mind is a description of a firm
24  commitment offering.
25  Q.   Right.  Once again you're equating firm

Securities and Exchange Commission v.
Revelation Capital Management, Ltd., et al.

Guy F. Erb
July 23, 2015

1    commitment with underwritten, right?
2       A.    And with purchase, yes.
3       Q.    And purchase.  And they did not equate
4    underwritten with firm commitment specifically in
5    their testimony, right?
6       A.    Well, if we're talking about the term
7    itself, yes, but they certainly meant to say that
8    when they have the liability, that's the firm
9    commitment and that's done --
10      Q.    Okay.
11      A.    -- at the moment of pricing.
12      Q.    Well, you're not opining on what they
13   meant to say, right?
14      A.    No.  Only on what they said.
15      Q.    Right.  And they didn't say that,
16   right?
17      A.    They didn't say what?
18      Q.    What you just opined they meant.  They
19   didn't say that this is a firm commitment offering?
20      A.    No.  They said it's underwritten.
21      Q.    Okay.  Thanks.  Turn to paragraph 27 of
22   your opinion, Mr. Erb.  You say, It is generally
23   the case that in follow-on offerings by closed-end
24   funds the shares are priced at a discount to the
25   market price and then you say, In the Central

1    Fund's offering the price of the share was set at a
2    4.17 percent discount to the closing price on
3    November 9th and at premium -- and at a premium of
4    4.87 percent on November 9th, which was 12.90; do
5    you see that?
6       A.    Yes, I do.
7       Q.    That's not actually how they set the
8    price of the offering?
9       A.    That's correct.  I -- I might have said
10   the price of the share was set with the consequence
11   that it represented a 4.17 discount rate.
12      Q.    Right.  Because they just set it by the
13   NAV of gold and silver in the landed price, right?
14      A.    That's correct.
15      Q.    Okay.  The share price was irrelevant
16   to that setting, right?
17      A.    I wouldn't say it was irrelevant, but
18   it's certainly the basis for the pricing was the
19   landed price of the mineral -- of the -- of the
20   bullion, yes.
21      Q.    Do you have any other opinions that
22   you're offering in this case that are not in this
23   report?
24      A.    No.
25      Q.    Have you been asked to do any other

1    work since you issued this report?
2       A.    Yes.
3       Q.    And what have you been asked to do?
4       A.    We reviewed the documents known as the
5    CIBC production, which came in after I wrote the
6    report.
7       Q.    When did the CIBC production come in?
8       A.    I don't recall the exact date.
9       MR. STODGHILL:  I think -- I think what he's
10   referring to are the link that you -- the link that
11   you sent to the documents that were Bates numbers
12   by CIBC.
13      MR. YOSKOWITZ:  Okay.
14      MR. STODGHILL:  I think the e-mails may have
15   been available to you in a different context
16   earlier, but I think that's what he's referring to.
17      MR. YOSKOWITZ:  Sure, Okay.
18      A.    There is material in there that I had
19   not seen before.
20      Q.    Okay.  I assume it didn't change your
21   opinion in any way?
22      A.    It didn't change the opinion.  It
23   clarified the timing of the transaction for me.
24      Q.    Okay.  Have you looked at the expert
25   reports issued by the defendants in this case?

1       A.    Yes.
2       Q.    Have you been asked to do any work with
3    respect to those reports?
4       A.    No.  Just to read them.
5       Q.    Okay.  Have you come to any conclusions
6    based on your review of those reports?
7       A.    Yes.
8       Q.    And what's your conclusion?
9       A.    I don't agree with them.
10      Q.    That's to be expected.  But any
11   specific thing that strikes you?
12      A.    Well, yes.  The central point of
13   Mr. Fleischman and Mr. Matthews.  I did not really
14   focus on Mr. Dumas' report.
15      Q.    Okay.
16      A.    But referring to those two by
17   Mr. Fleischman and Mr. Matthews, I don't agree that
18   the underwriting was done on a firm -- a best
19   efforts basis.
20      Q.    Okay.  Did -- Okay.  Did you come to
21   any more specific conclusions than that that --
22      A.    Well, there were several points at
23   which I would disagree, but I could -- I'd have to
24   look at the documents and indicate those to you.
25      Q.    Okay.  So we talked about -- you just

Securities and Exchange Commission v.
Revelation Capital Management, Ltd., et al.

Guy F. Erb
July 23, 2015

Page 93

1 talked about or you mentioned timing, so if you
2 could turn to paragraph 45 of your report.
3    A.   Yes.
4    Q.   And you talk about the exchange of
5 e-mails and then you say, Thereafter the
6 preparations -- and this is on the top of 18 now --
7    A.   Mm-hmm.
8    Q.   -- for the offering conformed to the
9 standards of practices of the industry with regard
10 to the firm commitment shelf offering, that is the
11 filing of the registration statement, due
12 diligence, book building, signature of the
13 underwriting agreement, pricing, the execution of
14 trades and closing; do you see that?
15    A.   Yes.
16    Q.   You have the order wrong actually here,
17 right, because the pricing occurred before the
18 signature of the underwriting agreement, right?
19    A.   That's correct, yes.  That -- that's
20 one -- I miss -- misplaced the underwriting
21 agreement there.
22    Q.   Okay.  And execution of trades, by the
23 way, and closings happens in any underwriting
24 right, best efforts --
25    A.   I'm sorry, can you repeat that?

Page 94

1    Q.   Yeah, I'm sorry.  Execution of trades
2 and closing happen in any underwriting, whether
3 it's firm commitment or best efforts, right?
4    A.   Yes.
5    MR. YOSKOWITZ:  All right.  Why don't we take
6 a break so I can see where we are.
7    A.   Okay.
8    VIDEOTAPE OPERATOR:  We are now going off the
9 record at 11:39 a.m., July 23, 2015.
10    (A brief recess was taken from 11:39 a.m. to
11 11:53 a.m.)
12    VIDEOTAPE OPERATOR:  We are now back on the
13 record at 11:53 a.m., July 23, 2015.
14    Q.   Mr. Erb, I just have a few more
15 questions.  Just turning back to your report on
16 page 10 and paragraph 28.
17    A.   Yes.
18    Q.   This is where you talk about the
19 virtually free trades -- risk-free trades?
20    A.   Yes.
21    Q.   Did you consider that the premium could
22 rise during that time causing losses by the people
23 that shorted the stock?
24    A.   Well, if -- if the price increases
25 after you've made a short sale, yes, you would lose

Page 95

1 money.
2    Q.   Okay.  And -- and there are other types
3 of risk, there's stock bar risk and there are risks
4 in terms of hedging risks, right?
5    A.   Yes.
6    Q.   You cite -- in paragraph 30 on the next
7 page you cite an investment banking treatise,
8 Investment Banking:  A Guide to Underwriting and
9 Advisory Services; do you see that?
10    A.   Yes.
11    Q.   Is that something that you relied on
12 while you were at Goldman or is that something that
13 the staff at BRG found for the purposes of this
14 engagement?
15    A.   Well, this book was published in 2010,
16 so I couldn't have relied on the book in the 1990s,
17 but this is fully consistent with my understanding
18 that prevailed during the 1990s.
19    Q.   Okay.  And is there anything else in
20 that book other than what you cite in paragraph 30
21 that you found relevant?
22    A.   Well, there may have been, but this was
23 I thought a pretty succinct and useful description
24 of what I was trying to say.
25    Q.   Okay.  And it's possible or probable

Page 96

1 that this book and this description is only
2 referring to U.S. offerings?
3    A.   I don't know the answer to that
4 question.  It's not limited to U.S. offerings and
5 it's by an international publisher, so I'd be
6 inclined to say it was not, but I don't recall that
7 particular feature of the book.
8    Q.   And was there any description in there
9 about an overnighted marketed offering?
10    A.   I don't recall.
11    Q.   We talked a little bit before about how
12 the offering price here was calculated based on the
13 NAV, right?
14    A.   Yes.
15    Q.   So would you agree with me that any
16 short sales by Revelation or others right before
17 the offerings wouldn't have affected the offering
18 price?
19    A.   That's correct.
20    Q.   By the way, you're not -- I think I
21 asked this, but you're not here as an expert on
22 Rule 105, right?
23    A.   That's correct.
24    Q.   Okay.  And you're not testifying or
25 giving any opinion as to the purpose of Rule 105,

Securities and Exchange Commission v.
Revelation Capital Management, Ltd., et al.

Guy F. Erb
July 23, 2015

Page 97

1  right?
2  A.   That's right.
3  Q.   Earlier you mentioned -- and it's
4  probably in the report somewhere, you mentioned
5  about the green shoe option?
6  A.   Yes.
7  Q.   Can you just explain what that means?
8  A.   Yes.  Well, there actually was a green
9  shoe company in the -- I believe it was even in the
10  1920s, but I can't pin that down to an exact date.
11  I learned by coincidence that this is now the
12  Stride Rite Company.
13  Q.   Oh.
14  A.   So green shoe exists to this day.  And
15  I believe that was the first instance where a deal
16  had been upsized following the pricing and sale of
17  initial rounds of sales of shares.
18  Q.   Did you have any experience in your
19  underwritings at Goldman with green shoe options?
20  A.   Yes.  I think several of them were
21  deals where the green shoe was exercised or the
22  overallotment option exercised.
23  Q.   Have you -- in any of them did the
24  green shoe have a -- in any of those underwritings
25  did green shoe have a one-day limit?

Page 98

1  A.   I don't recall.
2  Q.   Is that in your mind unusual, that the
3  green shoe in this underwriting had a one -- had a
4  one-day limit?
5  A.   I don't -- I didn't focus on that.  I
6  don't have an opinion on that.
7  Q.   Okay.  Sorry.  One second.  I have
8  nothing else for you, Mr. Erb.  Thank you for your
9  time.
10  A.   Thank you.
11  MR. STODGHILL: No questions.
12  VIDEOTAPE OPERATOR: This concludes the
13  deposition of Mr. Guy F. Erb.  The number of DVDs
14  used was two.  The original DVDs will be retained
15  at Behmke Reporting and Video Services, Inc., 160
16  Spear Street, Suite 300, San Francisco, California.
17  Going off the record and the time is 12:01 p.m.,
18  June 23, 2015.
19  (At 12:01 P.M., the deposition proceedings
20  concluded.)
21
22  --------------------------
23  GUY F. ERB
24
25

Page 99

1  STATE OF NEW YORK  )
2                     ) ss.
3  COUNTY OF NEW YORK )
4
5  I hereby certify that the witness in the
6  foregoing deposition, GUY F. ERB, was by me duly
7  sworn to testify to the truth, the whole truth and
8  nothing but the truth, in the within-entitled
9  cause; that said deposition was taken at the time
10  and place herein named; and that the deposition is
11  a true record of the witness' testimony as reported
12  by me, a duly certified shorthand reporter and a
13  disinterested person, and was thereafter
14  transcribed into typewriting by computer.
15  I further certify that I am not interested
16  in the outcome of the said action, nor connected
17  with nor related to any of the parties in said
18  action, nor to their respective counsel.
19  IN WITNESS WHEREOF, I have hereunto set my
20  hand this 4th day of August, 2015.
21  Reading and signing was:
22  ____ requested _____ waived ____ not requested
23
24  _Michele Moskowitz_
25  MICHELE MOSKOWITZ