UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

SECURITIES AND EXCHANGE COMMISSION,  :
                                     :
                        Plaintiff,   :
                                     :
            -against-                :
                                     :
REVELATION CAPITAL MANAGEMENT, LTD., :
and CHRISTOPHER P.C. KUCHANNY,       :
                                     :
                        Defendants.  :

-----------------------------------------------------------------X

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____                │
│ DATE FILED:___7/8/2016___            │
└─────────────────────────────────────┘
```

14-CV-645 (VEC)

MEMORANDUM
OPINION

VALERIE CAPRONI, United States District Judge:

The Securities and Exchange Commission ("SEC") filed suit against Revelation Capital

Management, Ltd. ("Revelation") and Christopher P.C. Kuchanny, Revelation's founder,

Chairman, Chief Executive Officer, Chief Investment Officer, and sole shareholder (collectively,

Defendants), alleging that Defendants violated Rule 105 of Regulation M, *see* 17 C.F.R.

§ 242.105.  Currently before the Court are Defendants' Motion to Exclude the Testimony of

Plaintiff's Expert Witness Guy Erb (Dkt. 42) and SEC's Motion to Strike Defendants' Expert

Report and Preclude the Expert from Testifying (Dkt. 39).  For the following reasons,

Defendants' Motion is DENIED, and Plaintiff's Motion is GRANTED.

## BACKGROUND[1]

Rule 105 of Regulation M prohibits any person who makes a short sale of securities

during a restricted period prior to the pricing of the securities in a firm commitment offering

from then purchasing securities in that same offering.  17 C.F.R. § 242.105(a).  Rule 105 only

---

[1]     The Court cites to the parties' briefing on Defendants' motion to exclude the testimony of Plaintiff's expert
Guy Erb as "Defs. Erb Mem.," "Pl. Erb Opp.," and "Def. Erb Reply."  The Court cites to the parties' briefing on
Plaintiff's motion to strike the expert report and preclude from testifying Defendants' expert Dennis Dumas as "Pl.
Dumas Mem.," "Defs. Dumas Opp.," and "Pl. Dumas Reply."

applies to offerings that are conducted on a firm commitment basis. 17 C.F.R. § 242.105(c); *see also* Defs. Erb Mem. at 1 n.1, 11; Pl. Erb Opp. at 4.[2]

The SEC claims that Defendants violated Rule 105 of Regulation M when they shorted securities of Central Fund of Canada Limited ("Central Fund") during the restricted period preceding Central Fund's November 2009 offering (the "Offering") and then purchased securities from the Offering. Compl. ¶¶ 2, 16-17 (Dkt. 2). According to the SEC, Defendants made approximately $1.37 million in profits from the short sale. *Id.* ¶¶ 2, 18.

Many of the facts in this case are not in dispute. Defendant Revelation is a Bermudian corporation, and Defendant Kuchanny is a citizen of the United Kingdom and a resident of Bermuda. *Id.* ¶¶ 10-11; Answer ¶¶ 10-11 (Dkt. 17). Central Fund is a closed-end fund incorporated and based in Canada that is listed on both the New York Stock Exchange and the Toronto Stock Exchange. Compl. ¶ 12; Answer ¶ 12. Defendants admit: that Revelation

---

[2]     The text of Rule 105 provides, in relevant part:

> (a) Unlawful activity. In connection with an offering of equity securities for cash pursuant to a registration statement . . . filed under the Securities Act of 1933 ("offered securities"), it shall be unlawful for any person to sell short (as defined in § 242.200(a)) the security that is the subject of the offering and purchase the offered securities from an underwriter or broker or dealer participating in the offering if such short sale was effected during the period ("Rule 105 restricted period") that is the shorter of the period:
>
> > (1) Beginning five business days before the pricing of the offered securities and ending with such pricing; or
> > (2) Beginning with the initial filing of such registration statement or notification on Form 1–A or Form 1–E and ending with the pricing.
>
> . . .
>
> (c) Excepted offerings. This section shall not apply to offerings that are not conducted on a firm commitment basis.

17 C.F.R. § 242.105(a), (c). The regulations define "short sale" as "any sale of a security which the seller does not own or any sale which is consummated by the delivery of a security borrowed by, or for the account of, the seller." 17 C.F.R. § 242.200.

directed the short sales of Central Fund securities between November 3 and 9, 2009, *compare* Compl. ¶ 17 *with* Answer ¶ 17; that Central Fund filed an underwriting agreement with the SEC following the Offering, Answer ¶ 16; and that Revelation directed the purchase of securities from Central Fund's Offering, *compare* Compl. ¶ 16 *with* Answer ¶ 16.

Defendants deny, however, that they engaged in any illegal trading or wrong-doing and deny that Rule 105 applies to the Offering. Answer ¶ 2. Specifically, they "deny that the Offering constituted a firm commitment follow-on offering" under Rule 105 and assert, instead, that "[t]he Offering was made on a 'best-efforts' basis." *Id.* ¶ 16.[3]

There are two motions before the Court: the Defendants' motion to exclude the testimony of Plaintiff's expert, Guy Erb, and Plaintiff's motion to strike the expert report of and preclude testimony from Defendants' expert Dennis Dumas. Plaintiff retained Erb to "opine on the assertion by [Defendants] that the underwriting of Central Fund shares in the Offering was on a 'best efforts' basis, not as a 'firm commitment' underwriting." Yoskowitz Decl., Ex. 1, ¶ 5 (Dkt. 44-1) (hereinafter, "Erb Report"). According to Plaintiff, Erb's testimony is offered to assist the fact finder in resolving the meaning of the term "firm commitment" as it is used by participants in the securities industry. Pl. Erb Opp., at 4. Erb's principal opinion is that "the underwriting of the Offering was in all respects a firm commitment underwriting." Erb Report ¶ 18. Defendants move to exclude Erb's testimony arguing that he is unqualified to opine on this issue, that his testimony is unreliable and, under Rule 403, unfairly prejudicial.

---

[3]     As discussed in more detail below, Defendants switched gears in their reply brief, now contending that they "are not arguing that this Offering was conducted on a best efforts basis. Instead, Defendants' experts, Edward Fleischman and Gilbert Matthews, testified that the November 2009 Offering of Central Fund securities was an *overnight marketed offering*, which is not conducted on a firm commitment basis, and therefore not subject to Rule 105." Defs. Erb Reply, at 2 n.2 (emphasis in original).

Defendants retained Dumas "to analyze and critique certain factors relating to the exercise of extraterritorial jurisdiction over the Defendants in the Litigation."  Pl. Dumas Mem., Ex. 1, ¶ 3 (hereinafter, "Dumas Report").  According to Defendants, Dumas will "aid the fact finder in understanding what factors entities like Revelation may have considered at the time of purchasing securities in the Canadian Offering and what expectations it would have had regarding the implications of the purchase and the application of U.S. law."  Defs. Dumas Opp. at 2.  Dumas's principal opinion is that "the exercise of jurisdiction over Defendants' participation in the Central Fund offering is not consistent with the factors considered by market participants in evaluating jurisdictional reach and choice of law."  Dumas Report ¶ 31.  Plaintiff moves to strike Dumas's expert report and to preclude him from testifying because his report is irrelevant to any issue before the fact finder or the Court, offers an impermissible legal opinion, is unreliable and, under Rule 403, is unfairly prejudicial.

## DISCUSSION

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony and provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The district court acts as a gatekeeper under Rule 702 and is charged with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task

at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *see also Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 503 (S.D.N.Y. 2015) ("A trial court should therefore admit expert testimony only where it is offered by a qualified expert and is relevant and reliable."); *Forte v. Liquidnet Holdings, Inc.*, No. 14 CIV. 2185 (AT), 2015 WL 5820976, at *5 (S.D.N.Y. Sept. 30, 2015) ("In order for an expert opinion to be admissible, the witness 'must be qualified as an expert, the testimony must be reliable, and the testimony must assist the trier of fact.'" (quoting *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 172 (S.D.N.Y. 2009))).  This gatekeeping obligation "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).  A district court has broad discretion to carry out its gatekeeping function. *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016).  The proponent of the expert testimony bears the burden of establishing by a preponderance of the evidence that the proffered testimony meets the admissibility requirements of Rule 702. *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 253 (S.D.N.Y. 2010); *Dreyer v. Ryder Auto. Carrier Grp.*, 367 F. Supp. 2d 413, 424-25 (W.D.N.Y. 2005).

I.   **Defendants' Motion to Exclude Erb's Testimony is Denied; Erb is Adequately Qualified, His Testimony is Reliable and His Testimony Is Not Unfairly Prejudicial.**

Defendants move to exclude Erb's testimony arguing that Erb is unqualified to opine on whether the Offering at issue was conducted on a firm commitment basis.  They further argue that Erb's testimony is unreliable and, under Rule 403, unfairly prejudicial.

A.   **Erb is Qualified To Opine that the Offering was on a Firm Commitment Basis.**

Defendants argue that Erb is unqualified to opine on whether the Offering was conducted on a firm commitment basis because his experience is limited to a small handful of securities underwritings, none of which was Canadian and all of which were conducted on a firm

commitment basis.  Moreover, Erb's experience did not focus on the mechanics of underwriting, but instead focused on other aspects, such as due diligence.  Defs. Erb Opp. at 1-2, 12-14; Defs. Erb Reply, at 2-4.

Whether a proposed expert is qualified in the area in which he or she intends to testify is a threshold inquiry under Rule 104(a) of the Federal Rules of Evidence.  *See Daubert*, 509 U.S. at 592 n.10; *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013).  "The Federal Rules of Evidence permit opinion testimony by experts when the witness is 'qualified as an expert by knowledge, skill, experience, training, or education.'"  *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir. 1995) (quoting Fed. R. Evid. 702).  To determine whether a proffered witness is qualified, a court must "ascertain whether the proffered expert has the educational background or training in a relevant field by looking at the totality of the witness's background," and then "'compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony.'"  *Arista Records LLC v. Lime Grp. LLC*, No. 06-CV-5936 (KMW), 2011 WL 1674796, at *2 (S.D.N.Y. May 2, 2011) (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004)) (other internal quotation marks and citations omitted).

"Courts within the Second Circuit 'have liberally construed expert qualification requirements' when determining if a witness can be considered an expert."  *Carey Oil Co. v. MG Ref. & Mktg., Inc.*, No. 99 Civ. 1725 (VM), 2003 WL 1878246, at *1 (S.D.N.Y. Apr. 11, 2003) (quoting *TC Sys. Inc. v. Town of Colonie, N.Y.*, 213 F. Supp. 2d 171, 174 (N.D.N.Y. 2002)); *see also Tourre*, 950 F. Supp. 2d at 674 ("Courts have construed the inquiry into an expert's qualifications with an eye towards the 'liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony.'" (quoting *Daubert,* 509 U.S. at 588-89) (internal quotation marks omitted)).  In light of this liberal construction, "courts in

6

this circuit have noted that an expert 'should not be required to satisfy an overly narrow test of his own qualifications.'" *Arista Records*, 2011 WL 1674796, at *3 (quoting *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, No. 04 Civ. 7369 (LTS)(HBP), 2006 WL 2128785, at *6 (S.D.N.Y. July 28, 2006)).  An expert who is qualified in one field cannot offer an opinion about aspects of the case in another field for which the expert is not qualified—the expert must stay within the reasonable confines of his subject area and not render expert opinion on an entirely different field or discipline.  *Id.* at *2; *Dreyer*, 367 F. Supp. 2d at 425.  But "[i]f the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent."  *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) (citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir. 1997)); *see also Cary Oil*, 2003 WL 1878246, at *2 ("'[L]ack of extensive practical experience directly on point does not necessarily preclude [an] expert from testifying.' A formal education in a particular field is sufficient to qualify a witness as an expert." (quoting *Valentin v. N.Y. City*, No. 94 CV 3911 (CLP), 1997 WL 33323099, at *15 (E.D.N.Y. Sept. 9, 1997)) (internal citation omitted)).  "[Q]uibble[s]" such as these are "properly explored on cross-examination and [go] to [an expert's] testimony's weight and credibility—not its admissibility." *McCullock*, 61 F.3d at 1043.

Plaintiff has established that Erb is adequately qualified as an expert to testify about the characteristics of the Offering as understood by the securities industry.  Erb has approximately twenty-five years of experience in international finance and at least a dozen years of experience working in the securities industry, including almost ten years at Goldman Sachs in both New York and Mexico.  Erb Report ¶ 6, App. 1.  While at Goldman Sachs, he participated in the underwriting of approximately ten equity offerings for Mexican companies listed on the New

7

York Stock Exchange, five of which were realized.  Yoskowitz Decl., Ex. 6, 12:17-17:3 (Dkt. 44-2) (hereinafter, "Erb Dep.").  Erb also has experience comparing United States securities industry practices to those of another country, specifically Mexico.  Erb Report ¶ 13.  Moreover, he has acted as an expert on securities underwriting on a number of occasions.  Erb Dep. 21:18-24:9.

Defendants argue that, despite his lengthy work history in finance-related positions, Erb lacks sufficiently particularized knowledge and experience to qualify him to opine on the nature of the Offering at issue here.  Defs. Erb Mem. at 12.  Specifically, Defendants argue that Erb's experience in underwritings is limited to his time at Goldman Sachs and to the due diligence and document creation aspects of underwritings.  *Id.* at 13 (citing Erb Dep. 15:4-17:3).  They argue that he has no experience in the mechanics of underwriting, which are at issue here, and he has no specialized underwriting training or education.  *Id.*  Moreover, they argue that all the underwritings in which he participated were firm commitment—none was on a different basis; and he has no experience with Canadian offerings.  *Id.* (citing Erb Dep. 36:8-13).

The Court disagrees that these concerns make Erb unqualified.  From his experience in the securities industry in an international capacity and his previous work on underwritings, Erb has provided more than adequate credentials to qualify him as an expert who can assist the fact finder in understanding the underwriting at issue.  He need not have experience or education directly on point.  *In re Zyprexa Products*, 489 F. Supp. 2d at 282 ("If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent."  (quoting *Stagl*, 117 F.3d at 80)).  Thus, even if Defendants' arguments are all accurate, they go to the weight, not the admissibility, of Erb's

testimony.  Put differently, Defendants' quibbles with Erb's credentials are properly explored on cross-examination.  *McCullock*, 61 F.3d at 1043.

**B.  Erb's Opinion Meets the Indicia of Reliability Required By Rule 702.**

Defendants also argue that Erb's Report and testimony are unreliable under Rule 702 and should be excluded because Erb: (1) impermissibly equates, without explanation, the term "underwritten" with a "firm commitment offering," Defs. Erb Mem. at 14-15; (2) relies on the language of the Offering documents but fails to take into account witness statements that the language in the Offering documents did not accurately describe the events that actually occurred in the Offering, *id.* at 15-16; (3) fails to consider that the underwriter of this Offering, CIBC World Markets, Inc. ("CIBC"), had firm bids prior to pricing, *id.* at 17-18; (4) fails to account for differences between offerings filed under the Multijurisdictional Disclosure System ("MJDS"), such as this one, and those that are purely United States offerings, *id.* at 18-19; and (5) cites to secondary materials, the Offering documents, and testimony of fact witnesses that do not support the opinions and conclusions he reached, *id.* at 19-23.

The Court looks to the indicia of reliability identified by Rule 702, "namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'"  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting Fed. R. Evid. 702).  The Supreme Court in *Daubert* identified a number of factors that may bear on reliability, including:

> (1) whether a theory or technique "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation"; and (4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community.

*Id.* at 266 (quoting *Daubert*, 509 U.S. at 593-94) (internal citations omitted); *see also Kumho Tire*, 526 U.S. at 151 ("[S]ome of *Daubert's* questions can help to evaluate the reliability even of experience-based testimony.").  The reliability inquiry is "fluid" and necessarily varies from case to case.  *See Daubert*, 509 U.S. at 594 ("The inquiry envisioned by Rule 702 is . . . a flexible one"); *Kumho Tire*, 526 U.S. at 150 ("[T]he gatekeeping inquiry must be tied to the facts of a particular case." (internal quotation marks and citation omitted)).

The Second Circuit has cautioned that not every flaw in an expert opinion warrants exclusion of the testimony.  *Amorgianos*, 303 F.3d at 266-68.  The Court must exclude an expert opinion when it "is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached."  *Id.* at 266.  Yet, "[w]here an expert otherwise reliably utilizes scientific methods to reach a conclusion, lack of textual support may 'go to the weight, not the admissibility' of the expert's testimony."  *Id.* (quoting *McCullock*, 61 F.3d at 1044).

> A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible. "The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions."  This limitation on when evidence should be excluded accords with the liberal admissibility standards of the federal rules and recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony.  As the Supreme Court has explained, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."

*Id.* (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 746 (3d Cir. 1994); *Daubert,* 509 U.S. at 596).

Indeed, "the Second Circuit [has] espouse[d] a particularly broad standard for the admissibility of expert testimony."  *Colon ex rel. Molina v. BIC USA Inc.*, 199 F. Supp. 2d 53, 75 (S.D.N.Y. 2001).  "[A] trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are 'so unrealistic and contradictory as to suggest bad

faith' or to be in essence 'an apples and oranges comparison.'" *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213-14 (2d Cir. 2009) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). But "'[o]ther contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony.'" *Id.* at 214 (quoting *Boucher*, 73 F.3d at 21). "If an expert's testimony lies within 'the range where experts might reasonably differ,' the jury, and not the trial court, should 'decide among the conflicting views of different experts,'" even if the evidence is "shaky." *Forte*, 2015 WL 5820976, at *6 (quoting *Kumho Tire,* 526 U.S. at 153). The objective of the court's gatekeeping role under Rule 702 is ultimately to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 152.

The Court finds that Erb's testimony has the indicia of reliability required by Rule 702. First, Erb's Report is factually grounded. The Report cited a number of sources to support Erb's view of the characteristics of "best efforts" and "firm commitment" offerings. Erb explained the difference between the two types of offerings. In a "best efforts" offering, an issuer and a broker-dealer, which acts as a selling agent, enter into a placement agreement. Erb Report ¶ 30. The selling agent is obligated to make its best effort to sell the shares but does not guarantee the full proceeds of the offer to the issuer. *Id.* (quoting Guiliano Iannotta, *Investment Banking: A Guide to Underwriting and Advisory Services*, Springer-Verlag, 2010, p. 52). In such an offering, the selling agent bears no responsibility for unsold shares. *Id.* In contrast, in a firm commitment offering, the underwriter guarantees the full proceeds to the issuer, regardless of the actual demand. *Id.* (quoting Guiliano Iannotta, *Investment Banking: A Guide to Underwriting and Advisory Services*, Springer-Verlag, 2010, p. 52). In such an offering, the underwriter bears the risk that it is unable to sell all of the shares at the offering price; at the end of such an

offering, the underwriter owns (and must pay for) any unsold shares.  *Id.* ¶ 32 (citing Barron's *Dictionary of Finance and Investment Terms*, Seventh Edition, dated June 2006, p. 255).[4]

Regarding the concept of underwriter risk, Erb discussed a 1987 underwriting for British Petroleum, in which the stock markets crashed before the offering, resulting in substantial losses to the underwriters, which were stuck with unsold shares priced before the market crashed.  Erb Report ¶¶ 41-42.  Erb explained that this experience was the impetus for the current practice of underwriters to "build[] a book of orders for offered shares by soliciting investor indications of their interest in purchasing the shares within an indicative price range."  *Id.* ¶ 43.  He opined that book building is now a standard feature of firm commitment underwritings.  *Id.*  From those facts, Erb summarized his understanding that

> there are two types of firm commitment underwriting: one in which the price is set before the underwriters go to market with the transaction and the other where the deal is "pre-marketed" before the underwriters purchase the shares.  Both have been described as "bought deals," since the distinguishing feature of the two types of firm commitment underwriting is the moment at which the shares are purchased, not whether the underwriters will purchase the shares.

*Id.* ¶ 44.  As discussed, Erb relied on more than just his experience and credentials and cited to secondary sources for his definition of firm commitment and best effort offerings and his explanation of how and why book building developed.  *Id.* ¶¶ 30-32, 41-42.

---

[4]     In contrast to Erb's opinion, which compares a "firm commitment" to a "best efforts" offering, and in contrast to Defendants' Answer, which states that the Offering was a "best effort" offering, Answer ¶ 16, Defendants now assert that the Offering was an "overnight marketed offering."  Defs. Erb Reply, at 2 n.2.  According to Defendants, their experts testified that the "November 2009 Offering of Central Fund securities was an *overnight marketed offering*, which is not conducted on a firm commitment basis, and therefore not subject to Rule 105."  *Id.* (emphasis in original).   Defendants define an "overnight marketed offering" as a "'deal [that] is being launched at the close of business on one day, with the anticipation, but no guarantee . . . of pricing that transaction and having final terms before the market opens the next day.'"  Defs. Erb Mem. at 6 (quoting Yoskowitz Decl., Ex. 10, 49:14-25 (hereinafter, "Smith Dep.")).  According to Defendants, this means that the underwriter, CIBC, gathered a book of firm bids overnight (that the bids were firm meant, in Defendants' view, the bids were "very difficult" to retract, *id.* at 9, n.11), and whether the offering or the signing of the underwriting agreement actually occurred was dependent on the firm bids that CIBC was able to gather, *id.* at 6.

Moreover, Erb's Expert Report and testimony are the product of reliable principles and methods. His Report is broken into sections, including a background section on the specific markets that are relevant; a section comparing industry practice relative to "best efforts" and "firm commitment" deals; a section describing his understanding of the Offering at issue in this case; and finally an analytical section in which he applies his understanding of industry practice to the Offering at issue to opine that it was on a "firm commitment" basis. Erb's preparation and presentation are certainly "of a kind that others in the field would recognize as acceptable." *Kumho Tire*, 526 U.S. at 151.

Finally, Erb applied his understanding of industry definitions for firm commitment versus best effort offerings reliably to the facts of the case. Erb analyzed the Offering at issue in light of his understanding of industry practice and relied on the plain language of the Offering documents and his review and interpretation of produced documents and deposition testimony. As set forth in his Report, based on his "investment banking experience with securities underwriting, [his] training in and knowledge of the standards and practices of the industry, [his] understanding of the regulatory framework for the Offering, the plain language of the Offering documents, and [his] review of the material produced in this matter," he reached the conclusion that the Offering was on a firm commitment basis. Erb Report ¶ 82.

The basis of Erb's opinion is clear and reasonable to the Court. In Erb's opinion, the risk of the Offering passed to the underwriter lock, stock and barrel; the fact that CIBC mitigated that risk in its overnight work does not alter the fact that, if some of the prospective buyers who expressed interest ultimately *did* fall through, the underwriter, not the issuer, would own those shares. "If an expert's testimony lies within 'the range where experts might reasonably differ,'

the jury, and not the trial court, should 'decide among the conflicting views of different experts.'"  *Forte*, 2015 WL 5820976, at *6 (quoting *Kumho Tire*, 526 U.S. at 153).

Defendants' concerns about Erb's Report and testimony all go to the weight, not the admissibility, of his opinion and can be addressed on cross-examination.  Defendants' first concern is that "Erb equates a firm commitment offering with the term 'underwritten,' or the point at which shares are purchased, but fails to explain how his experience leads him to that understanding."  Defs. Erb Mem. at 14 (citing Erb Dep. 44:19-22).  According to Defendants, "[i]nstead of providing objective evidence to support his opinion, Erb provides only his subjective opinion, which he claims is based on his purported experience, training, knowledge, and interpretation of documents."  *Id.* at 15.

Erb's opinion equating the terms "underwriting" and "firm commitment" is not so speculative, conjectural, or based on assumptions so unrealistic and contradictory as to suggest bad faith or to render his opinion inadmissible.  Although Defendants are correct that Erb must provide an explanation for his conclusions that is more than *ipse dixit* or a simple reference to his credentials and experience, Erb does not rely simply on *ipse dixit* or his credentials.  He cites a number of secondary sources to support his understanding of industry practice.  *See, e.g.*, Erb Report ¶¶ 30 (quoting Guiliano Iannotta, *Investment Banking:  A Guide to Underwriting and Advisory Services*, Springer-Verlag, 2010, p. 52), 32 (citing Barron's, *Dictionary of Finance and Investment Terms*, Seventh Edition, dated June 2006, p. 255).  Regardless, Defendants will be able to test the strength and accuracy of his opinion on cross-examination or by offering rebuttal testimony.

Second, Defendants argue that Erb, in relying on the Offering documents, failed to acknowledge that the documents did not accurately reflect the events that actually occurred in the Offering.  Specifically, Defendants contend that the prospectus for the Offering contained a

14

clause regarding the underwriter's ability to reduce the price at which shares were offered, and that CIBC witness Scott Smith testified that such a clause would be more appropriate in a "bought deal," which was not the case here.  Defs. Erb Mem. at 16.  Those concerns go to the weight of his testimony but do not render Erb's testimony and report inadmissible.

Third, Defendants argue that Erb's testimony is unreliable because he "fails to adequately explain how he extrapolated that there were no firm bids prior to pricing from the facts at issue." *Id.* at 17.  This argument simply reflects a disagreement over the interpretation of the documents and testimony and is not grounds for exclusion.  Although not entirely clear, Defendants appear to take the position that, prior to the underwriting in this Offering, "all of the shares had already been sold."  *Id.* (citing Yoskowitz Decl., Ex. 7, 100:3-23 (Dkt. 44-2) (hereinafter, "Kuchanny Dep."); Yoskowitz Decl., Ex. 10, 60:14-23, 128:8-16, 133:7-11, 146:5-16 (Dkt. 44-2) (hereinafter, "Smith Dep."); Yoskowitz Decl., Ex. 13, 75:18-76:9 (Dkt. 44-3) (hereinafter, "Scott Dep.")).  They argue that "Erb failed to take into account that Kuchanny, as well as [other witnesses], had all testified that there were firm bids for the securities before the pricing call." *Id.*  From that argument, the Court understands Defendants to be equating "firm bids" with "sale" of the shares.  Accordingly, Defendants appear to argue that Erb's opinion—that in a firm commitment offering, "the underwriters, not the issuer, bear the principal risk of selling the shares at the offering price"—is inapplicable because the shares had already been sold.  *Id.* (citing Erb Report ¶ 32).

Erb, on the other hand, appears to disagree that a "firm bid" removes the principal risk of the transaction from the underwriter or constitutes a sale.  In his Report, Erb writes:

> Sales of Central Fund shares only occurred after CIBC had received expressions of "firm interest" from potential investors, and after the deal was priced and CIBC had allocated the shares to the investors.  No sales or purchases of Central Fund

> shares were made before the pricing and allocation of shares. CIBC sent the final
> term sheet to investors after the execution of the trades.

Erb Report ¶ 65 (internal citations to Smith Dep. and Scott Dep. omitted). In other words, in

Erb's opinion, the record reflected that "[t]he Underwriters relied on their longstanding customer

relationships and industry traditions to mitigate the risk that a customer might have opted 'not to

proceed' with its purchase of Central Fund shares," but ultimately, CIBC, as the underwriter,

maintained that risk. *Id.* ¶ 67 (internal citations to Smith Dep. and Scott Dep. omitted).

The deposition testimony that Defendants cite to support their argument that "all of the

shares had already been sold" may well persuade a jury that Erb is wrong, but it is not a basis to

exclude his testimony in the first instance.[5]

Fourth, Defendants argue that Erb failed to account for differences between offerings that

are filed under the MJDS, such as this Offering, and those that are purely United States offerings.

Defs. Erb Mem. at 18-19. They argue that his reliance on only United States regulations was

inappropriate because the underwriters of this Offering were Canadian and the offering

documents provided that Canadian disclosure rules should apply. *Id.* Defendants specifically

take issue with Erb's reference to "rules promulgated under Regulation C," which they argue do

"not apply to documents filed under Form F-10, the form under which the November 2009

offering prospectus was filed." *Id.* at 18. Plaintiff responds that such arguments are a "red

herring" because the MJDS disclosure requirements "have little if any bearing on the merits of

the SEC's claims in this case" and are "irrelevant to Mr. Erb's principal conclusion that the

Offering was a firm commitment offering." Pl. Erb Opp. at 12 n.6.

---

[5]       Defendants also take issue with Erb's ordering of the steps within the Offering in paragraph forty-five of
his Report. Defs. Erb Mem. at 17-18. Erb admitted he misordered the steps, Erb Dep. 93:16-94:4; such a concern is
not of the type to render Erb's opinion inadmissible. *Amorgianos*, 303 F.3d at 267 ("A minor flaw in an expert's
reasoning . . . will not render an expert's opinion *per se* inadmissible.").

Erb's citation to Regulation C and lack of analysis of the MJDS disclosure rules are not reasons to exclude his testimony.  Even assuming that Defendants are correct that Regulation C is inapplicable to this Offering, Erb testified that he relied on that regulation only to convey the idea that "shelf takedowns were often on an expedited or rapid basis and so the exercise of the underwriting often occurs very quickly."  Erb Dep. 56:20-57:3.  Defendants fail to explain, and the Court does not see, how Erb's citation to Regulation C or his failure to cite the MJDS disclosure rules are such significant flaws that the Court should exclude his report and testimony. *Amorgianos*, 303 F.3d at 267 ("The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." (internal quotation marks and citations omitted)).

Finally, Defendants argue that Erb cites materials that do not support his opinions.  Defs. Erb Mem. at 19-23.  Defendants argue that none of the definitions Erb cited from secondary sources contains a discussion of pre-marketed offerings and that the Offering documents did not expressly use the term "firm commitment."  *Id.* at 19-21.  These concerns also do not warrant exclusion of Erb's testimony and can be dealt with on cross-examination.  During his deposition, Erb was himself quick to admit that there was no discussion of pre-marketed offerings in the secondary sources he cited and to explain how and why he used the definitions he did to arrive at his conclusions.[6]  The same is true for Erb's reliance on the Offering Documents.  He does not represent that the Offering Documents themselves use the phrase "firm commitment" (if they had, it seems unlikely an expert report would have been necessary).  He explained in his deposition, however, that he focused on the fact that the documents "use[] the term purchase,

---

[6]     *See* Erb Dep. 82:16-83:19 ("Q. . . . There's no reference in either of those definitions to pre-marketed deals, is there? A. I don't think so. Let me look to check here.  That is correct.  Q. So I guess I'm wondering what the basis is because it's not in the cite for your statement that a premarketed deal has been described as a bought deal? A.  Well, just my own experience any deal that involves a purchase of the shares would be sometimes referred to as a bought deal.   I just recall that terminology from my time in the industry.").

which is a characteristic of firm commitment underwritings." Erb Dep. 43:11-44:3. Neither of these instances reflects "assumptions that are 'so unrealistic and contradictory as to suggest bad faith,'" *Zerega*, 571 F.3d at 214, and they can be addressed on cross-examination.

Defendants further argue that Erb "misuse[d]" the fact testimony from CIBC underwriters, Scott and Smith, and "twist[ed] the facts to fit his own hypothesis." Defs. Erb Mem. at 21-23. Defendants are correct that neither Scott nor Smith definitively stated that a premarketed offering is a type of firm commitment underwriting; to the contrary, both Smith and Scott suggest that the opposite is true – they equate a firm commitment offering with a "bought" deal and indicate definitively that the Offering was not a "bought" deal but an "overnight marketing arrangement." *See* Smith Dep. 108:16-109:18, 139:4-140:5; *see also* Scott Dep. 24:6-29:8, 30:2-31:9. In his deposition, Erb explained that the citations in his Report to Smith's and Scott's depositions arise from his interpretation that "firm commitment" equates to "underwritten." Erb Dep. 52:21-55:4. As Erb testified, he cited to portions of Scott's and Smith's depositions in the context of the deal being underwritten and for the statements that the underwriters were purchasing the shares. Erb Dep. 52:21-55:4, 87:6-89:20 (testifying that Scott never used the term "firm commitment" but used the word "underwritten" and that Erb equates "firm commitment" with "underwritten" and with "purchase.").[7]

---

[7]      Upon review of Scott's and Smith's depositions, the Court is not convinced that Erb's views are as far apart and as contrary to Scott's and Smith's testimony as Defendants assert. For instance, in Scott's deposition, he described an overnight marketing arrangement as follows:

> assuming the company decides that they want to move forward, we make an announcement in most cases right after the market closes . . . and a press release is issued. That allows us to go out and market to investors on an overnight basis. That's why it's called an overnight marketed transaction. And then the size of the offering, the price of the offering, and, you know, ultimately the deal itself is determined the next day, the next morning. And at that stage it's underwritten and becomes a liability of the bank.

Scott Dep. 25:12-26:8. Scott testified that, in an "underwritten transaction," "[o]nce [CIBC] sign[s] the underwriting agreement . . . [CIBC] own[s the shares] . . . , and then it's [their] responsibility to collect the money from investors who have agreed to be part of the transaction. So we're essentially fronting the money on behalf of

In short, there is no indication that Erb's citations were intentionally manipulative or misleading, a bad faith twisting of the facts, or so speculative or conjectural as to render his testimony inadmissible.

In sum, Erb's testimony meets the indicia of reliability required by 702.  Defendants' arguments all go to the weight, not the admissibility, of his testimony and can be addressed on cross examination.[8]

### C.  Defendants' Motion to Exclude Erb's Testimony Under Rule 403 Is Denied.

Defendants also urge exclusion of Erb's testimony under Rule 403 of the Federal Rules of Evidence.  According to Defendants, Erb's "selectively researched and unsubstantiated opinions distill down to little more than his own 'beliefs,'" which "will serve only to confuse the issue with regards to the type of offering in which Revelation was participating and thus, the applicability of Rule 105 of Regulation M."  Defs. Erb Mem. at 24.  They further argue that Erb strayed from his scope of expertise and intruded into subject matters beyond which he was qualified resulting in "an undue degree of confusion."  *Id.*

Erb's testimony is highly relevant and probative to a central issue in the case.  Erb is qualified and his Expert Report and testimony meet the indicia of reliability required to be admissible under Rule 702 of the Federal Rules of Evidence.  In short, the probative value of his testimony is not outweighed by any danger of unfair prejudice, confusion of the issues, or misleading the jury.

---

shareholders or investors in this case."  *Id.* 28:12-19.  If an investor who indicated interest in participating in the deal decided not to go forward, CIBC would still own the shares and "would obviously either try to find another investor to buy those shares or we would end up having to hold them."  *Id.* 28:12-29:8.

[8]      As a last ditch effort, Defendants argue that "even where individual, separate flaws may properly be considered questions of weight," they may be "'sufficiently accumulated'" that they become so serious as to require exclusion.  Defs. Erb Reply at 9 (quoting *Malletier*, 525 F. Supp. 2d at 679).  While in concept the Defendants may be correct, that principle does not apply here.

**II.    Plaintiff's Motion to Strike Dumas's Expert Report and to Preclude Him from
Testifying is Granted; His Report and Testimony Are Irrelevant**.

Plaintiff moves to strike Dennis Dumas' expert report and to preclude him from
testifying.  According to Plaintiff, Dumas's report and testimony are irrelevant and constitute an
impermissible legal opinion:  "Dumas offers no opinions relevant to the substance of
Defendants' trading activity, the nature of the offering, or any other pertinent factual issue" but
instead devotes the entire report "to the legal question of whether the Court has jurisdiction over
the Defendants or their alleged misconduct."  Pl. Dumas Mem. at 3, 6-7.  Plaintiff further argues
Dumas's Report is unreliable, identifies no conflict of law, and, under Rule 403, is unfairly
prejudicial, confusing, and a waste of time.  *Id.* at 7-10

Dumas purports "to analyze and critique certain factors relating to the exercise of
extraterritorial jurisdiction over the Defendants in the Litigation."  Dumas Report ¶ 3.  Dumas
opines that "the exercise of jurisdiction over Defendants' participation in the Central Fund
offering is not consistent with the factors considered by market participants in evaluating
jurisdictional reach and choice of law."  *Id.* ¶ 31.  In his testimony, Dumas focused on how
market participants look at the question of jurisdiction and choice of law.  *See, e.g.*, Pl. Dumas
Mem., Ex. 2, 55:15-24 (Dkt. 40-2) (hereinafter "Dumas Dep.") ("Q.  . . . I'm trying to understand
the analytic framework against which you are applying the factors that you've just identified in
determining—in reaching the conclusion that you offer in this report.  A. I think I'm – I'm really
looking at how – how the – you know, the industry and the – the relevant states, you know,
historically have looked at the question of – of structuring and – and jurisdiction and choice of
law.").

In their opposition to Plaintiff's Motion, Defendants assert that "Dumas has opined
regarding the factors considered by *market participants* – not Courts – in evaluating, from a

business perspective, which country's regulations might apply to . . . multinational securities transactions." Defs. Dumas Opp. at 1 (emphasis in original). Put differently, Dumas opines that a market participant would not have understood that this transaction was subject to Rule 105 of Regulation M.

The Court fails to see how Dumas's opinion regarding what a market participant would have thought about the applicability of Rule 105 of Regulation M is at all relevant to any issue the jury will have to decide. Rule 105 of Regulation M imposes strict liability and prohibits conduct regardless of a short seller's intent. *See Short Selling in Connection with a Pub. Offering; Final Rule,* Exchange Act Release No. 34-56206, 91 S.E.C. Docket 781, 2007 WL 2254466 (Aug. 10, 2007); *see also* Exchange Act Release No. 34-54888, 89 S.E.C. Docket 1346, 2006 WL 3523646 (Dec. 6, 2006).[9] Therefore, what a hypothetical market participant would have understood with respect to the applicability of United States law to the facts, the factors Revelation might have considered at the time of purchasing securities in the Offering, or the expectations Revelation would have had regarding the implication of that purchase, are *all* irrelevant to any issue the jury will have to find. For these reasons, Plaintiff's motion is granted.[10]

## CONCLUSION

For the foregoing reasons, the Defendants' Motion to Exclude the Testimony of Plaintiff's Expert Witness Guy Erb (Dkt. 42) is DENIED and Plaintiff's Motion to Strike

---

[9]      Defendants do not explicitly admit or dispute that Rule 105 of Regulation M imposes strict liability. But even if they dispute whether Rule 105 of Regulation M imposes strict liability and even if they believe that this multijurisdictional offering is not subject to Regulation M even if it is a firm commitment offering, those are all legal questions that must be resolved by the Court.

[10]      Because Dumas's Expert Report and testimony are wholly irrelevant, the Court need not, and will not, discuss whether his expert report and testimony offer impermissible legal opinions or are unreliable or prejudicial.

Defendants' Expert Report and Preclude the Expert from Testifying (Dkt. 39) is GRANTED.

The Clerk of Court is respectfully directed to close Docket Entries 42 and 39.

Counsel for the parties must appear before the undersigned for a status conference to discuss the parties' anticipated summary judgment motions on **July 22, 2016 at 10:00 a.m.** in Courtroom 443 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York, 10007.

**SO ORDERED.**

**Date:  July 8, 2016**
      **New York, New York**

**VALERIE CAPRONI**
**United States District Judge**