UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
SECURITIES AND EXCHANGE COMMISSION,

                              Plaintiff,

                      -against-

REVELATION CAPITAL MANAGEMENT, LTD.,
CHRISTOPHER P.C. KUCHANNY,

                             Defendants.
-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/27/2017

14-CV-645 (VEC)

OPINION & ORDER

**VALERIE CAPRONI, United States District Judge:**

       Plaintiff Securities and Exchange Commission ("SEC") brought this enforcement action against Defendants Revelation Capital Management, Ltd. ("Revelation Capital") and Christopher P.C. Kuchanny (collectively, Defendants), alleging that Defendants violated Rule 105 of Regulation M, 17 C.F.R. § 242.105. The parties have cross-moved for summary judgment.[1] For the following reasons, Defendants' motion for summary judgment is GRANTED, and the SEC's cross-motion for summary judgment is DENIED.

---

[1] Notice of Motion, Dkt. 55; Plaintiff Securities and Exchange Commission's Memorandum in Opposition to Defendants' Motion for Summary Judgment and in Support of Cross-Motion for Summary Judgment ("SEC Opp."), Dkt. 62.

    The following abbreviations are used herein: Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 in Support of Defendants' Motion for Summary Judgment ("Def. 56.1 Stmt."), Dkt. 56; Plaintiff Securities and Exchange Commission's Response to Defendant's Statement of Undisputed Facts ("Pl. 56.1 Stmt."), Dkt. 63; Defendant's Response to Plaintiff's Statement of Additional Undisputed Facts ("Def. 56.1 Resp."), Dkt. 66; Exhibits to the Declaration of Jack Yoskowitz in Support of Defendants' Motion for Summary Judgment ("Yoskowitz Ex. __"), Dkt. 58; Complaint ("Compl."), Dkt. 2.

**BACKGROUND**

Most of the material facts in this case are undisputed. Kuchanny is the founder, CEO, and portfolio manager of Revelation Capital, a hedge fund manager. Def. 56.1 Stmt. ¶¶ 1-2. At all times relevant to this action, Revelation Capital and Kuchanny were in Bermuda. Def. 56.1 Stmt. ¶¶ 1–2. Non-party Central Fund, which is headquartered in Canada, is an investment holding company that buys and holds refined gold and silver bullion. Def. 56.1 Stmt. ¶ 4. Central Fund lists its shares on the New York Stock Exchange ("NYSE") under the symbol CEF and on the Toronto Stock Exchange under the symbols CEF.A and CEF.U. Pl. 56.1 Stmt. ¶ 5; Answer ¶ 17, Dkt. 17.

Between November 3, 2009, and November 9, 2009, Revelation Capital sold short approximately 1.3 million shares of Central Fund on the NYSE at an average price of $14.07 per share. Pl. 56.1 Stmt. ¶ 53; Answer ¶ 17.[2] These short sales were executed "through a brokerage account at MF Global Inc. in New York, New York." Answer ¶ 9. MF Global, the broker, used a third-party trading platform to execute the trades. Def. 56.1 Stmt. ¶¶ 14–15. The short sales were cleared and settled through Revelation Capital's prime brokerage account in London. Def. 56.1 Stmt. ¶ 15.

On or around November 9, 2009, Canadian broker-dealer CIBC World Markets, Inc. ("CIBC") signed an engagement letter for a potential offering of Central Fund shares (the "Offering"). Def. 56.1 Stmt. ¶¶ 17–18; Pl. 56.1 Stmt. ¶ 56; Yoskowitz Ex. 6.[3] After the close of trading that day, Central Fund issued a press release announcing a "proposed underwritten

---

[2] Between November 3 and November 9, 2009, Revelation Capital also sold 49,300 shares short on the Toronto Stock Exchange. Answer ¶ 17.

[3] The Offering was being made pursuant to Central Fund's base shelf prospectus, which allows Central Fund to offer shares through subsequent or "follow-on offerings." Def. 56.1 Stmt. ¶ 6; Yoskowitz Ex. 2 ("September 2009 Base Shelf Prospectus.").

offering by CIBC." Pl. 56.1 Stmt. ¶ 58, Def. 56.1 Stmt. ¶ 23; Yoskowitz Ex. 9. The issue was offered in U.S. dollars only. Yoskowitz Ex. 6 at 15; Yoskowitz Exs. 9, 10.

Scott Smith, CIBC's representative for the Offering, contacted Kuchanny to inquire whether Revelation Capital was interested in participating in the Offering. Def. 56.1 Stmt. ¶ 34. The following morning, after dickering over the price, Kuchanny agreed to buy $56 million shares at a 5.5% premium to the landed net asset value ("NAV") of Central Fund. Yoskowitz Ex. 11; Def. 56.1 Stmt. ¶¶ 24, 37; SEC Opp. at 4.[4] Although the SEC disputes whether Kuchanny was legally bound, the SEC acknowledges that failing to honor the offer would have been "very difficult" from a "practical and business perspective." Pl. 56.1 Stmt. ¶ 38.

Later that morning (November 10, 2009), CIBC and Central Fund participated in a pricing call during which CIBC advised Central Fund of the size of its order book, and CIBC orally committed to enter into an underwriting agreement. Def. 56.1 Stmt. ¶ 40; Pl. 56.1 Stmt. ¶ 59. Based on the orders in CIBC's book, Central Fund calculated the amount of gold and silver to purchase and placed its order with CIBC, which purchased the gold and silver bullion on behalf of Central Fund. Def. 56.1 Stmt. ¶ 41. Ultimately, CIBC agreed to purchase almost 17 million shares of Central Fund at $13.56 USD per share. Def. 56.1 Stmt. ¶ 44.[5] After the pricing call, CIBC contacted purchasers, including Revelation Capital, and confirmed the number of

---

[4] The NAV was calculated using the "landed" price of the gold and silver bullion. The "landed" price incorporates the purchase cost as well as all other costs attendant to the purchase, such as "transportation, insurance, positioning, delivery and verification costs." Yoskowitz Ex. 10; *see also* Def. 56.1 Stmt. ¶ 25; *see also* Yoskowitz Ex. 5 ("Smith Tr.") at 52:2–6 ("'landed' . . . means you're not just buying physical gold, physical silver at spot, you're buying it on a full-delivery basis, which includes security and transportation and a number of other things.").

[5] As with Kuchanny's offer, CIBC's book reflected the dollar amount of investor interest at a 5.5% premium to the landed NAV. The number of shares allocated to each purchaser was ascertained mathematically based on the total dollar amount of investor interest, the agreed-upon premium and the landed NAV, which was based on the actual landed price of the purchased bullion. *See* Def. 56.1 Stmt. ¶¶ 24–26, 41, 43–44; *see also* Smith Tr. at 59:8–15, 68:7–22.

shares that they had purchased. Def. Stmt. 56.1 ¶ 45. Smith confirmed Revelation Capital's purchase of approximately four million shares at $13.56 per share. Def. 56.1 Stmt. ¶ 45.

In the afternoon on November 10, 2009, CIBC and Central Fund executed an underwriting agreement ("Underwriting Agreement") in Toronto. Def. 56.1 Stmt. ¶ 48. Defendants admit that upon the execution of the Underwriting Agreement, "CIBC became contractually obligated, subject to certain conditions precedent, to purchase shares equivalent in number to the shares for which it had firm bids at the time of the pricing call, which had taken place prior to the execution of the underwriting agreement." Def. 56.1 Resp. ¶ 62. Central Fund filed a Prospectus Supplement that described CIBC's underwriting obligation as follows: "[t]he Underwriters are . . . obligated to take up and pay for all of the securities if any of the securities are purchased under the Underwriting Agreement." Pl. 56.1 Stmt. ¶ 61.

Once the Offering closed on November 17, 2009, the shares issued pursuant to the Offering were issued to the Central Depository for Securities ("CDS") in Canada. Def. 56.1 Stmt. ¶ 49. The share certificate for the Offering shares was transferred to CDS by a Canadian company. Def. 56.1 Stmt. ¶ 50. The proceeds of the purchases of the Offering shares were wired to CIBC in Canada, and the net proceeds were then wired to Central Fund in Canada. Def. 56.1 Stmt. ¶ 51; Yoskowitz Ex. 3 ("Spicer Tr.") at 85:8–86:4. The Offering was registered with the Canadian regulatory authority and cross-registered with the SEC pursuant to the Multijurisdictional Disclosure System ("MJDS"), which facilitates cross-border filings of Canadian-issued offerings in the United States. Def. 56.1 Stmt. ¶¶ 7–8; Yoskowitz Ex. 10; Spicer Tr. at 71:3–4; SEC Opp. Ex. 2 at 28:5–16.

In January 2014, the SEC brought this enforcement action against Defendants, alleging that Defendants had violated Rule 105 of Regulation M, 17 C.F.R. § 242.105. Rule 105 prohibits, during a certain restricted period of time, any person who has sold short securities that

are the subject of a registered offering from purchasing the offered securities. 17 C.F.R. § 242.105(a).[6]  Rule 105 applies to offerings that are conducted on a firm commitment basis.  17 C.F.R. § 242.105(c).  The SEC alleges that Defendants violated Rule 105 by purchasing shares in the Offering after having sold short the same securities during the restricted period.  Compl. ¶¶ 2, 16–17.  According to the SEC, Defendants made approximately $1.37 million in profits from the short sales.  Compl. ¶¶ 2, 18.

Defendants move for summary judgment, arguing that Rule 105 does not apply to the transactions at issue (1) because of *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), and (2) because the Offering was not conducted on a firm commitment basis.  The SEC cross-moves for summary judgment on liability, arguing the opposite.  For the following reasons, Defendants' motion is GRANTED, and the SEC's cross-motion is DENIED.

---

[6]  Rule 105 provides, in relevant part:

> (a) Unlawful activity. In connection with an offering of equity securities for cash pursuant to a registration statement . . . filed under the Securities Act of 1933 ("offered securities"), it shall be unlawful for any person to sell short (as defined in § 242.200(a)) the security that is the subject of the offering and purchase the offered securities from an underwriter or broker or dealer participating in the offering if such short sale was effected during the period ("Rule 105 restricted period") that is the shorter of the period:
>
>> (1) Beginning five business days before the pricing of the offered securities and ending with such pricing; or
>> (2) Beginning with the initial filing of such registration statement or notification on Form 1–A or Form 1–E and ending with the pricing.
>
> . . .
>
> (c) Excepted offerings. This section shall not apply to offerings that are not conducted on a firm commitment basis.

17 C.F.R. § 242.105(a), (c). The regulations define "short sale" as "any sale of a security which the seller does not own or any sale which is consummated by the delivery of a security borrowed by, or for the account of, the seller." 17 C.F.R. § 242.200.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "A genuine dispute exists when the evidence is such that, if the party against whom summary judgment is sought is given the benefit of all permissible inferences and all credibility assessments, a rational factfinder could resolve all material factual issues in favor of that party." *SEC v. Sourlis*, No. 14-2301-CV(L), 2016 WL 7093927, at *2 (2d Cir. Dec. 6, 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Summary judgment is appropriate when there can be but one reasonable conclusion as to the verdict, *i.e.*, it is quite clear what the truth is, and no rational factfinder could find in favor of the nonmovant." *Id.* at *2 (citations and internal quotation marks omitted).

The non-moving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts" and "may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir. 2005) (citations and internal quotation marks omitted). Rather, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (quoting *Anderson*, 477 U.S. at 256).

Defendants argue that pursuant to *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), the Court should hold that Rule 105 is inapplicable to Defendants' trades. The SEC counters that *Morrison* may not even apply to Rule 105, but if it does apply, the transactions at

issue in this case are domestic and hence subject to Rule 105 under *Morrison*. The Court agrees with Defendants that Defendants' transactions are not subject to Rule 105 under *Morrison*.[7]

In accordance with the presumption against extraterritoriality, *Morrison* held that section 10(b) of Exchange Act is applicable "only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." 561 U.S. at 273. For securities *not* listed on a domestic exchange, "the exclusive focus [is] on *domestic* purchases and sales," *id.* at 268 (emphasis in original). Put differently, *Morrison* established two tests for determining whether securities transactions are "domestic": "transactions in securities listed on domestic exchanges and domestic transactions in other securities." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 66, 66 (2d Cir. 2012) (quoting *Morrison* (alteration omitted)).[8] To satisfy *Morrison*'s second prong—domestic transactions in unlisted securities—a transaction is domestic only "when the parties incur irrevocable liability to carry out the transaction within the United States or when title is passed within the United States." *Id.* at 69. To establish irrevocable liability, the plaintiff must prove "that the purchaser incurred irrevocable liability within the United States to take and pay for a

---

[7] Although this issue does not seem to have been previously decided, this Court sees no principled basis to conclude that *Morrison*'s analysis is inapplicable to Rule 105. Although *Morrison* concerned claims brought under section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), Rule 105 was promulgated under Regulation M, which was itself promulgated under the Exchange Act in addition to the Securities Act of 1933. *See* Final Rule, SEC Release No. 56206, 2007 WL 2254466, at *24 (Aug. 10, 2007) (hereafter, "Final Rule"). Like section 10(b), Rule 105 "gives no clear indication of an extraterritorial application," and the presumption against extraterritorial application must apply. *See Morrison*, 531 U.S. at 255. In addition, courts have applied *Morrison* when examining extraterritoriality concerns presented under other statutes, including the Securities Act of 1933. *See, e.g.*, *In re Vivendi Universal, S.A., Sec. Litig.*, 842 F. Supp. 2d 522, 529 (S.D.N.Y. 2012) ("*Morrison* permits Securities Act claims only 'in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States.'"); *see also Loginovskaya v. Batratchenko*, 764 F.3d 266, 272 (2d Cir. 2014) (Commodities Exchange Act).

[8] Contrary to defense counsel's assertions during oral argument, the *Morrison* test is disjunctive. *See Morrison*, 561 U.S. at 269–70. If a transaction satisfies the first prong of *Morrison*, the second prong need not be examined and vice versa. *See Absolute Activist*, 677 F.3d at 69 n.4 ("[P]ursuant to the first prong of *Morrison*, § 10(b) does apply to transactions in securities that are listed on a domestic exchange.").

Below.

security, or that the seller incurred irrevocable liability within the United States to deliver a security." *Id.* at 68.

In the context of section 10(b), a finding that the relevant transactions were domestic is necessary but not sufficient to satisfy *Morrison*. *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014). *Parkcentral* concluded that securities-based swap agreements that were executed and performed in the United States, but that involved claims arising out of foreign shares traded only on foreign exchanges with foreign defendants, were not domestic. *Id.* at 215–16. *Parkcentral* cautioned, however, that its conclusion "depend[ed] in some part on the particular character of the unusual security at issue" and "express[ed] no view whether [the Second Circuit] would have reached the same result if the suit were based on different transactions." *Id.* at 201–02. In addition, again in the context of a section 10(b) claim, the Second Circuit has cautioned that the mere cross-listing on a domestic exchange of foreign-issued shares that are purchased by a foreign entity on a foreign exchange does not render the transaction "domestic" under *Morrison*. *City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014).

This Court is, of course, dealing not with section 10(b) but with Rule 105. Rule 105 concerns short sales that are effected immediately prior to purchasing in an SEC-registered equity offering. 17 C.F.R. § 242.105; Final Rule at *1.[9] The application of *Morrison*'s

---

[9] Such short selling "can artificially depress market prices which can lead to lower than anticipated offering prices, thus causing an issuer's offering proceeds to be reduced." Final Rule at *1. Although an earlier version of Rule 105 prohibited "cover[ing] a short sale with offered securities," 17 C.F.R. § 242.105 (2005), the SEC amended Rule 105 to its current (and applicable) version to "change[] the prohibited activity from covering to purchasing the offered security, in order to put an end to strategies that obfuscated the prohibited covering but replicated its economic effect." Final Rule at *5. In general, the amended Rule 105 "prohibits purchasing a security in a registered offering if the buyer has a restricted short position in that security." *SEC v. Colonial Inv. Mgmt LLC*, 659 F. Supp. 2d 467, 474 (S.D.N.Y. 2009); *see also* Final Rule at *16 ("Under the amendments, the prohibited activity is now purchasing in the offering.").

extraterritoriality analysis to Rule 105 is a question of first impression. Unlike section 10(b), Rule 105 involves two transactional events, not one. Under Rule 105, the "objects of the statute's solicitude," *see Morrison*, 561 U.S. at 267, are (1) selling short a security *and* (2) subsequently purchasing that same security in an offering. Neither leg is prohibited by Rule 105 without the other; it is the occurrence of *both* events within a certain time period that gives rise to Rule 105 liability. The question thus becomes how to apply *Morrison*'s analysis—which examined the locus of a single transaction (a purchase or sale)—to a two-legged activity in which both legs are necessary to liability. For the reasons discussed below, this Court concludes that, at a minimum, the purchase must satisfy *Morrison* for Rule 105 to apply.[10]

It is undisputed that during the restricted period prior to the Offering, Revelation Capital sold short approximately 1.3 million Central Fund shares on the NYSE through a broker in New York. Pl. 56.1 Stmt. ¶ 53; Answer ¶¶ 9, 17. These short sales were directed from Bermuda and were settled and cleared through a London brokerage account. Def. 56.1 Stmt. ¶¶ 1–2, 15. The SEC argues that these NYSE short sales fall within the first prong of *Morrison* because they were "the . . . sale of a security listed on an American stock exchange," *Morrison*, 561 U.S. at 273.

---

[10] As discussed *infra*, the SEC argues that only one leg (the short sale) needs to satisfy *Morrison* in order for Rule 105 to apply. Although an argument could be made that both legs have to satisfy *Morrison*, it seems obvious that if only one leg has to comply with *Morrison*, it needs to be the purchase in the Offering, not the short sale. The purpose of the Rule is to protect the issuer from having its offering proceeds depressed by short selling activity immediately before the offering. That goal gives the SEC an interest in protecting a United States offering from foreign short sellers; the Court sees no interest of the SEC in protecting Canadian issuers from American short sellers.

Indeed, in a legal bulletin post-dating *Morrison*, the SEC stated that Regulation M does *not* apply to an "entirely foreign distribution of a security," even if the "reference security does have a market in the United States." *Frequently Asked Questions About Regulation M*, Division of Market Regulation: Staff Legal Bulletin No. 9, S.E.C. Release No. SLB – 9, 2002 WL 32987527, at *10–11 (Sept. 10, 2010). By extension, Rule 105, which is part of Regulation M, does not apply to an entirely foreign distribution, even if the reference security is traded in the United States.

In contrast, the activities relative to the Offering were entirely foreign. Defendants' purchase of the Offering shares was not a purchase of securities listed on an American stock exchange; indeed, the Offering shares were not listed on the NYSE until after the Offering closed on November 17, 2009, which was after Defendants purchased their Offering shares. *See* Spicer Tr. at 86:22–87:22. Therefore, for Rule 105 to apply to the Offering under *Morrison*, the parties must have "incur[red] irrevocable liability to carry out the transaction within the United States" or title for the transaction must have passed within the United States. *Absolute Activist*, 377 F.3d at 69. Facts supporting irrevocable liability or the transfer of title in the United States include "facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." *Id.* at 70.

Even when viewed in the light most favorable to the SEC, none of the record evidence tends to show that Defendants incurred irrevocable liability within the United States for their purchase of the Offering shares. In the Rule 10b-5 context, irrevocable liability is incurred at "the time when the parties to the transaction are committed to one another," *i.e.*, that "there was a meeting of the minds of the parties; it marks the point at which the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time." *Id.* at 68 (quoting *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876 (2d Cir. 1972)). In the Rule 105 context, "the purchase occurs at the time the investor becomes committed by agreement or is commitment [sic] to buy the offered security, whether such agreement is oral or written." Final Rule at *14.

It is undisputed that Kuchanny was in Bermuda and Smith was in Canada at all times relevant to Defendants' purchase of the shares in the Offering. Def. 56.1 Stmt. ¶¶ 1–2, 9, 11, 34. From their respective overseas locations, Kuchanny and Smith negotiated over email and by telephone Defendants' order to purchase shares in the Offering. Yoskowitz Ex. 11; *see also* Def.

56.1 Stmt. ¶¶ 1–2, 11, 34.  It is undisputed that from their overseas locations, Kuchanny orally agreed to purchase in the Offering and that Smith confirmed Kuchanny's order.  Yoskowitz Ex. 11; Def. 56.1 Stmt. ¶¶ 1–2, 9, 11, 37, 45; *see also* Yoskowitz Ex. 1 ("Kuchanny Tr.") at 92:2–13 ("On November the 10th . . . that morning early, before any transaction was executed by CIBC on behalf of Central Fund, in the gold and silver bullion markets to hedge the participation, we put in for a bid of $56 million, I believe, and that bid was accepted by Scott Smith [at CIBC].").  The Offering itself was negotiated and signed in Canada.  Def. 56.1 Stmt. ¶ 48; Yoskowitz Ex. 7 ("Scott Tr.") at 80:21–81:4.

The SEC fails to adduce any evidence that Defendants incurred irrevocable liability within the United States relative to their purchase in the Offering, as is the SEC's burden to do to survive Defendants' motion for summary judgment.  *See Absolute Activist*, 677 F.3d at 68 ("[T]o sufficiently allege a domestic securities transaction in securities not listed on a domestic exchange, we hold that a plaintiff must allege facts suggesting that irrevocable liability was incurred or title was transferred within the United States.").  Indeed, there is no evidence in the record tending to show that *any* activities relative to Defendants' purchase occurred in the United States.  Without such facts, no rational factfinder could find that irrevocable liability for Defendants' purchase was incurred in the United States.  Perhaps recognizing its lack of evidence that irrevocable liability was incurred in the United States, the SEC did not even attempt to argue the applicability of *Morrison's* second prong in its briefing; the SEC rested its *Morrison* argument solely on Defendants' short sales.

Nor does the SEC adduce any evidence tending to show that title for the Offering shares purchased by Defendants passed within the United States.  It is undisputed that: the underwriting agreement was negotiated and signed in Canada; the Offering shares were issued in Canada; the share certificates were transferred to CDS in Canada by CIBC Mellon Trust Company, a

Canadian company; the funds used to purchase the shares were wired to CIBC in Canada; and the net proceeds of the Offering were wired to Central Fund in Canada from CIBC in Canada. Def. 56.1 Stmt. ¶¶ 48–51; Spicer Tr. at 99:14–24; Scott Tr. at 80:21–81:4. Defendants' purchase of the Offering shares was a purchase of shares of a foreign offering, issued and underwritten by foreign entities, and negotiated, confirmed and executed in a foreign country. The SEC points to no record evidence tending to show that Defendants' purchase, at any point, passed through the United States. Because Defendants' purchase in the Offering was neither a purchase of shares listed on a domestic exchange,[11] nor a domestic transaction in an unlisted security, Defendants' purchase fails both prongs of *Morrison*.

As far as this Court is aware, no court has examined *Morrison*'s applicability in circumstances such as these, in which one leg necessary to liability (a short sale) is domestic, but the other leg necessary to liability (a purchase in an offering) is foreign. Nevertheless, the SEC release regarding Rule 105 makes clear that "the prohibited activity is . . . purchasing in the offering." Final Release at *16. In light of Rule 105's primary focus on the purchase of offering shares, and in the absence of any case addressing this issue, this Court concludes that because the purchase of the Offering shares was neither a transaction in a security listed on a domestic exchange nor a domestic transaction in an unlisted security, *see Absolute Activist*, 677 F.3d at 66, Rule 105 is not applicable to the transactions in this case.

---

[11] In circumstances such as these, the purchase of offered shares will never be purchases of domestically-listed shares because there will be no listed shares at the time of the purchase; the shares are listed only after the offering closes and certain conditions are met. *See* Spicer Tr. at 87:10–15. For that reason, a version of *Morrison*'s first prong more applicable to the Rule 105 context might focus on whether the offering is domestically registered or whether the company offering the shares has other domestically-listed shares. Nevertheless, the *Morrison* test is clear and the SEC did not present that argument, and so this Court need not consider it here. Indeed, at oral argument, the SEC did not appear to assign any significance to the fact that the Offering was cross-registered in the United States. *See* Tr. at 23 (Q: "How important is it to your case that the offering was cross-registered in the United States?" A: "The significance of that, your Honor, would be the same as the dual trading." . . . Q: "Are you suggesting that even if the offering had not been registered in the United States that the short in connection with a purchase of a Canadian offering would be sufficient under Rule 105?" A: "We would argue that, your Honor.")

The SEC contends that Defendants' short sales on the NYSE are sufficient to satisfy *Morrison*'s first prong. The SEC's theory is that Defendants' purchase was the counterpart to the short sales and that, therefore, Defendants' purchase in the Offering was "in connection with" the NYSE short sales. In support of this theory, the SEC cites several cases in which courts, including the Undersigned, held that insider trading in certain financial instruments linked to an underlying domestically-listed security satisfied *Morrison*'s first prong. *See SEC v. Compania Internacional Financiera S.A.*, 11 Civ. 4904 (DLC), 2011 U.S. Dist. LEXIS 83424, at *19–20 (S.D.N.Y. July 29, 2011) (contracts-for-difference ("CFDs") satisfied *Morrison*'s first prong because the CFDs triggered a corresponding purchase or sale on the NYSE); *SEC v. Maillard*, No. 13-cv-5299 (VEC), 2014 U.S. Dist. LEXIS 56456, at *7 (S.D.N.Y. Apr. 23, 2014) (same); *SEC v. Sabrdaran*, No. 14-cv-04825-JSC, 2015 U.S. Dist. LEXIS 25051, at *30 (N.D. Cal. Mar. 2, 2015) (foreign spread bet hedged by call options on a domestically-listed security "creates a sufficient connection with domestic securities" under *Morrison*).

The Court is not persuaded by the SEC's argument. Not only do the cases on which the SEC relies concern section 10(b), which is not at issue here, but the SEC also ignores the fact that in those cases, the financial instruments triggered a corresponding transaction on the domestic exchange. Put differently, there was a financial relationship between the foreign instrument that the defendant traded and the transaction in the domestically-listed security. Here, Defendants' short selling was a securities event wholly separate and distinct from Defendants' purchase in the Offering. The SEC's interpretation of "in connection with" is an overly expansive interpretation of *Morrison*'s first prong that is inconsistent with the presumption against extraterritoriality. *See In re Optimal U.S. Litig.*, 865 F. Supp. 2d 451, 455 (S.D.N.Y. 2012) (correlation between the plaintiffs' purchases of Optimal U.S. shares and Madoff's trades on the NYSE was too attenuated to satisfy *Morrison*'s "in connection with" language, and "it

would disregard *Morrison*'s presumption [against extraterritoriality] to extend the holding in *Compania* to reach" the plaintiffs' transactions). This Court declines to adopt such an interpretation here.

Because Defendants' purchase in the Offering does not satisfy either prong of *Morrison*, Rule 105 is not applicable to the transactions in this case. Because *Morrison* precludes the applicability of Rule 105 to Defendants' transactions, the Court need not determine whether the Offering was conducted on a firm commitment basis.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the SEC's cross-motion for summary judgment is DENIED. The Clerk of Court is respectfully directed to terminate Docket Entry No. 55 and close this case.

**SO ORDERED.**

*[signature: Valerie Caproni]*

**Date: March 27, 2017**   **VALERIE CAPRONI**
**New York, New York**    **United States District Judge**